# EXHIBIT 1
# PART 2

Page 114

```
1   A       I thought so.
2   Q       What did Rhett know about your
3   father?
4   A       He knew my father's age and his
5   health and sometimes when you are on break
6   or you're eating lunch or something he'd
7   ask how is your dad or, you know, what's
8   going on with you or if I -- you know,
9   daddy was not doing good or, you know, even
10  sometimes if I -- like with what John might
11  know or what Rick could have known is if my
12  father was sick or my daughter was sick, we
13  would try to work it where I could be a
14  little flexible maybe leave an hour early
15  and come in an hour early the next day to
16  make up for it.
17  Q       Would the two of them fill in
18  the gaps while you were gone, is that why
19  you would talk with them about having
20  flexibility?
21  A       John and Rick?
22  Q       Uh-huh.
23  A       Well, they were my direct
```

Page 115

```
1   supervisors, so they knew when I was there
2   and if I needed to leave or needed to come
3   in an hour late.  I would -- they were who
4   I reported to.
5   Q       Right, okay.
6   A       Just as if, you know, it focused
7   down -- funneled down to Brian Burkhead,
8   you know, he was my direct supervisor.  And
9   if I called in or needed to call in he
10  would be who I would report to.
11  Q       Okay.  And I might have been
12  confused earlier were you lumping Rhett
13  Perry in that group earlier I didn't as
14  well --
15  A       At one point in time Rhett kind
16  of handled the shop and I handled all of
17  the administrative stuff over there because
18  we didn't have a supervisor for a while.
19  Q       Uh-huh.  So Rhett would pick up
20  your slack?
21  A       No, no, Rhett couldn't do my job
22  nor could I do Rhett's but it was just a
23  matter of he would help me.  I would of
```

Page 116

```
1   communicated a lot at that point of not
2   having a supervisor because the customers
3   he would be doing repairs for I would be
4   the one talking to them on the phone about
5   the repairs and scheduling and that kind of
6   thing.
7   Q       I see.  To respond to client
8   demands you would coordinate with each
9   other if you were absent?
10  A       Right, right.
11  Q       What about Melody Orr?
12  A       Melody Orr was my point of
13  contact at Mechanicsburg, which is a
14  division of the Navy that is responsible
15  for the commercial asset visibility system
16  and is the way they keep up with their
17  parts that are out for repair.
18  Q       And why would Melody have any
19  information related to the claims you have
20  made here?
21  A       Melody was -- I had daily
22  dealings with her and that kind of thing.
23  And she and I did talk as friends also as
```

Page 117

```
1   far as, you know, she would ask how my
2   father was doing, how my father was that
3   kind of thing.  She would have knowledge of
4   that and also during some of the dates in
5   question about whether, you know, the days
6   that was said that I hadn't reported to
7   work or something of that kind of nature.
8   I was on the phone in emails with her to
9   get stuff to be able to get some orders out
10  for Miltope, so she would have knowledge of
11  that date and us discussing those things.
12  Q       And on those occasions you and
13  Melody were speaking via email I suppose;
14  is that right?
15  A       I had -- I still know the number
16  I talked to her so many times.
17  Q       Okay.  When you talked to her,
18  did you say anything about your father's
19  condition?
20  A       Sometimes I would, yes, she
21  would ask me how my dad was doing and I'd
22  say, well, he is not doing good today.  I
23  have got to take him to the doctor today or
```

**Page 118**

1 something.
2 Q       Did you say anything to her
3 about whether you were going to get a leave
4 of absence?
5 A       I probably did, I probably told
6 her they thought that's what I needed to
7 do.
8 Q       Okay. Well, I would like to get
9 her phone number so I could interview her
10 then. I don't know if you have all of that
11 contact information?
12      MR. BLYTHE: If you know it,
13 give it to her.
14      THE WITNESS: I'm sure I would
15 have said something to her. It's 71 -- let
16 me -- hang on a minute (717)605-7660,
17 Melody, M-e-l-o-d-y.
18 Q       Okay. There were some other
19 people listed on what we call initial
20 disclosures, for example Tom Bradley I
21 believe.
22 A       Yes.
23 Q       What would he know about this

**Page 119**

1 case?
2 A       Tom, Tom was over a over a
3 program that Miltope had with the sport
4 computer.
5 Q       Uh-huh.
6 A       Tom was a program director,
7 Mr. Crowell was program manager. Program
8 manager, there was a need for a position to
9 be filled to help with an upgrade on some
10 items that we had and they asked if I would
11 be interested in doing  that and I -- you
12 know, I wanted to. I wanted to say yes
13 because I was -- you know, I wanted to do
14 the right thing and help the company and
15 try to do more and, you know, perhaps in,
16 you know, improve my position in the
17 company. I guess I should say and I went
18 on a trip with Mr. Bradley and we got
19 through the nuts and bolts of it and there
20 was no -- absolutely no way I was going to
21 be able to leave my father and child and be
22 gone two weeks at a time, which were some
23 of the trips that were going to be

**Page 120**

1 necessary for that position.
2      And I explained to Mr. Bradley
3 as I explained to Mr. Crowell that there
4 was absolutely no way I could go and be
5 gone two weeks. And I also said that I
6 felt I needed to take, you know, some time
7 I told Gabe and I told Brian I needed time
8 to get all of this other stuff sorted out.
9 Q       Let's stop because what I need
10 you to do is answer the question I ask
11 otherwise it is --
12 A       Okay.
13 Q       It's hard for us, I know it is
14 hard for you to -- it is artificial, it is
15 not a conversation. It is hard to do. If
16 you would like to take a break you can.
17 A       Just ask the question again, I'm
18 sorry.
19 Q       It's okay, it happens all the
20 time.
21 A       What would Tom Bradley know, is
22 that it?
23 Q       And I gather from what you are

**Page 121**

1 saying, Tom Bradley would have some
2 information about your personal home life
3 that would impact your decision making
4 about your job. Let me ask a better
5 question. Did Tom know that you might want
6 a leave of absence?
7 A       I told Tom that I would -- I
8 might need a leave of absence, and that
9 they -- strike that. I told Tom that they
10 needed to find someone else to do the DPA
11 upgrade.
12 Q       Because of your family
13 situation?
14 A       Because I could not do it,
15 that's exactly what I said.
16 Q       That's what you said, and that's
17 all you told him?
18 A       I think so, I think that's what
19 I told him, Gabe and Brian, okay.
20 Q       We'll get to them. They're the
21 hard ones, I have got to save them for
22 last. Let me get through the easy ones.
23 What about Brian Golf, what does he know?

Page 122

1   A       Brian Golf, Brian and I talked,
2   he was -- you know, a lot of us there were
3   friends, I had probably told him several
4   times that I needed some time and needed to
5   get things straightened out. And I
6   probably -- I think he was in my office
7   when Dee Colter brought me the family
8   medical leave paperwork to my cube.
9   Q       Okay.
10  A       I believe he was in my office
11  when she brought it to me.
12  Q       Anything else Brian Golf would
13  know?
14  A       I don't think so.
15  Q       Lee Butler, what would he know?
16  A       Lee Butler was right over the
17  wall from me. He would probably know a lot
18  as far as my situation. He and I talked a
19  great deal being so close to one another in
20  the office.
21  Q       When you say right over the
22  wall, you mean your cubes were next to each
23  other?

Page 123

1   A       Cubes were beside the cubes,
2   yes.
3   Q       What would John Reeves know?
4   A       John Reeves, John Reeves is a --
5   is the maintenance or building maintenance
6   supervisor, I believe. I knew him outside
7   the company. Also he had kept his boat at
8   my house for a while and he would probably
9   know a lot as far as my dad's health and
10  that kind of thing, that kind of, you know,
11  situation I was living in and what I was
12  doing and taking care of.
13  Q       And did you share a boat space
14  with him?
15  A       No, I have a boat house at home
16  that I keep mine in.
17  Q       Okay. So he did not keep his
18  boat in your boat house?
19  A       No, he kept it outside of my --
20  tied off on my pier.
21  Q       What about Crystal Weed?
22  A       That's his daughter.
23  Q       Is Weed her married name?

Page 124

1   A       Yes.
2   Q       And did she baby sit for you?
3   A       She did, she kept Sydney a few
4   times for me and watched my dad.
5   Q       And is there anything you
6   discussed with her relating to your attempt
7   to get some leave?
8   A       I had -- I had probably told
9   both of them they was trying to -- or that
10  I had filed the paperwork and --
11  Q       Well, let me ask you something
12  probably that makes me wonder you really
13  remember that or if you are just sort of
14  guessing?
15  A       I'm sure I said something at
16  some point in -- I'm -- I'm not going to
17  guess in that.
18  Q       How are you sure?
19  A       How am I sure?
20  Q       Yeah. Can you remember a
21  conversation sitting down with one of them
22  and talking about it?
23  A       I think after I had been

Page 125

1   terminated or I think she had called and I
2   think I told her that I was fired I had
3   filed the paperwork and told Brian to turn
4   it in, I think it was a phone conversation.
5   Q       And did this conversation occur
6   before you received your letter saying that
7   you were considered to have abandoned your
8   job?
9   A       Yes.
10  Q       And in that conversation didn't
11  she tell you that you needed to get in
12  touch with Mr. Crowell to talk with him
13  about your situation?
14  A       I don't recall that being said.
15  Q       Did she tell you that you needed
16  to speak with Brian Burkhead to talk about
17  your situation?
18  A       I had tried.
19  Q       Well, I'm asking you what
20  Crystal said?
21  A       I don't remember her saying
22  that, I don't, I really don't.
23  Q       Okay.

(Pages 126 to 129)                                                                33

Page 126

1   A       I'm not saying that she didn't,
2   I'm saying that I don't remember.
3   Q       **A person named Aaron Melton?**
4   A       Aaron Melton.
5   Q       **What would he know?**
6   A       Just probably -- I mean, all of
7   these people are people that I was friends
8   with there, so I mean probably they would
9   all know the same thing.
10  Q       **Okay. So some of these folks**
11  **were people that you speak with socially at**
12  **Miltope that you worked with?**
13  A       Right.
14  Q       **And so you feel that they would**
15  **know things about your situation with your**
16  **dad?**
17  A       I'm sure, yes.
18  Q       **Did you specifically talk with**
19  **any of these people about any conversations**
20  **you had with Brian or Gabe about having a**
21  **leave?**
22  A       I might have -- that's a bad way
23  to say that.

Page 127

1   Q       It's okay if you don't
2   **remember. I just need to know if you**
3   **remember doing that or not. I don't want**
4   **you to guess so think about it.**
5   A       Yeah, let's take a break and let
6   me think about that, please, can we?
7          MR. BLYTHE: Just go ahead and
8   answer the question and then we will -- go
9   off the record for a second.
10         (A discussion was held off the
11  record.)
12  Q       **(By Ms. Lindsey) Let me ask a**
13  **better question. You've given me a list of**
14  **folks that you worked with as friends that**
15  **you spoke with on a social basis from time**
16  **to time?**
17  A       Right.
18  Q       **Among that group of friends, did**
19  **you ever speak with any one of those folks**
20  **specifically about talking with Gabe or**
21  **Brian to get leave?**
22  A       Yes.
23  Q       **Which ones?**

Page 128

1   A       Yes, yes.
2   Q       **Which ones?**
3   A       Probably all of them.
4   Q       **Okay. And would this have been**
5   **before or after?**
6   A       Before because -- see, well,
7   before.
8   Q       **Okay. Before you took your dad**
9   **to the doctor in November?**
10  A       Before I turned the paperwork in
11  and before I had taken my dad in we're
12  stuck in one hump, if we can get over that
13  hump. As far as the other stuff it's so
14  hard to recall.
15  Q       **Does the same answer apply to**
16  **Shelley Lee?**
17  A       Shelley Lee was the lead tech in
18  product support.
19  Q       **Okay.**
20  A       Yeah, she probably knew that
21  yes.
22         MS. LINDSEY: Let me go off the
23  record for just a minute.

Page 129

1          (A discussion was held off the
2   record.)
3   Q       **(By Ms. Lindsey) Do you have**
4   **contact information for Rick Collins, John**
5   **Stokes, Doug Snell, Rhett Perry and Crystal**
6   **Weed?**
7   A       I have contact information
8   probably -- I have Crystal's number and I
9   might have Rick's number.
10  Q       **Do you have them with you now?**
11  A       I think so.
12  Q       **You don't have it in your**
13  **memory?**
14  A       No, no, I don't.
15  Q       **We can -- on a break later I**
16  **would like to get contact information for**
17  **these folks who are no longer employed who**
18  **you have listed as witnesses?**
19  A       Which ones are?
20  Q       **Which ones, contact info on Rick**
21  **Collins, John Stokes, Doug Snell, Rhett**
22  **Perry, Crystal Weed.**
23  A       Okay. What about Brian Burkhead

Page 130

1    and --
2         MR. BLYTHE:  Those are the hard
3    ones she said.
4    Q      (By Ms. Lindsey) I have already
5    got them, thanks.
6    A      Okay.
7    Q      Going back to your dad, did he
8    seem to respond well to the therapy at
9    Chapman when he was admitted for a couple
10   of weeks after his pneumonia?
11   A      I feel like he did.  Can we
12   please take that break?
13   Q      Of course.
14   A      Okay.
15        (A short recess was taken.)
16   Q      (By Ms. Lindsey) Do you have
17   anything that you want to say to clarify
18   any of your answers, Mr. Bailey?
19   A      I don't think so.
20   Q      I was going to ask you a little
21   bit more about your father.  Do you have
22   any reason to dispute that if a medical
23   record says that Hospice got involved

Page 131

1    around late July, do you have any reason to
2    dispute that they got involved around late
3    July?  I know it is hard to remember.
4    A      Hold on.  I guess --
5    Q      The records are considerable and
6    I didn't bring everyone of them in here and
7    I can tell you the number, but I'm not sure
8    if yours are numbered that way.  Why don't
9    I take you back a little bit and help you
10   remember?
11   A      Okay.
12   Q      As we discussed, your father was
13   admitted for pneumonia June 30th, '03, does
14   that make sense to you?
15   A      That makes sense.
16   Q      And he stays in the hospital
17   until I believe July 12th?
18   A      Okay.
19   Q      Does that sound right to you?
20   A      Yes.
21   Q      Okay.  And during that time,
22   according to the records, you took some
23   time off of work, do you recall spending

Page 132

1    that time with him while he was ill?
2    A      Yes, yes.
3    Q      And I assume --
4    A      There was time during that time
5    that I would go to work and come back to
6    the hospital.
7    Q      Well, now isn't it your
8    practice to fill out your time sheet so
9    that you are paid accurately?
10   A      Yes.
11   Q      So if you worked you would have
12   to put it on your time sheet; right?
13   A      Right.
14   Q      So if I have a time sheet record
15   which reflects that you did not work at all
16   the week of July 4th, would you have any
17   reason to dispute that?
18   A      No, I wouldn't dispute that but
19   he was in there more than one week.
20   Q      I understand.  And according to
21   your time sheet you took two sick days, two
22   vacation day, and one of those days was
23   July 4th and you were paid holiday pay,

Page 133

1    does that strike a bell?
2    A      That sounds right.
3    Q      Okay.  So you must have
4    discussed this with Brian in advance; is
5    that correct?
6    A      If -- yes.
7    Q      And in fact the time sheet shows
8    that he signed off on it for you so --
9    A      Okay.
10   Q      I assume he was your supervisor
11   then?
12   A      Correct.
13   Q      And if he was your supervisor,
14   you would have discussed it with him?
15   A      Absolutely.
16   Q      Okay.  And so while you were out
17   this entire week, you must have been in
18   contact with him about your father being in
19   the hospital, is that fair to say?
20   A      I'm sure.
21   Q      Okay.  And he gave you that time
22   off without any difficulty; correct?
23   A      Right.

Page 134

1  Q      And he was sympathetic to you,
2  wasn't he?
3  A      Somewhat.
4  Q      What do you mean by that?
5  A      Just -- I mean, he --
6  Q      Was he irritated that you
7  weren't there?
8  A      Not necessarily irritated just
9  -- it just seemed like it was -- it was
10  something that I -- I needed to find a way
11  to work out not necessarily the time he was
12  in the hospital but other times so while he
13  in the hospital, no, he was not hard to
14  deal with on that at all.
15  Q      And that's what I need to focus
16  on one phase at a time?
17  A      Okay.
18  Q      I appreciate your making that
19  clarification.  So if I understand
20  correctly when your dad was in the
21  hospital, you had no trouble with Brian in
22  terms of being accommodating?
23  A      Right.

Page 135

1  Q      And the following Monday also
2  shows you took vacation pay and you were
3  absent, does that -- do you have any reason
4  to dispute that?
5  A      No.
6  Q      Do you remember signing off on
7  your time sheets, what's called a weekly
8  labor distribution that looks like that, do
9  you remember signing off on those?
10  A      Yes.
11  Q      And was there ever a time that
12  you were asked to sign something that
13  didn't accurately reflect your hours?
14  A      I don't think I was asked to
15  sign something, no.
16  Q      So you would have reviewed it
17  and if it was accurate, you would have
18  signed it; correct?
19  A      I would think so, yes.
20  Q      Now according to your dad's
21  records, you signed a release of
22  information which you submitted to Faith
23  Hospice Care on July 22nd, 2003, do you

Page 136

1  have any reason to dispute that?
2  A      No.
3  Q      And it also shows according to
4  your time records that you took a vacation
5  day and you did not work at Miltope that
6  day, do you remember that?
7  A      Not specifically but.
8  Q      My assumption is you had to take
9  that day off to handle Hospice care issues,
10  does that sound familiar, do you want to
11  look it up?
12       MR. BLYTHE:  What day are you
13  on?
14  Q      (By Ms. Lindsey) July 22nd.
15  It's hard to tell because the sheet says
16  week ending date.
17  A      Week ended 27th.
18  Q      Yeah, week ending 27th and
19  according to the sheet that says week ended
20  the 27th, it shows that on Monday you took
21  a sick day and on Tuesday you took a
22  vacation day and then you reported the last
23  three days of week, do you see that?

Page 137

1  A      Okay.  That's what that looks
2  like.
3  Q      Do you have any reason to
4  dispute that document?
5  A      No.
6  Q      Is that your signature at the
7  bottom?
8  A      Yes.
9  Q      According to your dad's record,
10  he was receiving some care those two days.
11  Were you taking time off so you could help
12  him with those appointments, or do you
13  remember?
14  A      Could you be more specific as
15  the care he was receiving those two days?
16  Q      Sure.  On 7/21 he had a check up
17  with Dr. Law and he was evaluated again to
18  see if he had any signs of pneumonia coming
19  back.  Does that refresh your memory?
20  A      That may have been.
21  Q      You can say you don't remember.
22  A      I don't remember if somebody --
23  if it was -- I don't think that -- gosh, I

Page 138

1  might have had someone take him.
2  Q        Pardon?
3  A        Do you have anything in your
4  records from the doctor's office of who
5  took him?
6  Q        No, I don't.  It's possible you
7  didn't take him?  Well, let me just ask a
8  better question.  Sitting here today, you
9  don't remember; right?
10  A        Hold on, the 21st, the days end
11  on Sunday; correct, Mr. Crowell on the time
12  sheets?
13         MR. CROWELL:  Yes
14         THE WITNESS:  So week ending in
15  27th would be Sunday.  The 21st was a
16  Monday and the 22nd was a Tuesday and it
17  shows on here that a sick day and a
18  vacation day were used on those two days?
19  Q        Correct.
20  A        I don't see -- I know he had to
21  have the check-up, I don't recall exactly
22  what was done that day but if he went, I
23  was probably the one that took him.

Page 139

1  Q        Was there anyone else who took
2  him after your wife and you divorced?
3  A        No, I think later on when
4  Hospice was coming, they took him a couple
5  of times.
6  Q        And during these two -- well,
7  this may not be a question you can answer
8  because you don't remember.
9  A        Hold on just a second, please.
10  Q        Okay.
11  A        Let me look at one thing here.
12  Q        Are you trying to make sure you
13  don't have to clarify an answer?
14  A        No, I'm just trying to get that
15  time.
16  Q        Sitting here today, you don't
17  recall Brian giving you any difficulties
18  about taking these two days off; correct,
19  just talking about those two days?
20  A        Do you mind if we take a break?
21  Q        Well, my preference is that you
22  answer a question before you take a break.
23  If you don't remember that's okay.

Page 140

1  A        No, I think I have a very good
2  recollection of it, I just --
3  Q        My question is that you took
4  those two days off and my question is you
5  didn't receive any difficulties, did you
6  from Brian?
7  A        There was a comment made.
8  Q        Okay.  Tell me the comment.
9  A        Perhaps I should get married so
10  I should have someone to help me handle all
11  of these responsibilities I have.
12  Q        Brian told you that?
13  A        So I can work, yes.
14  Q        Were y'all talking on the
15  telephone, when this comment was made?
16  A        No, we were face to face.
17  Q        So you had reported back to work
18  when this comment was made?
19  A        I was at work when I told him if
20  I remember the comment being made in and
21  I'm looking at notes I have made myself to
22  kind of keep my time in order and that was
23  around the time that that was said.

Page 141

1  Q        Well, if I don't have notes
2  from that time period.  I only have a
3  calendar from November so are there other
4  documents that you have that should be
5  produced to me so I can better understand
6  your claims?
7         MS. LINDSEY:  Privileged?
8         MR. BLYTHE:  Yes.
9         MS. LINDSEY:  Well, you might
10  want to tell him not to look at the
11  privileged documents during the depo.  I
12  could legitimately make a claim and get
13  those documents.
14         MR. BLYTHE:  Well, just don't
15  look at your notes.
16  Q        (By Ms. Lindsey) If you are
17  reviewing notes to answer my questions,
18  Mr. Bailey, you are going to lose the
19  privilege that you and your lawyer are
20  trying to protect.  I need you to answer
21  based on your memory.  What was the
22  comment?
23         MR. BLYTHE:  Can I stop you for

(Pages 142 to 145)

37

Page 142

1  one second?
2       MS. LINDSEY:  Sure.
3       MR. BLYTHE:  The notes are
4  basically going to -- coming from the diary
5  that I produced for you.
6       MS. LINDSEY:  Okay.  Let me ask
7  you a question.  The only diary I have is
8  from November '03 is there a diary that
9  predates?
10      MR. BLYTHE:  Well, then there
11 may be -- I don't know.
12      THE WITNESS:  But most of my
13 notes come from that.
14 Q      (By Ms. Lindsey) I understand.
15 Let me put on the record that I'd like for
16 you to make a search, Mr. Bailey, and see
17 if there are any other calendars prior to
18 November of '03 that contain notes to this
19 case.  If you find them, I would like to
20 see them because those calendars would be
21 kept contemporaneously; right, Derek?
22      MR. BLYTHE:  That's correct.
23      MS. LINDSEY:  And in that event

Page 143

1  I may have additional questions, hopefully
2  we will cover everything today but I need
3  to see those documents if you intend to use
4  them at trial.
5       MR. BLYTHE:  Okay.
6  Q      (By Ms. Lindsey) So he says
7  perhaps you should get married so you could
8  have a wife to take care of these other
9  responsibilities you have?
10 A      Yes, so I would have someone to
11 help me take care of these other
12 responsibilities.
13 Q      And what was his facial
14 expression at that time if you recall?
15 A      I -- I couldn't believe he said
16 it.
17 Q      Do you recall a facial
18 expression?
19 A      No, I couldn't even look at him
20 after he said it.  I don't know what he
21 looked like.
22 Q      Did you say anything in
23 response?

Page 144

1  A      I just --
2  Q      Did you feel that internally or
3  did you say that out loud?  Did you say I
4  can't believe he said that and I don't
5  understand whether you are telling me you
6  spoke it to him in response?
7  A      I mentioned it to Gabe, we were
8  -- I mentioned at this time to Gabe in the
9  product support room shortly after it was
10 done.
11 Q      Let's go back to -- did you
12 comment when Brian said that to you as I
13 understand your testimony, you do not
14 recall a facial expression, you didn't want
15 to look at him?
16 A      No.
17 Q      And I assume then that you
18 walked away?
19 A      Pretty much, yes.
20 Q      And at any point in this
21 encounter did you make any comment directly
22 to him such as I can't believe you just
23 said that?

Page 145

1  A      I might have made that remark
2  when I was walking away, but I don't recall
3  saying it, no.
4  Q      Sitting here today you don't
5  know?
6  A      No.
7  Q      But you're saying that you
8  clearly recall his making the comment you
9  just reported; correct?
10 A      True.
11 Q      And do you know one way or the
12 other whether he was joking?
13 A      No.
14 Q      Prior to this comment you and
15 Brian had a good relationship; correct?
16 A      Yes.
17 Q      And he had accommodated you in
18 terms of the illness with your father;
19 correct?
20 A      Yes.
21 Q      So at that point I take it you
22 were upset and you went to speak to Gabe;
23 is that correct?

Page 146

1    A        We had to meet in product
2    support in the repair area.
3    Q        Okay.
4    A        And I mentioned to Gabe with
5    Brian standing right there what he had
6    said. And Gabe said did you really say
7    that and I said oh, yes, he really did.
8    Q        And what did Brian say?
9    A        I guess he tried to blow it off
10   or something but it did not it was not
11   something that sits well with me.
12   Q        The comment that he had made did
13   not sit well with you; correct?
14   A        No.
15   Q        But sitting here today, you
16   don't recall anything else that he said?
17   A        No.
18   Q        You don't recall anything he
19   said in response to Gabe?
20   A        No.
21   Q        That's correct?
22   A        No, I don't.
23   Q        Okay. Yeah, I'm sorry, before I

Page 147

1    got started I should have told you this
2    too. Sometimes no depending on how I ask
3    the question and when I get tired I don't
4    ask as good of question, and it should be
5    yes and you say no I will just ask you to
6    clarify and ask you is that correct. I'm
7    not trying to give you a hard time. The no
8    could mean two things sometimes I will have
9    to say is that correct and I'm not trying
10   to give you a hard time.
11   A        Okay.
12   Q        Did you and Gabe say anything
13   else about this on that day?
14   A        Nothing that I recall.
15   Q        And was this encounter before or
16   after you were going to be taking this sick
17   day and the vacation day that week?
18   A        I think it was around the same
19   time to my recollection.
20   Q        In other words, do you know
21   whether Brian was making the comment after
22   you had been out or before you were about
23   to go out?

Page 148

1    A        He made it beforehand.
2    Q        Okay. Since you were out on a
3    Monday and Tuesday, do you think this
4    encounter occurred the prior Friday?
5    A        I believe so.
6    Q        Okay. Do you recall anything
7    about workload, issues with pleasing the
8    customer, was there any frustration that
9    Brian was venting at this time?
10   A        I'm not aware of any that there
11   might have been.
12   Q        At that time did you believe you
13   were performing and handling the
14   responsibilities of your job despite your
15   absence?
16   A        I believe I was.
17   Q        How were things being handled
18   when you were absent?
19   A        Lee Butler, later on, we kind of
20   got together to get some things done but as
21   far as cross training, we didn't -- if I
22   was out, I would have to come back in and
23   hustle and catch up but I -- usually I

Page 149

1    tried to get as much done as I could. And
2    if I knew I needed to be out, I would make
3    arrangements to get everything I had to do
4    done prior to being out.
5         I had a good working
6    relationship with my customers and I would
7    get everything done that needed to be done.
8    Q        So you don't recall Brian ever
9    complaining to you that you were dropping
10   the ball in terms of keeping the customer
11   happy?
12   A        I don't think so.
13   Q        If Brian were to testify that he
14   recalls apologizing to you, would you say
15   he is lying?
16   A        Perhaps after the fact.
17   Q        When you say after the fact, do
18   you think that later on that same day?
19   A        I don't think it was the same
20   day, I -- I don't have any ill feelings
21   toward him. The remark upset me because of
22   all of the pressure that I was under. It
23   was not a very well thought out remark. It

Page 150

1   was ill placed.
2   Q       And that's the objection you
3   raised to Gabe; correct?
4   A       Yes.
5   Q       And Gabe's response was to look
6   at Brian and say did you really say that?
7   A       Yeah, Gabe looked at Brian and
8   asked him did you really say that.
9   Q       Uh-huh, and you don't recall
10  anything else Gabe said; correct?
11  A       No.
12  Q       I'm correct that you don't
13  recall anything else?
14  A       You are correct that I don't
15  recall anything else.
16  Q       Okay. Thank you. Thanks for
17  bearing with me.
18  A       Sorry.
19  Q       It's okay. Off the record.
20          (A discussion was held off the
21  record.)
22  Q       (By Ms. Lindsey) Do you remember
23  your first contact with Hospice when they

Page 151

1   began caring for your dad?
2   A       I do.
3   Q       And what was that conversation
4   like?
5   A       Well, it was kind of difficult,
6   they had to come out and interview. They
7   had to also qualify him for Hospice. And
8   when they qualified him for that, it had to
9   be a terminal illness. And the terminal
10  illness that they used to qualify him was
11  cancer.
12  Q       Did you ever see any
13  documentation that backs up what you have
14  just said?
15  A       No, I wasn't involved in the
16  qualification. I was just there as the
17  representative of the potential client for
18  Hospice.
19  Q       Okay. So when you had this
20  discussion with the Hospice representative,
21  it was your understanding that they were
22  qualifying your dad because of a belief
23  that he had terminal cancer?

Page 152

1   A       Yes.
2   Q       Was there any discussion about
3   whether it was appropriate to leave your
4   dad alone all day?
5   A       At that time he could be left
6   alone, but he could not be left alone by
7   himself all day. They, you know --
8   Q       Why not?
9   A       Just let me change that. I
10  didn't feel it was right that he be left
11  alone all day. He just wasn't --
12  Q       As his son, you felt obligated
13  to make sure he wasn't alone?
14  A       Yes, I did.
15  Q       But at this time you were
16  working all day so he was being left alone;
17  correct?
18  A       Yes, except for days that I
19  would people would come in. I'd have
20  someone to check on him, somebody would
21  come in.
22  Q       People like who, the Hospice
23  folks?

Page 153

1   A       Sometimes people from the church
2   would visit, Hospice would come in some,
3   but they didn't -- up until that point he
4   was not a regular patient -- patient.
5   Q       Which church?
6   A       First Presbyterian Church
7   Alexander City. My father was Sunday
8   School Superintendent there for 29 years.
9   Q       Did Crystal sometimes come back
10  and check on him?
11  A       They could come down on the
12  weekends sometimes because they left her
13  boat there, and they would look in there.
14  Q       So during the work week the folk
15  that would come were the people from church
16  and then when Hospice was involved the
17  people from Hospice?
18  A       Right.
19  Q       Was there anybody else?
20  A       Neighbors would stop by
21  sometimes, but it was just when they were
22  out walking.
23  Q       And at this time he was living

Page 154

1  with y'all, living on the lake; right?
2  A     Right.
3  Q     Which lake is that?
4  A     Martin.
5  Q     Is the house somewhat secluded
6  from the neighbor's houses?
7  A     It's on a point.
8  Q     Would it be a long walk for
9  someone to get from the nearest house?
10  A     Not a long walk, 100 yards
11  maybe.  The house next door is 50 yards
12  away.
13  Q     Did you have any discussions
14  with the Hospice nurse about what your dad
15  was going to do to feed himself while you
16  were gone?
17  A     I did.  I made arrangements for
18  him to -- at that point the Alzheimer was
19  not so bad, and he was able to microwave or
20  cook some soup or something at that point
21  in time.  And they said it was good to keep
22  him trying to do things because that way he
23  would have -- you know, he would be -- I

Page 155

1  don't know, it would keep his mind working,
2  keep him doing things.
3  Q     Right.  So y'all did discuss
4  making arrangements for him to feed himself
5  while you were at work?
6  A     Right, I would get dinners that
7  he could cook.
8  Q     And you were responsible for
9  filling up his medication box?
10  A     Yes.
11  Q     And did you sometimes have
12  trouble keeping the medication box filled
13  so that your dad could keep up his meds?
14  A     No, I don't think I ever had
15  trouble keeping it filled.  Sometimes he
16  would go get into it and take it from the
17  wrong day, but we got a system down for
18  that.
19  Q     Do you ever recall the Hospice
20  nurse bringing to your attention that your
21  dad hadn't taken his medication in two
22  weeks?
23  A     Excuse me.

Page 156

1  Q     There's a Hospice note from
2  8/22/03 that indicates that your dad had
3  not taken his medication in two weeks, does
4  that ring a bell?
5  A     There might have been a
6  medication that he didn't take because of
7  problems with getting the medication from
8  the pharmacy, but I had gotten a local
9  drugstore to -- if I had a situation like
10  that, I would get the local drugstore to
11  fill a smaller prescription and have the
12  doctor's office to call it in to another
13  pharmacy, and I could get there.
14  Q     It is a note from 8/29/03 by the
15  chaplain and the chaplain writes patient
16  struggling with some family problems, son's
17  issues.  Do you have any idea what the
18  chaplain was talking about when he wrote
19  that?
20  A     When was that?
21  Q     August 29th, 2003.
22  A     No, I don't.
23  Q     Approximately a week later the

Page 157

1  Hospice notes indicate that you were going
2  to Atlanta Saturday night.  Were you going
3  there because of the band that you and
4  Derek Welsh were putting together?
5  A     8/29?
6  Q     9/5.
7  A     9/5?
8  Q     September 5th, '03 indicates you
9  were in Atlanta?
10  A     Yeah, yeah, that's exactly when
11  that was, it was a rehearsal for that show
12  that was going to be in November that's
13  what that was.
14  Q     Okay.  So sometime prior to
15  September 5th, '03 you and Derek must have
16  talked about that?
17  A     We did, it never became exact
18  that it was going to happen until we had
19  gotten together.  I think that is the first
20  time we had gotten together for that.
21  Q     I guess it was communication by
22  email or phone?
23  A     With Derek?

Page 158

1  Q     Uh-huh.
2  A     Sometimes both.
3  Q     So did you get along with the
4  Hospice folks?
5  A     Yes, absolutely.
6  Q     And did you have any conflicts
7  with them about whether the care that your
8  dad was receiving was adequate?
9  A     Never.
10  Q     And were they supportive of your
11  — in terms of the care you were providing?
12  A     I think so.
13  Q     Were they ever critical to you
14  in terms of the care you were able to
15  provide?
16  A     No.
17  Q     Were they critical of your
18  working?
19  A     I don't think they were critical
20  of me working, I think some -- I don't
21  know, no, they weren't critical of me.
22  Q     Did anyone at Hospice tell you
23  you should quit your job so you could take

Page 159

1  care of your father?
2  A     No.
3  Q     Did anyone at Hospice tell you
4  that your dad might have to be moved into
5  an assisting living facility or a nursing
6  home?
7  A     It was mentioned.
8  Q     And how did you feel about that
9  idea?
10  A     My dad did not want to go to a
11  nursing home.
12  Q     Had he been in a nursing home
13  before?
14  A     Yes, it's in the records, 21
15  days.
16  Q     In the rehab after the
17  pneumonia?
18  A     Yeah, he was in a nursing home.
19  Q     So after that experience he
20  didn't want to go back?
21  A     Yeah.
22  Q     And he told you that?
23  A     In 1997 he had open heart

Page 160

1  surgery, he got a staph infection in the
2  chest incision near your sternum. He had
3  to go stay in the nursing home then also
4  and he just did not want to go through that
5  again. He wanted to stay at home.
6  Q     And he told you this?
7  A     Yes.
8  Q     And you wanted to respect his
9  wishes?
10  A     Yes, I did.
11  Q     Did you ever discuss with the
12  Hospice nurse the possibility of changing
13  your job so that you could be at home more?
14  A     It's possible, I don't recall
15  right off.
16  Q     There is a note from a Hospice
17  nurse that says that you informed her that
18  you would be at home more to spend time
19  with dad and possibly change jobs. Do you
20  have any reason to disbelieve that note
21  that she wrote about you in 2003?
22  A     (Witness shakes head.)
23  Q     Was that a no when you shook

Page 161

1  your head?
2  A     What's the date on that again
3  please?
4  Q     The date of November 3?
5  A     I could have, but I don't recall
6  saying that. I don't -- I might have told
7  -- I had already filled out by that time
8  the family medical leave paperwork.
9  Q     And you had received that
10  paperwork from Dee Colter; correct?
11  A     Correct.
12  Q     She was a relatively new
13  employee, do you remember that?
14  A     I don't recall how long she had
15  been there, I just knew that she brought
16  the paperwork to me.
17  Q     And how did she come to bring
18  that paperwork to you, did you ask her for
19  it?
20  A     She was -- I had talked to -- I
21  don't know who I had talked to, I had
22  mentioned something to her. She was
23  over -- I think talking -- I think I was

42                                                                          (Pages 162 to 165)

Page 162

1  talking with Brian Golf in my cubical, I
2  think and she brought me the paperwork.  I
3  remember her bringing the paperwork when
4  Brian was in there.
5  Q      And at that time did you have
6  any discussion with Dee about the reason
7  you wanted the paper work in front of
8  Brian?
9  A      I'm sure I did, yes, because of
10  my father, yes.
11  Q      Do you recall telling her that
12  you wanted it to be kept confidential?
13  A      No, I don't recall that.
14  Q      Do you recall telling her that
15  you wanted to consider some leave for
16  personal reasons, and you didn't want her
17  to tell any anybody else?
18  A      No.
19  Q      Do you think Dee, if she
20  testified to that under oath, would be
21  lying?
22  A      I don't recall is all I am
23  saying.

Page 163

1  Q      So it's possible her memory is
2  more accurate and she would be telling the
3  truth; correct?
4  A      I don't know about that either.
5  Q      Did you like Dee?
6  A      I had no reason not to like Dee.
7  Q      Has she ever lied to you before
8  to your knowledge?
9  A      No.
10  Q      So in terms of what you can
11  remember specifically about contact with
12  Dee, you know you got the paperwork from
13  her; correct?
14  A      Yes.
15  Q      Specifically you can't recall
16  what the two of you said to each other;
17  correct?
18  A      I know I asked about the
19  paperwork, I know she brought me the
20  paperwork, and I know I filled out the
21  paperwork, okay.
22  Q      But before we got to the filling
23  out part, am I right that you don't

Page 164

1  remember specifically what the two of you
2  said to each other when the paperwork was
3  being given?
4  A      No, I don't specifically
5  remember that.
6  Q      Okay.  And you say you remember
7  filling it out?
8  A      Yes.
9  Q      Okay.  When did you fill it
10  out?
11  A      I filled it out the week -- I
12  want to say I dated it October 27th is when
13  it was filled out.
14  Q      That was a Friday?
15  A      I remember that date, I remember
16  that date.
17  Q      October 27th was a Monday?
18  A      Okay.
19  Q      Does that help you be anymore
20  sure or not?
21  A      I scheduled or I sent a request
22  to Mr. Crowell for a meeting.
23  Q      Well, before we talk about that,

Page 165

1  I want to make sure we talk about when you
2  filled this paperwork out.  You say you
3  filled it out on the 27th, you were at work
4  that day; correct?
5  A      Correct.
6  Q      And according to the time you
7  had written to work on the 27th?
8  A      Okay.
9  Q      And you say you filled it out
10  that day; right?
11  A      Okay.
12  Q      And so at that point you could
13  have taken it to Dee and given it back her
14  as she had requested you to do?
15  A      Perhaps could have and probably
16  should have.
17  Q      When you and Dee spoke about
18  this paperwork, wasn't it your
19  understanding that if you needed FMLA
20  leave, you needed to get back in touch with
21  her or Ed so you could complete the
22  paperwork and get it approved?
23  A      That's why I said that I had

(Pages 166 to 169)                                                    43

Page 166

1  scheduled a meeting with Mr. Crowell
2  because Gabe and Brian directed me to get a
3  meeting with Mr. Crowell to discuss that.
4  Q      Okay.  And prior to Brian and
5  Gabe directing you to do that, is it your
6  testimony you don't remember one way or the
7  other whether Dee also directed you to do
8  that?
9  A      I -- she gave me the paperwork
10 and I filled it out.  I had already
11 mentioned it to Brian and mentioned it to
12 Gabe.
13 Q      And they said you needed to talk
14 to Mr. Crowell that's what you said?
15 A      Yes.
16 Q      And you and Mr. Crowell didn't
17 have a meeting about it, did you?
18 A      Oh, yes, we did.
19 Q      When did you have a meeting?
20 A      I sent an email request for a
21 meeting, and I didn't hear back for a
22 couple days.  And then I sent another email
23 request for a meeting and we had a meeting.

Page 167

1  Q      Okay.  I visited that facility,
2  and it seems like it is pretty easy for
3  everyone to just say hello without relying
4  only on email, is that a fair statement?
5  A      Yes.
6  Q      You weren't too far from
7  Mr. Crowell's office, were you?
8  A      No.
9  Q      You could have walked by him any
10 day and said Mr. Crowell, I need to speak
11 to you?
12 A      Mr. Crowell was and probably is
13 a very busy man.  I thought it necessary to
14 ask for a meeting rather than just take
15 something this serious to him.
16 Q      But my question is you could
17 have come by his office and spoken with him
18 directly if he was actually in his office;
19 correct?
20 A      Right.
21 Q      Okay.  And every day you spoke
22 to him and others that you saw on a daily
23 basis at Miltope; correct?

Page 168

1  A      You don't see him every day.
2  Q      You don't say hello or speak to
3  him every day?
4  A      No ma'am, he was not there every
5  day.
6  Q      Was he there on the first day
7  that you requested a meeting by email?
8  A      I'm not sure if he was or not
9  because I was requesting a meeting that way
10 I could arrange what I had to arrange
11 around that if we could have a meeting and
12 if he could have been busy, I had no way of
13 knowing.
14 Q      Okay.  So on the 27th you say
15 you asked for a meeting with him?
16 A      I don't know that I did that on
17 the 27th, I think I filled the paperwork
18 out on the 27th.
19 Q      Okay.
20 A      I did -- do you have the email
21 request that I sent to Mr. Crowell for a
22 meeting.
23 Q      I do.

Page 169

1  A      And what date is that on that --
2  I will be quiet.
3  Q      I know it is hard not to --
4  A      Can we take a break?  Since I
5  asked the last question, can we take a
6  break?
7  Q      Yes, you can.
8         (A short recess was taken.)
9  Q      (By Ms. Lindsey) All right.
10 Let's go back on the record.  I'm going to
11 show you what I have marked as Exhibit 4.
12        (Defendant's Exhibit 4
              was marked
13            for identification.)
14        And these documents that I have
15 marked as Exhibit 4 represents a portion of
16 the employee handbook at Miltope, do you
17 recognize these?
18 A      I remember when I worked at
19 Miltope the first time I was given an
20 employee handbook.
21 Q      Uh-huh.
22 A      And had to sign that I had
23 received an employee hand book and had gone

Page 170

1  over it and everything like that. But when
2  I went back to work there, I was not given
3  all of that, and I don't think I --
4  Q     Well, if --
5  A     I'm not saying it wasn't
6  available to me, but I did not have one.
7  Q     Is this what you mean by the
8  signature page for your first term of
9  employment?
10  A     Yes.
11  Q     Okay. So you signed off on the
12  hand book in '97?
13        (Defendant's Exhibit 5
          was marked
14        for identification.)
15        And when you came back for your
16  second term of employment, you don't recall
17  anyone telling you, hey, here's a new
18  handbook?
19  A     No, I didn't sign anything or
20  anything like that.
21  Q     Didn't you understand that there
22  was a handbook though?
23  A     Well, of course.

Page 171

1  Q     And you knew you had to follow
2  the policies within the handbook; right?
3  A     Sure, yes.
4  Q     I mean for example normal
5  working hours are 8:00 a.m. to noon and
6  1:00 until 5:00, you did that when you were
7  available to do that; right?
8  A     Yes.
9  Q     And getting to work regular and
10  on time is an essential part of your job?
11  A     Yes.
12  Q     You remembered that was the
13  policy and you tried to comply with that,
14  didn't you?
15  A     Yes.
16  Q     And for example, it says when
17  illness keeps you at home or absent for
18  some other reason call your supervisor
19  between 8:00 and 9:00 a.m., so you remember
20  that being the policy?
21  A     Yes.
22  Q     And you remember trying to
23  comply with that?

Page 172

1  A     Yes.
2  Q     You didn't have any problem with
3  these policies, did you?
4  A     No.
5  Q     And it goes into time sheets,
6  which we have already discussed, you tried
7  to fill those out accurately; correct?
8  A     Correct.
9  Q     And in terms of your vacation
10  pay and your sick time, I'm sure you
11  reviewed the policy either orally with
12  someone or in writing so you'd know what
13  your entitlement was; correct?
14  A     Could you repeat that, please?
15  Q     Well, you were probably
16  interested in vacation pay; right?
17  A     I had to use my vacation pay
18  pretty much like sick time.
19  Q     Okay. And you were probably
20  interested to keep up how much vacation you
21  had left or how much sick time you had
22  accumulated; right?
23  A     Yes, usually I would have to

Page 173

1  check with someone to find out if I had any
2  left or --
3  A     Uh-huh.
4  A     -- that kind of thing.
5  Q     So you would check with payroll
6  I assume?
7  A     Yes.
8  Q     So I assume that you attempted
9  to learn as much as you could about what
10  vacation time and sick time you had
11  available and to comply with those
12  policies; correct?
13  A     Generally when I had an issue
14  come up with someone sick I pretty much
15  took care of what I had to take care of and
16  I think I was even in arrears for sick time
17  and vacation time at some point.
18  Q     Well, yeah, and you have a
19  program where you can borrow from someone
20  else?
21  A     I don't know if you could
22  borrow, they just would dock me or let me
23  make it up or when I accrued some more,

Page 174

1 they took some of it. I don't know how that
2 worked exactly.
3 **Q       And ultimately you were on the**
4 **plus side by the end of your employment;**
5 **correct?**
6 A       I'm not sure.
7 **Q       Do you recall calling personnel**
8 **or payroll to ask them to apply your**
9 **remaining sick leave and vacation so that**
10 **you could get some form of paycheck that**
11 **first week of November?**
12 A       Yeah, that was right before
13 Christmas.
14 **Q       Are you sure that you made the**
15 **call that late?**
16 A       I don't recall when I made that
17 call.
18 **Q       Okay.**
19 A       I don't remember that.
20 **Q       Weren't you paid at the ordinary**
21 **time?**
22 A       Yeah, it was direct deposit.
23 **Q       Okay.**

Page 175

1 A       Or my paychecks were direct
2 deposit.
3 **Q       And so I'm sure you also**
4 **reviewed the handbook for purposes of**
5 **family medical leave and leaves of absence;**
6 **correct?**
7 A       At that time, I was asking
8 others what I needed to do.
9 **Q       Okay.**
10 A       Because I -- and --
11 **Q       And that's why you talked with**
12 **Dee about getting the paperwork?**
13 A       That's why I talked with Gabe
14 and Brian talked with Dee. I requested the
15 meeting with Mr. Crowell and everything
16 else. I'll be honest, I didn't -- I don't
17 think I. --
18 **Q       Are these the papers that Dee**
19 **gave you?**
20 A       No, these aren't filled out.
21 **Q       Well, when Dee gave them to you**
22 **they weren't filled out, were they?**
23 A       No.

Page 176

1 **Q       She gave you blank forms?**
2 A       She gave me blank forms.
3 **Q       I hear you, but I'm just asking**
4 **you what did she give you, she gave you**
5 **blank forms and you believe these are the**
6 **same?**
7          **(Defendant's Exhibit 6**
                **was marked**
8          **for identification.)**
9 A       No, I don't know about this.
10 **Q       Okay. Hold on one second.**
11 **Let's just go off the record.**
12          **(A short recess was taken.)**
13          THE WITNESS: The paperwork that
14 I filled out was the application for family
15 medical leave not the physician
16 certification. I didn't fill out the
17 physician certification.
18 **Q       (By Ms. Lindsey) Did you take**
19 **that to Dr. Law to fill out?**
20 A       I asked Brian to turn in the
21 application and let me know if there was
22 anything else he needed. That same day he
23 told me I needed a letter from my father's

Page 177

1 doctor to complete the application for
2 family medical leave. I said I would get
3 that. I requested it that day. And when
4 the letter was available, it was faxed from
5 the doctor's office to the Miltope product
6 support fax number.
7 **Q       What did I do with 7? I see**
8 **because I've got to skip around, I'm**
9 **sorry. What you just referenced, I**
10 **suppose, is what's represented by Exhibit**
11 **8; is that correct?**
12          **(Defendant's Exhibit 8**
                **was marked**
13          **for identification.)**
14 A       That's exactly right, it says I
15 have requested a letter from the doctor to
16 satisfy approval of a leave. I will
17 forward it to your attention when I receive
18 it.
19 **Q       In fact you did not receive it,**
20 **as far as you know was it faxed to Miltope?**
21 A       No, I have a copy of it.
22 **Q       You have a copy of it, but you**
23 **never provided it to Miltope; correct?**

Page 178

1    A      No, it was faxed I took -- okay.
2    Q      Sitting here today, do you have
3    a facsimile receipt that shows that was
4    faxed to Miltope?
5    A      No, I do not.
6    Q      Okay. So if the folks at
7    Miltope say they never received it, you
8    can't dispute that one way or the other,
9    can you?
10   A      It was faxed from Dr. Vincent
11   Law's office.
12   Q      Now did you sit there and watch
13   the lady do it?
14   A      I handed it to her, she faxed
15   it, and she handed it back to me.
16   Q      And you couldn't see her put the
17   number in, could you?
18   A      No, but I gave her the number.
19   Q      It's possible she made a
20   mistake, isn't it?
21   A      It -- the letter of termination
22   or the termination date was the 11th of
23   November.

Page 179

1    Q      Yes, sir, but --
2    A      The letter was requested the 5th
3    of November, I did not even have seven days
4    to get the letter.
5    Q      Sir, I hear you, but I'm asking
6    you another question. I know you are
7    wanting to tell me what's important to you,
8    but I need you to answer the question I
9    have asked.
10   A      No, I do not have a facsimile
11   confirmation receipt.
12   Q      Okay. And it was is possible
13   that she dialed the wrong number?
14   A      Yes.
15   Q      Okay. Now prior to this
16   communication you just described with
17   Brian, I believe your testimony is you had
18   asked Brian and Gabe what do I do about
19   getting leave approved is that about
20   right? And I'm talking about back to what
21   you told me earlier.
22   A      They told me to go see
23   Mr. Crowell.

Page 180

1    Q      And this was before your
2    conversation happened -- before you tried
3    to get up that meeting with him; right, the
4    conversation with Gabe and Brian?
5    A      Yeah.
6    Q      And so that had to be late
7    October; right?
8    A      And they said to have the
9    meeting with Mr. Crowell.
10   Q      Okay. And so then you have said
11   that you did have a meeting with him?
12   A      Yes.
13   Q      Tell me about that meeting.
14   A      I went in, sat down, we spoke.
15   I told him that I wanted to take some time
16   to take care of some things at home with my
17   father, and that I just needed to take
18   family medical leave and get things sorted
19   out at home and try to get everything
20   situated there. And by that meaning making
21   sure everything was good with my father,
22   making sure my daughter was -- you know, I
23   was getting everything down there because I

Page 181

1    was stretched pretty thin at that time.
2    And when we had that meeting, he ensured me
3    of how important my job was and told me
4    that the company really needed me and that
5    the sport upgrade thing was very important.
6          And then he shared a story with
7    me about his father, who had who had passed
8    away. And when I left out of Mr. Crowell's
9    office, I really was confused about what to
10   do at that point because I felt guilty for
11   needing to get these things sorted out and
12   having this time off. And I felt guilty
13   about not being there to do my job over
14   this period of time because we were still
15   under a -- I mean 9/11 was two years prior
16   to that. Everybody was really trying to do
17   their job and get things done, and when I
18   left from there, I -- I just did not have a
19   clue what to do.
20          Honestly, because I had my mind
21   made up that that's what I should do and
22   when I came out, I wasn't sure what to do.
23   And I -- I -- in the week that followed

Page 182

1  that, my daughter had gone down to visit
2  with her mother over that weekend. I meet
3  them -- she was really late leaving with
4  her to bring her back to me. On the way
5  home, I had a flat tire. It was almost
6  2:30 in the morning when I got home. I
7  called in to work. I was exhausted. There
8  is no way I could go to work.
9         I called in, and the next
10 morning my daughter was sick throwing up.
11 I had to call in the next day because my
12 father was sick again. I had to call in
13 and that's when I told Brian to turn in the
14 family medical leave paperwork and let me
15 know if you need anything else.
16 **Q       Let me back up because you just
17 told me a lot of stuff. First of all, when
18 you had the car trouble and you were
19 exhausted and you decided to call in, you
20 did not speak to Brian; right?**
21 A      I spoke to Shelly Lee who was --
22 who was in product support, and she was the
23 lead tech right under Brian. I couldn't

Page 183

1  get Brian so I called the other side of the
2  building to the supervisor that was about
3  the same level as Brian, who was Darlene
4  Hill. And I ended up speaking to Tommy
5  Choice, who works right under Darlene
6  because I didn't get to Darlene to start
7  with. And then I finally got Darlene, and
8  I thought that would satisfy calling in.
9  And I had tried Brian and tried Shelley
10 thinking Brian may be in the shop but away
11 from his desk. And I did everything I
12 could to get to somebody.
13 **Q       Why didn't you leave him a voice
14 mail?**
15 A      Well, it was kind of I just
16 wanted to talk to somebody, I mean, I did.
17 I talked to three people.
18 **Q       You wanted to talk with them
19 about how difficult the weekend had been
20 and try to get some friendly support
21 because these were all your friends; right?**
22 A      I told them that I had a flat
23 tire at 1:30 in the morning and had to stop

Page 184

1  and buy fix-a-flat to get home and drive 40
2  miles an hour because it vibrated the car.
3  **Q       And this was all after your
4  ex-wife had not been cooperative in getting
5  your daughter back?**
6  A      She was just late, very late
7  meeting me.
8  **Q       Uh-huh, so you were venting your
9  frustrations, I suppose, with them; is that
10 right, on that Monday?**
11 A      I was just probably telling them
12 what happened as to why I couldn't come in.
13 **Q       And then the next day Sydney was
14 sick?**
15 A      Yes.
16 **Q       And so you didn't call in to
17 Brian that morning either?**
18 A      I believe I sent an email --
19 **Q       You talk to Darlene again?**
20 A      No, I don't think I talked to
21 Darlene, I think I actually talked to Brian
22 that day. I talked -- who did I talk to?
23 **Q       At this point you were having

Page 185

1  some troubles at home but it sounds to me
2  that if you hadn't had that flat tire or
3  Sydney hadn't been sick, you could have
4  reported to work; is that right?.**
5  A      Well, I mean probably those two
6  days, yes.
7  **Q       Yeah. And then I guess you
8  probably planned on not reporting to work
9  the day that your dad had his doctor's
10 appointment because you were going to take
11 him; right?**
12 A      I didn't -- my dad was sick.
13 **Q       But he had an appointment on the
14 6th, didn't he? Do you remember that?
15 According to your diary, you took dad to
16 the doctor, you spoke to Lee Butler, that
17 was the on the 6th, remember that? We are
18 going to call this Exhibit 9.
19         (Defendant's Exhibit 9
            was marked
20          for identification.)
21         According to your diary on that
22 Wednesday, the day after Sydney was sick,
23 you called in and left a message. Called

Page 186

1   in.  You have a note, Nicki, there is no
2   reference to your dad being sick.  Do you
3   see that?
4   A        I would have to -- I would have
5   to look at this the actual medical records
6   to tell if that was -- if I took dad to the
7   doctor or who took dad for the doctor's
8   appointment.
9   Q        Well, that note comes on the
10  6th, the next day?
11  A        Right, took dad to doctor.
12  Q        But earlier you told me that
13  your dad was sick on that Wednesday?
14  A        No, no, no, hold on, hold on.
15  Q        He wasn't?
16  A        Hold on.  Wednesday, okay.  Dad
17  was sick Wednesday, called Dr. Law's
18  office, requested letter, took dad to
19  doctor.  Okay.  Tuesday called in.  On
20  Wednesday, according to this my notes, took
21  dad to doctor.  Now I would think if my
22  father was sick that I would have stayed
23  home with him, which is what I'm sure I did

Page 187

1   and told Brian to fill out or to turn in
2   the paperwork that I had filled out.
3   Called the doctor's office, requested the
4   letter, and made an appointment.
5           You know I would be glad to find
6   that out there in the doctor's office if I
7   called Wednesday and made the doctor's
8   appointment, that would -- that would be
9   the only way to get an appointment for the
10  next day.
11  Q        And looking at the diary, was
12  this something you kept at work?
13  A        Sometimes kept it in the car
14  sometimes.
15  Q        When did you fill out these
16  notes that are showing up here?
17  A        I guess as we were going through
18  at this point.
19  Q        Are you sure?
20  A        No.
21  Q        Is it possible you filled it in
22  later?
23  A        Not much later, maybe the next

Page 188

1   day.
2   Q        Why were you keeping these
3   notes?
4   A        Ex-wife.
5   Q        What about her led you to keep
6   notes?  This sounds like a good story.
7   A        We don't have time for that.
8   Q        You got into this habit because
9   of your ex-wife?
10  A        Yes.
11  Q        I see.  Sometimes your days are
12  rather detailed and sometimes they aren't,
13  why did you make a decision to be detailed
14  on that day?
15  A        All of that happened.
16  Q        Did you fill this in the day you
17  talked to Brian?
18  A        I'm pretty sure because it looks
19  like I wrote it in a hurry.  I was probably
20  writing it down as things were happening.
21  Q        Were you afraid he wouldn't turn
22  it in?
23  A        Excuse me?  No, I asked him to

Page 189

1   turn it in.  I had no reason to think
2   otherwise.
3   Q        Did you write -- call Dr. Law's
4   office requesting the letter on a different
5   day?  The writing is slightly different.
6   A        Probably not at a different day,
7   probably later.
8   Q        When did you first consider
9   suing?
10  A        Now you have really asked me a
11  tough one.  Probably when I was denied
12  unemployment for --
13  Q        That's Exhibit 7.
14           (Defendant's Exhibit 7
             was marked
15           for identification.)
16           So did that make you angry when
17  you were denied unemployment?
18  A        Well , I just didn't think it
19  was fair.
20  Q        Why wasn't it fair?
21  A        Because I was in the process or
22  thought I was in the process of or had
23  leave when I called Brian and told him

Page 190

1 about that paperwork and to turn it in. I
2 thought everything would be fine from
3 there. I would get my things worked out,
4 and I could come back to work and
5 everything would be fine.
6 **Q     What did you write down on that**
7 **leave paperwork?**
8 A     As in?
9 **Q     What were the facts, what did**
10 **you say?**
11 A     Oh, goodness. I remember it
12 asking on there when would the leave take
13 effect, and you could choose when you
14 wanted it to take effect, and I checked
15 immediately.
16 **Q     Okay.**
17 A     Because I immediately -- it
18 needed to be immediate so I could take care
19 of all of these things. I had to fill out
20 all of my dad's information, all of my
21 information. It said to -- and I even
22 checked through there, when it said, you
23 know, to take care of an illness for self

Page 191

1 or child or adopted child or --
2 **Q     Parent?**
3 A     Or elderly parent, that kind of
4 thing, I remember that, but I did. I
5 filled out all of that paperwork.
6 **Q     Did you write down what was**
7 **wrong with your dad, or did you leave that**
8 **for the doctor to fill out for you?**
9 A     I don't know if I wrote down
10 what was wrong with my dad I -- I know that
11 when Brian told me that I needed a letter
12 that I called the doctor's office and asked
13 for a letter exactly as I said.
14     Now I thought at that point that
15 if whatever I had done was not sufficient
16 that someone would call me and let me know
17 that it wasn't sufficient and we could make
18 it sufficient, but I had several -- I mean
19 the dates of everything happening lay it
20 all out, I mean, my termination letter is
21 dated the 11th.
22 **Q     Do you consider it a termination**
23 **letter?**

Page 192

1 A     That's what it said.
2 **Q     I think we are on 10.**
3     (Defendant's Exhibit 10
4     was marked
5     for identification.)
6     Here's the original. Is this
7 the letter that you're referring to? It is
8 dated November 9th signed by Ed Crowell.
9 A     It took effect on the 11th;
10 right?
11 **Q     I see that as well. Is that why**
12 **the 11th strikes in your mind?**
13 A     Yes.
14 **Q     And the letter says as stated --**
15 A     It is also Veteran's Day; isn't
16 it?
17 **Q     As stated in our policy, absence**
18 **and tardiness, if you are absent without**
19 **providing acceptable notice, you may be**
20 **considered to have resigned without notice**
21 **and removed from the payroll. Your**
22 **absences meet this requirement of having**
23 **voluntarily resigned. Please contact me to**
24 **make arrangements to return the company's**

Page 193

1 **laptop and any other Miltope property in**
2 **your possession. When you got this letter**
3 **you were mad; right?**
4 A     When I got this letter, I was
5 fired.
6 **Q     When you got this letter, how**
7 **did you feel?**
8 A     Fired.
9 **Q     Well, what I'm asking you is how**
10 **did you feel?**
11 A     Betrayed, fired.
12 **Q     Did you pick up the phone to**
13 **call Ed back and say I'm really sorry this**
14 **happened, I will get the laptop back?**
15 A     I didn't know what to think.
16 **Q     You didn't call anybody back,**
17 **did you?**
18 A     I didn't know what to think. I
19 sent several emails, I called. I think
20 around the -- because I didn't get this
21 letter until I think the -- I want to say
22 it was Tuesday the 11th. What day was
23 Tuesday?

Page 194

1  Q        Tuesday was the 11th.
2  A        Okay.  Tuesday was the 11th.
3  Okay.
4  Q        Did you get the letter the
5  following Tuesday?
6  A        It was dated the 12th, so it
7  would have gone in the mail, two days to my
8  house.  I think -- was it -- it what would
9  be Friday be the 14th.
10 Q        Uh-huh.
11 A        Okay.  So I got the letter the
12 same day that Libby Swindle, the hospice
13 nurse, had picked up the letter from the
14 doctor's office and brought it to me.  I
15 took the letter back up there, faxed it,
16 and in the meantime came home checked the
17 mail and this letter was in there.
18 Q        Okay.  Is your testimony now
19 that you faxed the letter because I thought
20 you told me --
21 A        No, took it up there and she
22 faxed it.
23 Q        So you have already told me

Page 195

1  about that?
2  A        Yeah, I have been trying to trim
3  that up a little bit.  But in no way would
4  I have resigned my position.
5  Q        Have you ever known anybody at
6  Miltope to be denied leave when they ask
7  for it?
8  A        No, in fact I had been given
9  leave before and I never filled out the
10 first paper.
11 Q        Uh-huh.
12 A        It was when my daughter was
13 born, and I never filled anything out.
14 Q        That was back in the '90's?
15 A        Right.
16 Q        So are you claiming that as far
17 as you understood the policy it wasn't
18 required to fill out the paperwork?
19 A        No, I filled out the paperwork.
20 Q        You don't have any disagreement
21 with that requirement; is that correct?
22 A        No, I was just making a point
23 that I was given a week to stay with my

Page 196

1  wife and my daughter when she was born
2  without filling out any paperwork.  But
3  this time I filled out the paperwork, asked
4  my supervisor to turn it in, and here we
5  sit.
6  Q        So you think that things would
7  have been better if you hadn't had to fill
8  out any paperwork and someone had done it
9  for you?
10 A        No, I think under the -- under
11 the situation that if we had communicated a
12 little better that this situation might not
13 have arisen.
14 Q        Now Dee had given you the
15 paperwork well in advance of this meeting
16 you had with Brian and Gabe; correct?
17 A        Not well in advance.
18 Q        At least a couple of weeks;
19 right?
20 A        I don't recall the exact date
21 that Dee gave me the paperwork to fill out.
22 Q        And when you were asked to call,
23 you didn't actually call; correct?

Page 197

1  A        By whom?
2  Q        When you were asked by Ed
3  Crowell and in this letter to you it asked
4  you to call back to return the laptop and
5  any other property.  You did not make that
6  phone call, did you?
7  A        At that point in time I did not
8  know exactly what to do, I was very
9  confused about this situation.  It was a
10 lot of stress and strain on me.  I didn't
11 know what to do.
12 Q        Your last contact with Ed
13 Crowell was the meeting that you described
14 for me earlier; is that true?
15 A        No, I think there was a -- I
16 think there were some emails, were there
17 not, do you not have any emails?
18 Q        The only emails I have seen are
19 the emails you claim to have sent him in
20 October and set up a meeting.  I don't see
21 any other email between you and Mr. Crowell
22 unless you were seeing him on the emails
23 you were sending to Gabe?

Page 198

1   A      Would that not be contact, would
2   he not get that?
3   Q      Well, it's not contact generally
4   that I'm asking you about, Mr. Bailey, this
5   letter from the Vice President of
6   Administration at Miltope says please
7   contact me at (334)613-6542, now you did
8   not do that; correct?
9   A      Not that day, no, no.
10  Q      You never called him at this
11  number, did you?
12  A      I talked to -- I tried to
13  contact like Gabe and Brian and wanted to
14  know about this, and when I responded to
15  emails that Gabe and Brian had sent me, I
16  tried to -- and I even copied Mr. Crowell
17  to please let me know why this is going
18  like it is going and the reason being is
19  because I did not want to talk on the phone
20  and have anything twisted around.  I wanted
21  something in writing.
22  Q      So you didn't trust
23  Mr. Crowell?

Page 199

1   A      It wasn't a matter of trust.  It
2   wasn't a matter of trust I asked people to
3   call me back I asked people to let me know
4   what I needed --
5   Q      So the answer to my question is
6   that you did not call Mr. Crowell at
7   (334)613-6542 as he requested, am I right?
8   A      No.
9   Q      I'm not right?
10  A      Yes, you're right.
11  Q      Okay.  Thank you.  Now instead
12  what you have told me is you used email to
13  raise the questions that you had about what
14  had happened?
15  A      Right.
16  Q      Okay.  Did it ever occur to you
17  that you could be rehired because you had
18  simply been absent for three consecutive
19  working days without providing notice, hey,
20  there must be a misunderstanding, I ought
21  to call him and remind him about that
22  meeting we had, did that ever occur to you?
23  A      Honestly, no.

Page 200

1   Q      When you emailed Gabe and Brian
2   about what had happened, what had gone
3   wrong, did it ever occur to you to write
4   down to them, I had a meeting with
5   Mr. Crowell, I don't know why I got fired?
6   A      I believe I have an email that
7   has basically that same verbiage in it.
8   Q      I'd like to see it because I
9   have seen no email that indicates after you
10  stopped working at Miltope that you said
11  you had a meeting with Mr. Crowell.  The
12  only emails that I have seen is that you
13  were requesting a meeting, not that a
14  meeting actually occurred.  So if I am
15  wrong, I would like to see the document.
16  A      Okay.  That is something you
17  just gave me.
18         MR. BLYTHE:  We are going to
19  have to call this off.
20         MS. LINDSEY:  Is it already 3:00
21  o'clock?
22         MR. BLYTHE:  It is ten after.
23         MS. LINDSEY:  I don't have a

Page 201

1   watch, my watch is messed up.  Well, let me
2   wrap up some questions, and then we will
3   have to reconvene.  I suppose we may need
4   to get an extension.
5          MR. BLYTHE:  That's what I was
6   going to tell you why don't we just do that
7   and that way you can finish.
8          MS. LINDSEY:  Let me just ask
9   you a few more questions before you go, I
10  don't think it will take very long.
11  Q      In terms of communications
12  orally with Brian, Gabe, and Mr. Crowell,
13  have you told me about all of those?  I'm
14  not talking about emails, I'm talking about
15  face to face or on the phone, have we
16  talked about all of those?
17  A      I mean the one that sticks out
18  to me the most is when we we had the
19  meeting -- Mr. Crowell and I had the
20  meeting, he told me about his dad.  I
21  remember he called him Pop and it makes me
22  think about mine and I don't have any --
23  you know, I explained to Gabe and Brian

Page 202

1    that I don't have any brothers or sisters
2    or anybody to help me. It is a tough
3    situation. I think a lot of people there
4    knew that.
5    Q      Now let's focus on Gabe, Brian,
6    and Mr. Crowell. So you told me what you
7    said to them. Have you told me everything
8    that they said to you?
9    A      I think so.
10   Q      Okay. Have you told me
11   everything that you said to them?
12   A      I'm pretty sure.
13   Q      Okay. Now from what you have
14   described, I have not heard you say that
15   Gabe, Brian, or Mr. Crowell told you no,
16   you can't do this or it would be wrong?
17   A      To me the letter I received in
18   the mail that told me I had been terminated
19   was me telling them, know that's any --
20   Q      Let's back up, I don't think
21   the letter -- right now let's back up. The
22   meeting you told me about before you had
23   broken down on the road in Wetumpka, going

Page 203

1    back before that, you had these meetings.
2    Now the story you told me about Mr. Crowell
3    suggested to me that he was interested,
4    supportive, that he was referring
5    sympathetically, referred to his father, am
6    I wrong?
7    A      I'm not saying that he wasn't
8    supportive.
9    Q      Okay. Let me ask you this,
10   Mr. Crowell is sitting right here across
11   the table. Are you testifying here today
12   that Mr. Crowell had an intent to deny you
13   your rights under the law?
14         MR. BLYTHE: I'm going to object
15   to the form of that question.
16   Q      (By Ms. Lindsey) You can still
17   answer.
18         MR. BLYTHE: You can still
19   answer it though, go ahead and answer it.
20         THE WITNESS: When I went in
21   Mr. Crowell's office, I had my mind made up
22   what I needed to do and why I needed to do
23   it.

Page 204

1    Q      (By Ms. Lindsey) And what you
2    needed to do was immediately have leave to
3    take care of the situation that was
4    developing with your dad?
5    A      Exactly.
6    Q      And to make sure your daughter
7    was cared for?
8    A      And keep in mind the time frame
9    the doctor had told me was three to six
10   months.
11   Q      So in your mind --
12   A      This was three to six months.
13   Q      Okay.
14   A      We're three months out from when
15   he was told that he was going to start
16   having all of these problems, and it was
17   really really getting to me. And when I
18   left the office, I felt like I needed to go
19   over to my cube and get back to work. And
20   then the next week when everybody started
21   getting sick and things started happening,
22   I knew what I needed to do. The smoke had
23   cleared, I knew what I needed to do.  I

Page 205

1    asked Brian, who I thought was the person
2    who I needed to tell, he knew when, where I
3    was, to turn my paperwork in, let me know
4    that you need anything else.
5    Q      Did it ever occur to you to call
6    Mr. Crowell and say, hey, that paperwork is
7    in the cube?
8    A      In all honesty, I did not feel
9    comfortable calling Mr. Crowell because I
10   was afraid that he was going to try to find
11   a way to talk me out of taking the leave
12   any way or either say here take two weeks
13   vacation I couldn't take a chance on being
14   -- and maybe I just felt more comfortable
15   talking to Brian and Gabe but I didn't feel
16   like the intensity of my situation was
17   getting across.
18   Q      But based on what you have told
19   me, there is nothing specific Mr. Crowell
20   told you to understand this feeling so is
21   this just something that you were worried
22   about?
23   A      It was my perception --

Page 206

1   **Q        It was your own internal worry?**
2   A        It was my perception.
3   **Q        You did not voice it to him, did**
4   **you, I feel like you're discouraging me?**
5   A        I didn't feel I had to say it.
6   **Q        Well, what I'm trying to make**
7   **sure I understand is this, and I don't mean**
8   **to pester you, but I wasn't there.  You had**
9   **this meeting with him, what you told me is**
10  **that you went in and you told him you**
11  **needed to take care of some stuff with your**
12  **dad and you told him that you wanted to do**
13  **it immediately, and that he told you your**
14  **job was real important and that he also**
15  **talked to you about his own dad.  If that's**
16  **the sum of your conversation, I'm still**
17  **trying to figure out what it was that he**
18  **said or did?**
19  A        Mr. Crowell is a very
20  influential man in that company.  His
21  wishing would make one want to please him.
22  **Q        Okay.  But sitting here today**
23  **you don't know what was in his mind, do**

Page 207

1   **you?**
2           MS. LINDSEY:  I have got to get
3   this closed down, I can't --
4           THE WITNESS:  What do I need to
5   say to close it down?
6           MR. BLYTHE:  I don't know.
7           MS. LINDSEY:  I mean I don't
8   think it is fair to me when I set this
9   deposition up I didn't know you had fires
10  going on today.  I thought I had all day
11  and I --
12          MR. BLYTHE:  You had five hours.
13          MS. LINDSEY:  I have tried to
14  wrap it up.
15          MR. BLYTHE:  You have had five
16  actual hours.
17          MS. LINDSEY:  I get seven under
18  the rules, Derek.
19          MR. BLYTHE:  And I'm willing to
20  come back and give you two more.
21          MS. LINDSEY:  I hear you, but it
22  is not fair to me not to wrap up one area.
23  I'm where, you know, -- I'm trying to

Page 208

1   finish up.
2           MR. BLYTHE:  Well, finish it.
3           MS. LINDSEY:  Okay.
4   **Q        Mr. Bailey, is there anything**
5   **else you can recall specifically that**
6   **Mr. Crowell did or said that made you feel**
7   **discouraged?  Just a yes or no question.**
8   A        Not any one thing.
9           MS. LINDSEY:  Okay.  We'll hold
10  this open then, put that on the record
11  please and --
12          MR. BLYTHE:  Yes, I don't have a
13  problem with coming back.
14          MS. LINDSEY:  I'm sorry, I don't
15  mean to frustrate you, it's just that --
16          MR. BLYTHE:  I know.
17          MS. LINDSEY:  I can't --
18          MR. BLYTHE:  There ain't but
19  eight hours in the day, I know that.
20          MS. LINDSEY:  And it is one of
21  those things where I can't feel like I can
22  put aside a certain part of my depo until I
23  know all of the questions.

Page 209

1           (A discussion was held off the
2   record.)
3           MR. BLYTHE:  We need to get an
4   extension.
5           MS. LINDSEY:  Well, I will draft
6   up a motion, and we will get it filed.  I
7   will let you look at it.
8           MR. BLYTHE:  If you want to do
9   it as a joint motion, that is fine with me
10  too.
11          MS. LINDSEY:  That's great just
12  let me know.
13          END OF THE DEPOSITION
14
15
16
17
18
19
20
21
22
23

54                                                                              (Page 210)

Page 210

```
 1        C E R T I F I C A T E
 2
 3   STATE OF ALABAMA )
 4   JEFFERSON COUNTY )
 5
 6        I hereby certify that the above
 7   and foregoing deposition was taken down
 8   by me in stenotype, and the questions and
 9   answers thereto were reduced to computer
10   print under my supervision, and that the
11   foregoing represents a true and correct
12   transcript of the deposition given by
13   said witness upon said hearing.
14
15        I further certify that I am
16   neither of counsel nor of kin to the
17   parties to the action, nor am I in
18   anywise interested in the result of said
19   cause.
20
21   _____
        Alana Mize, Commissioner
22
23
```



# NEWS

**May 17, 2006 - The Rat Race To Perform Live**
McQueen Street band members Derek Welsh, Pat Bailey and Kane Bowden will join Chris Lilly from The Cold Hard Truth and original guitarist for The Rat Race, Lance Lisenby for a reunion concert in Columbus, GA on Saturday June 24, 2006 at SOHO. Advance tickets can be purchased by clicking here. Further information at: http://www.theratrace.com

**February 16, 2006 - The Cold Hard Truth Live in Auburn, AL March 11, 2006**
One of the few shows open to the general public will be performed at The Highlands in Auburn, AL. For more info on The Cold Hard Truth go to: http://www.thecoldhardtruth.info

**December 07, 2005 - McQueen Street Members To Perform Live**
McQueen Street members have formed a new side project and will be performing select dates throughout the Southeast. The band is called "The Cold Hard Truth" and the first live performance will be in Montgomery, AL on Friday December 16th at Off The Wagon. For more info go to: http://www.mcqueenstreet.com/thecoldhardtruth.html

**August 04, 2005 - 48 Hour Merchandise Sale**
For the next 48 hours the online store is running a buy 1 get 1 free sale. Buy any item and get one free. Simply make your selections and enter "MSBYG1F" in the comments section. View details here: http://www.mcqueenstreet.com/mscountdown.html

**March 11, 2005 - March 4th Show A Success**
The turnout for the March 4th concert was fantastic! Rockers were out in force to support Lance and all four bands put on great shows. To read more go to: http://www.mcqueenstreet.com/MSNewsletter031105.htm

**January 29, 2005 - McQueen Street To Perform Live March 4th To Aid Guitarist Lance Lisenby**
McQueen Street will perform live on Friday March 4th along with at least 3 other original acts in an effort to raise money for his medical bills. The concert is being held at The Blue Iguana in Prattville, AL located at 1714 East Main Street. All ticket sales will be donated to Lance's "Lend A Hand" Fund. Further details to be announced shortly.

**January 18, 2005 - Rat Race Guitarist On The Road To Recovery**
The Rat Race guitarist Lance Lisenby is now at home and recovering from his



DEFENDANT'S
EXHIBIT



accident. A large benefit was held in Montgomery, AL on Sunday January 16th to
raise money for his medical bills and to show support. It was a huge success.

**January 01, 2005 – The Rat Race Cancels January 15th Concert**
The band has canceled the January 15th show due to a recent tragedy. Early
Saturday morning guitarist Lance Lisenby's vehicle was hit by a train in downtown
Montgomery, Alabama. His left arm was severed and he has been in serious condition
since the accident.

**December 22, 2004 - More Rat Race Show Details Added**
Additional information regarding the January 15th show in Columbus, GA can be
viewed here:
http://www.mcqueenstreet.com/MSnewsletter122204.html

**November 22, 2004 - The Rat Race To Perform Live**
McQueen Street band members Derek Welsh, Richard Hatcher and Pat Bailey will join
guitarist Lance Lisenby for a reunion concert in Columbus, GA on Saturday January
15, 2005 at SOHO. Further details to be announced.

**November 15, 2004 - Derek Welsh Audio Interview Surfaces**
The original interview from The Hairball John Radio Show with Derek Welsh as a
special guest on 1/18/2005 has been found and is posted at:
http://www.hairballjohn.com/interviews.jsp

**October 31, 2004 - December 2005 Show Postponed**
The December 2005 McQueen Street concert in Alabama will be moved to early 2005
due to scheduling conflicts. Time and place to be announced.

**October 3, 2004 - December 2005 Show Plans**
The band is currently discussing the possibility of a December 2005 concert in
Alabama. Time and place to be announced shortly.

**September 21, 2004 - Liam Cooper Arrives**
Derek and wife Cherie welcome their second son Liam Cooper Welsh into the world on
September 21st at 4:13 PM. A healthy 7 pound 3.5 ounce rocker.

**August 30, 2004 - Special Edition CD In The Works**
Plans are in the works for a new enhanced McQueen Street 2 CD. The disc will include
new packaging, full lyrics, 2 never released bonus tracks and the full length music
video of "Money", which appeared on MTV.

**July 08, 2004 - Metal Dreams Reviews "2"**
"It's rare for me to be blown away by any CD, but it's even more rare for a band to
reunite after a long layoff and then impress me at all. McQueen Street succeeds on
both counts.
http://members.aol.com/mtldreams/mcqueenstreet.htm

**March 03, 2004 - Melodicrock.com Interview Posted**
Read one of the most in-depth interviews to date. Frontman Derek Welsh discusses
everything from the early history of the band to the long and winding road to their
second CD release.
http://www.melodicrock.com/interviews/mcqueenstreet.html

**February 27, 2004 - XM Radio Plays McQueen Street**
Various tracks from the band are played on XM Radio's Boneyard channel 41.
http://www.xmradio.com

**January 7, 2004 - Archives Section Added**
Read about the early history of the band and the success of "In Heaven" at radio and
"My Religion" on MTV's Headbangers Ball.
http://www.mcqueenstreet.com/archives/index.html

**January 6, 2004 - The Rat Race Story Included**
Find out about the project Derek & Richard started in 1993 and continued through
1997. The band recorded 3 CDs and toured extensively. Fans of The Rat Race can
purchase CDs.
http://www.mcqueenstreet.com/ratrace/index.html

**January 4, 2004 - MP3 Audio Samples Added**
Listen to sample tracks from the new McQueen Street 2 CD. All files are in MP3
format. For more information click on the link below or paste it into your browser:
http://www.mcqueenstreet.com/audio/index.html

**December 31, 2003 - CD Reviews Added**
Read the latest McQueen Street reviews of the new CD. Includes comments from
industry experts at radio and music press. For more information click on the link
below or paste it into your browser:
http://www.mcqueenstreet.com/reviews/index.html

**December 5, 2003 - 2005 Cities Announced**
McQueen Street has announced that they will perform in various cities during the
months of February and March. Venues and specifics to be added soon. For more
information click on the link below or paste it into your browser:
http://www.mcqueenstreet.com/tour/index.html

**November 30, 2003 - First Show A Success**
McQueen Street performed for the first time in 12 years and the magic is undoubtedly
still there. Fans came out in force to the Montgomery, Alabama concert showing their
strong support. The band delivered a 90 minute powerhouse performance with a 4
song encore. Some of the live photographs can be viewed on the "band" page. Simply
click on the link below or paste it into your browser:
http://www.mcqueenstreet.com/band/index.html

**October 30, 2003 - Downloadable Lyrics Available**
The lyrics for both McQueen Street 1 and McQueen Street 2 have been added to the
site and are in printable Adobe Acrobat form. These are free of charge to all
newsletter subscribers. Simply click on the link below or paste it into your browser:
http://www.mcqueenstreet.com/lyrics/index.html

**October 29, 2003 - Band Bio Section Added To Site**
Details regarding the current McQueen Street lineup have been added to the Web
site. To get further details click on the link below or paste it into your browser:
http://www.mcqueenstreet.com/band/index.html

**October 28, 2003 - T-shirts Added to Store**

2 new T-shirt designs featuring logos from the 1st and 2nd CDs have been added to the online store. All shirts are top quality 100% cotton Hanes® Heavyweight. To order or find out more click on the link below or paste it into your browser: http://www.mcqueenstreet.com/store/index.html

### October 11, 2003 - New McQueen CD Available
Today marks the preliminary release of "McQueen Street 2", the latest CD from the band. The 14 track CD features such songs as "Psychosis", "World Machine", "What about Jane", "White Junk Monkey" and more. To order your copy now click here or go to: http://www.mcqueenstreet.com/store/index.php

### October 10, 2003 - Online Store Opens
The McQueen Street "Store" is now live. CDs, T-Shirts and more can be ordered online by visiting: http://www.mcqueenstreet.com/store/index.html

### October 8, 2003 - Venue For First Show Confirmed
The band has finalized details for the first live performance in more than 12 years. In an effort to keep the show up close and personal McQueen Street has chosen Carrera's in Montgomery, AL located at 3432 Atlanta Highway. Tentative show time is 9:30 PM with doors scheduled to open at 8PM. Please keep in mind this is a very small club setting and seating is extremely limited. Early attendance advised as club capacity is estimated at 300-400 people.

### September 9, 2003 - First Live Show Announced
McQueen Street announces the band's first live U.S. performance in more than 12 years, slated to kick-off November 29 2003 in Montgomery, AL. Future markets and venues are still being finalized for late 2003 and 2005. Make sure to subscribe to the McQueen Street newsletter for the latest breaking news.



Copyright © 1998-2006 McQueen Street

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

PATRICK BAILEY,           )
                                   )
     Plaintiff,             )
                                   )   Case No. 2:05-CV-1061-MEF-DRB
v.                               )
                                   )
MILTOPE CORPORATION,     )
                                   )
     Defendant.        )

## PLAINTIFF'S RESPONSE TO DEFENDANT'S INTERROGATORIES

COMES NOW, PATRICK BAILEY, by and through his Attorney of Record, Derrick Blythe, who responds to Defendant's interrogatories as follows, to-wit:

## INTERROGATORIES

1.     State the Plaintiff's full name, including middle name, and all nicknames, or any aliases, by which the Plaintiff has been known, and the Plaintiff's social security number and date of birth.

ANSWER:  Patrick A. Bailey, Pat,

2.     State the addresses of all residences at which the Plaintiff has lived from January 1, 2001 to the present, specifying the dates during which the Plaintiff resided at each address.

ANSWER:  Physical Address:             Jackson's Gap, Alabama 36861;  Mailing Address:        Alexander City, Alabama 35011-1805.

3.     Describe the Plaintiff's education, including but not limited to identifying all schools attended, military training received, courses of instruction



DEFENDANT'S EXHIBIT

2

of any type in which the plaintiff participated, on the job training received, all degrees or certifications received, and the dates of attendance for each.

ANSWER: High School Diploma at Benjamin Russell High School in May of 1984; B.A. from Auburn University in August of 1990; Defense Acquisition University, IND 101, Class 02-005, Property Administration Fundamentals on August 30, 2002.

4.    Identify all of the Plaintiff's employers from January 1, 1996 to the present, including the Plaintiff's position, rate(s) of pay, benefits, supervisor's name, the dates of employment and address for each.

ANSWER: Miltope Corporation, CAV Administrator, Jim Pointer, $9.50 per hour; Bice Motors, salesman, Brian Bice, Commission; Liberty National Insurance, salesman, Eddie Milner, Commission; Miltope Corporation, CAV Administrator, Government Property Administrator, Brian Burkhead, $15.00 per hour.

5.    Identify all employers with whom the Plaintiff has applied for or sought employment, regardless of whether the plaintiff was hired, from January 1, 2001 to the present, specifying the dates on which the Plaintiff applied with each.

ANSWER: Miltope

6.    Identify all physicians, psychiatrists, psychologists, counselors, ministers, or other healthcare providers, whether for physical or mental health treatment, from whom the Plaintiff has sought or received treatment, or from whom treatment was sought or received by the Plaintiff's father or any other person whose condition caused the Plaintiff to request or take a leave of absence or time off from work at Miltope from January 1, 2001 to the present, regardless of the nature of the reason, specifying the dates on which the treatment was sought or received from each.

ANSWER:  Dr. Vincent Law/Temple Medical Clinic; Glenda/Nurse for Faith Hospice; Dr. Randy Stubbs, Rev. Garland Gamble/Faith Hospice.  Plaintiff reserves the right to supplement this response after reviewing further medical records.

7.     Identify all medications that the Plaintiff has been prescribed, or that were prescribed to the Plaintiff's father or any other person whose condition caused the Plaintiff to request or take a leave of absence or time off from work at Miltope from January 1, 2001 to the present, including the name of the physician or other healthcare provider who prescribed the medication, the pharmacy or drug store where the prescription was filled, and the dates on which the medications were prescribed.

ANSWER:  Aricept/Dr. Vincent Law/Temple Medical Clinic in Alexander City.  Plaintiff will supplement the prescription records as soon as they are available to him to the best of his ability.  All prescriptions were filled by the Veteran's Administration except for occasional emergency prescriptions, which were filled at Carlisle Drug Company located at 12 Main Street, Alexander City, Alabama.

8.     If the Plaintiff, or the Plaintiff's father or any other person whose condition caused the Plaintiff to request or take a leave of absence or time off from work at Miltope, has ever been treated as an inpatient in a hospital or received any treatment on an outpatient basis from January 1, 2001 to the present, please state the dates of each such treatment and identify the physician(s), psychiatrist(s), psychologist(s), or other healthcare provider who treated the plaintiff.

ANSWER:  Russell Medical Center from January 2001; treating physician Dr. Randy Stubbs with attending physician Dr. Vincent Law.

9.     Has the Plaintiff ever applied for disability benefits of any type, including through the Social Security Administration or a private insurance

carrier? If so, state the date of the application, the entity from which the benefits were sought, and whether benefits were awarded.

ANSWER: No.

10.    Has the Plaintiff ever applied for unemployment compensation benefits? If so, in what state, and when, and were benefits awarded?

ANSWER: Yes. Alabama in November 2003 after being terminated from Miltope Corporation.

11.    Has the Plaintiff ever declared bankruptcy? If so, what chapter and in what court? Has the bankruptcy been discharged?

ANSWER: No.

12.    Has the Plaintiff ever been a party to a civil lawsuit? For each lawsuit:

        (a)    State the dates that each lawsuit commenced and ended, or whether it is presently ongoing,

        (b)    State whether the Plaintiff is or was a plaintiff or defendant,

        (c)    State the nature of the dispute, including the facts and circumstances involved,

        (d)    State the specific claims and defenses asserted,

        (e)    State the disposition of the case, and if settled, for what amount.

ANSWER: Jonathon Bloom V. Patrick Bailey, dissolution of LLC, settled; Patrick Bailey V. Buddy McCorkle, breach of contract, judgment obtained, over ten years ago;  Patrick Bailey V. Mike O'Brien, contract dispute, judgment obtained, over ten years ago.

13.    State whether the Plaintiff has ever been arrested and/or convicted, and for each such arrest and/or conviction, identify the basis for the arrest, the nature of any charges, the nature of the conviction, and the jurisdiction in which

the arrest and/or conviction occurred.

ANSWER: No.

14.    Identify every person who the Plaintiff believes has knowledge of any or all of the allegations in the plaintiff's complaint.

ANSWER: Gabe Riesco, Rick Collins, John Stokes, Brian Burkhead, Doug Snell, Rhett Perry, Ed Crowell, Dee Colter, and Melody Orr.

15.    Identify every person who has provided the Plaintiff or the Plaintiff's counsel with a statement, orally or in writing, regarding any or all of the allegations in the complaint.

ANSWER: None to date.

DATED this the _18_ day of ___April___, 2006.

_____
Derrick Blythe (BLY-007)
Attorney for Plaintiff
126 Marshall Street
Alexander City, Alabama 35010
(256) 234-4101


## CERTIFICATE OF SERVICE

I hereby certify the above and foregoing has been served on the following counsel of record via United States Mail, postage prepaid, on this the _18_ day of _____April_____, 2006 to:

**JOHNSTON BARTON PROCTOR & POWELL LLP**
2900 AmSouth/Harbert Plaza
1901 6th Avenue North
Birmingham, Alabama 35203-2618

_____
OF COUNSEL