# EXHIBIT 2
# PART 1

1                UNITED STATES DISTRICT COURT

2           FOR THE MIDDLE DISTRICT OF ALABAMA

3                    NORTHERN DIVISION

4

5    PATRICK BAILEY,          )

6                             )

7          Plaintiff,         )

8    VS.                      )        CASE NO:

9    MILTOPE CORPORATION,     )2:05-CV-1061-MEF-DRB

10                            )     DEPOSITION OF:

11        Defendant.          )     PATRICK BAILEY

12                                   VOLUME 2

13

14          S T I P U L A T I O N S

15        IT IS STIPULATED AND AGREED, by and

16    between the parties through their

17    respective counsel, that the deposition

18    of:

19                    PATRICK BAILEY,

20    may be taken before LeAnn Maroney, Notary

21    Public, State at Large, at the law offices

22    of Johnston, Barton, Proctor & Powell, 2900

23    AmSouth/Harbert Plaza, Birmingham, Alabama,

Page 212

1  on September 29, 2006, commencing at
2  approximately 10:00 a.m.
3
4      IT IS FURTHER STIPULATED AND AGREED
5  that the signature to and reading of the
6  deposition by the witness is waived, the
7  deposition to have the same force and
8  effect as if full compliance had been had
9  with all laws and rules of Court relating
10 to the taking of depositions.
11
12     IT IS FURTHER STIPULATED AND AGREED
13 that it shall not be necessary for any
14 objections to be made by counsel to any
15 questions, except as to form or leading
16 questions, and that counsel for the parties
17 may make objections and assign grounds at
18 the time of the trial, or at the time said
19 deposition is offered in evidence, or prior
20 thereto.
21          ***
22
23

Page 214

EXHIBIT LIST

Defendant's Exhibit 11 - 265
Defendant's Exhibit 12 - 266
Defendant's Exhibit 13 - 298
Defendant's Exhibit 14 - 315
Plaintiff's Exhibit 1  - 342
Plaintiff's Exhibit 2  - 351
Plaintiff's Exhibit 3  - 352
Plaintiff's Exhibit 4  - 354
Plaintiff's Exhibit 5  - 384

Page 213

1      A P P E A R A N C E S
2  FOR THE PLAINTIFF:
3      DERRICK BLYTHE
4      Attorney at Law
5      126 Marshall Street
6      Alexander City, Alabama  35010
7
8  FOR THE DEFENDANT:
9      HEATHER F. LINDSAY
10     Attorney at Law
11     Johnston, Barton, Proctor & Powell
12     2900 AmSouth/Harbert Plaza
13     Birmingham, Alabama  35203
14
15
16        I N D E X
17 MS. LINDSAY: 215-319; 356-385
18 MR. BLYTHE:      319-356
19
20
21
22
23

Page 215

1      I, LeAnn Maroney, a Court
2  Reporter of Birmingham, Alabama, and a
3  Notary Public for the State of Alabama at
4  Large, acting as commissioner, certify that
5  on this date, pursuant to Rule 30 of the
6  Alabama Rules of Civil Procedure and the
7  foregoing stipulation of counsel, there
8  came before me on September 29, 2006,
9  PATRICK BAILEY, witness in the above cause,
10 for oral examination, whereupon the
11 following proceedings were had:
12         PATRICK BAILEY,
13 being first duly sworn, was examined and
14 testified as follows:
15 EXAMINATION BY MS. LINDSAY:
16 Q        Mr. Bailey, we meet again.
17 Thanks for coming back.  We'll just finish
18 up this deposition.  Hopefully it won't
19 take very long.
20         I have some reminders for you.
21 Try to remember to say yes or no rather
22 than uh-huh or huh-uh.  You and I sometimes
23 interrupt each other accidentally.  I'll

Page 216

1  try not to do that.  If you would, try to
2  remember just to answer my question.  And
3  if there's something that you haven't had a
4  chance to discuss, I'm sure your lawyer
5  will have a chance to ask you those
6  questions at the end.
7  A      Okay.
8  Q      I have some notes just based on
9  things I wasn't able to wrap it up last
10  time.  These questions may bounce around in
11  different areas, so just bear with me.
12  A      Okay.
13  Q      One question I have is you
14  mentioned having a legal dispute with a
15  Mr. McCorkle and Mr. O'Brien.  Do you
16  remember that?
17  A      Correct.
18  Q      Were y'all in the same band
19  together?
20  A      No.
21  Q      As I recall your testimony, the
22  dispute was over something to do with
23  music.

Page 217

1  A      Correct.
2  Q      Were you in bands with each one
3  of them?
4  A      No.
5  Q      So, you were not in a band with
6  McCorkle?
7  A      No.
8  Q      And you were not in a band with
9  O'Brien?
10  A      No.
11      MR. BLYTHE:  Off the record for
12  a second.
13      (Discussion held off the record)
14  Q      Can you tell me briefly what
15  that dispute was about?
16  A      Totally separate engagements.
17  They had hired a band I was in to play, and
18  they did not pay.  Therefore, we had to
19  seek some sort of action to be paid.
20  Q      And when you say we, which band
21  were you acting on behalf of when you asked
22  McCorkle and O'Brien to pay?
23  A      Imposter.

Page 218

1  Q      That was the band you were in at
2  Auburn, right?
3  A      Correct.
4  Q      Another follow-up question about
5  a time period other than your employment
6  with Miltope.  When you were in the Rat
7  Race prior to your working at Miltope, were
8  you getting paid for your performances with
9  that band?
10  A      With Rat Race?
11  Q      Yes.
12  A      Yes.
13  Q      And I believe that this was
14  probably in the year 1995 or 1996.  Is that
15  correct?
16  A      It was prior to my initial
17  employment with Miltope for a little less
18  than one year.  It was almost a whole year.
19  Q      And this had happened right
20  after your mother passed away, correct?
21  A      Correct.
22  Q      Was the income you received for
23  the Rat Race performances your only source

Page 219

1  of income in that time period?
2  A      Yes.  I was married during that
3  time, also.
4  Q      And your wife was working?
5  A      Yes.
6  Q      Just for clarification, when you
7  interviewed at Miltope with Mr. Ed Crowell,
8  what did you understand his title to be?
9  A      I don't recall.
10  Q      Do you recall Mr. Ed Crowell
11  interviewing you prior to both terms of
12  employment at Miltope?
13  A      I'm not exactly sure about the
14  first term of employment.  But the second
15  term of employment, I did speak to Mr.
16  Crowell.
17  Q      Do you recall receiving offer
18  letters from Mr. Ed Crowell for both terms
19  of employment?
20  A      I believe that's right.
21  Q      Did you understand him to be the
22  one to make the decision to hire you?
23  A      Yes.

Page 220

1  Q      And was that understanding the
2  same both times you were employed at
3  Miltope, that Mr. Ed Crowell hired you both
4  times?
5  A      I believe that to be right.
6  Q      What did you understand Brian
7  Burkhead's position to be when you worked
8  at Miltope the second time?
9  A      The second time, my supervisor.
10 Q      Did you know what area he
11 supervised?
12 A      He supervised O&R and me.
13 Q      What does O&R stand for?
14 A      Overhaul and repair.
15 Q      When you say he also supervised
16 you, what area were you running?
17 A      I was the CAV administrator and
18 the government property administrator.
19 Q      Did you say CAV, C-A-V?
20 A      CAV, commercial asset
21 visibility.
22 Q      What does that mean to a regular
23 person like me?

Page 221

1  A      I was in charge of the computer
2  system that made it possible for the Navy
3  to view their assets in Miltope's
4  possession for repair.
5  Q      Was this a way that they could
6  keep track of the status on repair of their
7  property?
8  A      Exactly, and also for their
9  program managers and people of that nature
10 to be able to tell in what condition each
11 piece of material was. So, if they needed
12 a certain amount, they could look and see
13 how many we had and they could put an order
14 in for that amount or know that they had
15 that many there. And they could also check
16 the status on delivery orders that we had
17 in-house.
18 Q      When you listed your area, you
19 said CAV administrator and government
20 property, I believe.
21 A      Right.
22 Q      How was being over government
23 property different from what you just

Page 222

1  described?
2  A      We had one area that was called
3  NAV IPC Mechanicsburg which was tracked in
4  CAV. That was the Navy ships. We had
5  another area that was NAV ICP Philadelphia
6  which was Navy planes. Those two were the
7  CAV items. The other items that we had
8  in-house were any and all other government
9  property, which would be Army, Air Force,
10 that kind of thing.
11 Q      So, there were two items that
12 fell within the CAV administrator title?
13 A      Two sections I would say would
14 be a better way to say it.
15 Q      And that would have been the
16 Mechanicsburg and --
17 A      Philadelphia.
18 Q      And then there was also a
19 separate administrative duty you had with
20 respect to other government property?
21 A      Correct.
22 Q      Could you tell me more about
23 what that entailed for you, this separate

Page 223

1  administrative duty you had?
2  A      I was sent to school in Ohio for
3  that. That's the IND 101 that you see on
4  there.
5  Q      I got you.
6  A      And I was instructed in ways to
7  maintain and store and secure government
8  property. And I was trying to implement
9  some of the things that I had learned in
10 school, which would mean that the -- some
11 certain things I had to have a security
12 clearance for. Some things I had to be
13 able to show a secure storage for and a way
14 to track them when they were in-house.
15 Q      What type of property were you
16 having to track and store securely?
17 A      S-3 drives.
18 Q      What are S-3 drives?
19 A      Can I go off the record?
20 (Discussion was held off the record.)
21 Q      Back on the record. With
22 respect to the other government property
23 you had to track and secure securely, that

Page 224

1  would have been classified information, as
2  far as you know?
3  A       Yes.
4  Q       What did you understand the
5  position of Gabe Riesco to be?
6  A       He was the director of -- he was
7  Brian's boss. So, he would have been the
8  director of product support. And he was
9  also a program manager of a program that I
10 can't recall the name of right now. But he
11 was Brian's -- Brian reported to him.
12 Q       And you reported to Brian,
13 right?
14 A       Correct.
15 Q       Do you know who Gabe reported
16 to?
17 A       I believe he would report to --
18 I don't know if he reported directly to Ed
19 or directly to the president of the
20 company. I'm not sure. I don't know how
21 that went.
22 Q       This is just a follow-up
23 question here. The last time we were

Page 225

1  together, you indicated that you were asked
2  to join the McQueen Street Band for a
3  reunion show in 2003. Do you remember that
4  testimony?
5  A       Yes.
6  Q       And when you were talking about
7  that, you said you were honored to be
8  asked. Do you remember that?
9  A       Right.
10 Q       And you also said I believe
11 something along the lines of with all that
12 was going on, it was also something of an
13 escape. Do you remember saying that?
14 A       Perhaps. Would you like me to
15 clarify that?
16 Q       I was just going to ask you what
17 you meant by all that was going on.
18 A       I had a lot of responsibilities,
19 and my father's illness, my daughter. It
20 was kind of like -- escape was a bad word.
21 It was a very-much-needed temporary
22 distraction. Not an ongoing one, but just
23 a temporary distraction, something to do

Page 226

1  other than, you know, worry about
2  everything that was going on. I got to go
3  play and it was fun and I enjoyed it. It
4  made me feel good, and then it was back to
5  reality.
6  Q       When you talk about having a lot
7  of responsibilities and going back to
8  reality, you are referring to your dad's
9  illness and your responsibilities as a
10 single dad, right?
11 A       Right. That's a lot of work.
12 Q       I'm sure it is. And you are not
13 referring to any other problem or issue
14 when you are talking about this, are you?
15 Was there anything else going on?
16 A       I would have to say that before
17 that, you know, getting divorced. That was
18 a great deal of emotional pressure. I had
19 done everything for everyone else at that
20 point. So, doing a little something for
21 myself was kind of a well-needed thing or
22 well deserved.
23 Q       Do you remember what date your

Page 227

1  divorce was final?
2  A       I know the date. I don't
3  remember what year. August 9th of -- I
4  don't remember what year. That's bad.
5  Q       Was it the year prior to the
6  issues with your dad, or had it been
7  several years that you had been divorced
8  from Melissa?
9  A       If you will give me a minute, I
10 can tell you what year it is. If I could
11 look -- I think I have a copy of my divorce
12 decree.
13 Q       Don't refer to any notes that
14 you don't want me to see.
15 A       If it's my divorce decree, it's
16 public record. I think I've got a copy of
17 that. So, it would be August -- does that
18 say '03?
19        MR. BLYTHE: '02.
20 A       '02. It was final on August the
21 9th '02.
22 Q       Thanks for checking that.
23 A       No problem.

Page 228

1  Q      The last time we talked, you
2  said that prior to playing in Cold Hard
3  Truth, you played in a band with a friend.
4  Do you remember that testimony?  What I'm
5  getting at is was there another band you
6  played in besides McQueen Street, Rat Race
7  and Cold Hard Truth?
8  A      Oh, sure.  I've filled in with
9  bands.  There was never any kind of
10 permanent situation.  I played bass in a
11 band, but that was not a permanent
12 situation.
13 Q      So, since you left Miltope the
14 second time, you are saying that you filled
15 in with bands at various times but not on a
16 permanent basis?
17 A      Right.
18 Q      When you filled in with those
19 bands, did you receive some compensation
20 for those shows?
21 A      Sometimes.  Most of the time,
22 yes, or I wouldn't -- I wouldn't have done
23 it had I not.

Page 229

1  Q      Were you sometimes with the Jeff
2  Golden Band again?
3  A      No.
4  Q      Is it your testimony that your
5  income from filling in was not sufficient
6  to report to the IRS?
7  A      No, it wouldn't have been.  Or I
8  was told by the accountant that it wouldn't
9  have been.
10 Q      You do have an accountant?
11 A      That filed taxes when I did, yes.
12 Q      The last time we talked, you
13 said that working two days a week with Cold
14 Hard Truth I believe you said is the best
15 arrangement considering your family
16 obligations.  Do you remember that
17 testimony?
18 A      Well, I mean, under the
19 circumstances, it works.  Something else
20 would probably work, too, you know.
21 Q      Are you pursuing any other
22 options that you think would work better
23 for your family?

Page 230

1  A      At this moment, no.
2  Q      Have you actively pursued any
3  other options in the last couple of years?
4  A      Actively.  I might have talked
5  to someone about something.  But as far as
6  -- no.  Actively, no.
7  Q      Is there any other work schedule
8  that you think would work better for your
9  family than what you are doing now?
10 A      I'm not sure.
11 Q      You haven't come up with a
12 different idea?
13 A      If the opportunity presented
14 itself, I might consider it and think about
15 it.  But I don't dwell on that.
16 Q      Last time we talked about your
17 dad going to the Presbyterian church at
18 some time in his life.  Does he still
19 attend church today?
20 A      No.
21 Q      Is he physically able to attend
22 church?
23 A      No.

Page 231

1  Q      And why is that?  Can you tell
2  me something about his physical condition
3  that --
4  A      He sometimes cannot -- how do I
5  say that?
6       MR. BLYTHE:  Just say it.
7  A      There have been instances where
8  he has used the restroom on himself and
9  that kind of thing, and that would not be
10 something that I would want to put him
11 through.
12 Q      So, was there a time that you
13 stopped -- well, can you point to a time
14 when he stopped attending church for the
15 reason that you just described?  In other
16 words, is there a time frame for when this
17 began?
18 A      When his dementia started, when
19 the Alzheimer's hit.
20 Q      I want to ask you about this
21 opportunity you had with Tom Bradley, who
22 was a program director.  Do you remember
23 that?

Page 232

1  A      Yes.
2  Q      As I understand it, you were
3  being asked to take on a job that would
4  have taken you away from home for about two
5  weeks; is that right?
6  A      Two weeks at a time is what I
7  was told.
8  Q      Two weeks at a time. And this
9  would be a different role within Miltope
10 that you were being asked to assume; is
11 that right?
12 A      Right.
13 Q      Were you being asked to do this
14 around the time that you were telling me
15 you were seeking leave?
16 A      It was prior to me seeking
17 leave.
18 Q      Do you remember the title of
19 that job?
20 A      I want to say that it was DPA
21 upgrade administrator or something of that
22 nature, something close to that. The
23 program was a DPA upgrade.

Page 233

1  Q      Last time we talked about your
2  meeting with Mr. Crowell on October 27th.
3  Do you remember that meeting you told me
4  about?
5  A      Yes.
6  Q      When y'all were talking about --
7  when y'all were having that meeting, my
8  understanding is that the DP upgrade
9  administrator job was off the table. That
10 was not discussed between you and Mr.
11 Crowell at that time; is that correct?
12 A      I believe I mentioned that, and
13 I also believe that I -- I told him that
14 there was no possible way that I could go
15 and be gone to all these different Army
16 bases for a week or three days or two weeks
17 at a time in the situation that I was in.
18 Q      Had you not already rejected
19 that position, though, by the time you
20 spoke with Mr. Crowell in October 2003?
21 A      I had told Mr. Bradley, I had
22 told Gabe, I had told Brian that we were
23 going to have to find someone else to do

Page 234

1  this. And I don't -- I don't know at that
2  point in time if they had taken it off the
3  table or not.
4  Q      In other words, do you think you
5  were still being encouraged to reconsider?
6  A      Yes.
7  Q      Did all this come up for the
8  first time after July of '03, or do you
9  remember?
10 A      After July of '03 when my father
11 was in the hospital the first time?
12 Q      Yes.
13 A      It came up after that. I think
14 in a way I wanted to try to do more, to be
15 more of a provider for my family, and I
16 really wanted to be, you know, more
17 financially successful. And after looking
18 -- I went to Redstone Arsenal with Mr.
19 Bradley and I saw what truly was involved
20 in the whole thing. And there was no way I
21 was going to be able to fill that role that
22 needed to be filled, and I told him he was
23 going to have to get someone else. And the

Page 235

1  reason that I made that decision and
2  thought that was there was a gentleman
3  there at Redstone whose wife was at home
4  dying of cancer, and he was at work. And I
5  couldn't understand that. That's what made
6  me think of that. I said, "There's just no
7  way I can do this."
8  Q      Did that make you feel that you
9  should be home with your dad at that point?
10 A      Yes, it did. When I saw someone
11 that wasn't at home with their loved one,
12 that's what really made me think that. And
13 things just kept stacking up that made me
14 make my mind up about that. And then we
15 had that meeting. And it was like when I
16 came out of the meeting, I was totally
17 confused again about all those great ideas
18 that I had, I need to do this, I need to do
19 this, I need to do that. And then I left
20 that meeting and I was like, okay, now I
21 feel bad. Now what do I do?
22 Q      What you are referring to I
23 believe is when you left the meeting with

Page 236

1  **Mr. Crowell on October 27th. Am I right?**
2  A       Right.
3  **Q       When you say you left that**
4  **meeting confused, am I right that at that**
5  **point you did not specifically say I need**
6  **my leave to start on such and such date,**
7  **that you left it open?**
8  A       When I went in there, I went in
9  there to tell him I needed to take the
10 leave. And when I told him that and he
11 spent 20 minutes or so -- I don't recall
12 exactly how long the meeting was. But when
13 he had told me the story about his father
14 and that kind of thing, that kind of made
15 me feel like maybe I can work my way
16 through this and get through this and take
17 care of everything I've got to take care
18 of.
19         In other words, after I left the
20 meeting, I had been completely talked out
21 of exactly what I went in there to tell
22 him. So, I went back to my cube and went
23 back to work, and then the events that

Page 237

1  followed that week were the events that
2  made me call Brian and tell Brian to turn
3  that paperwork in.
4  **Q       What do you recall of what you**
5  **were told about his dad's illness?**
6  A       I believe he told me that his
7  father also had had cancer. And he told me
8  that even though he was sick, he spent a
9  lot of time with his dad and he was able to
10 -- you know, he had family I believe he
11 told me that helped him. Of course, he was
12 married. He had brothers and sisters and
13 other family that could help and that kind
14 of thing. But, see, I wasn't -- I didn't
15 have that.
16 **Q       Did he tell you what kind of**
17 **treatment his dad was receiving?**
18 A       I don't recall.
19 **Q       Did he tell you whether his dad**
20 **was able to drive and take care of himself**
21 **during his cancer?**
22 A       I don't recall.
23 **Q       So, when you left that meeting**

Page 238

1  with Mr. Crowell and you say you were --
2  you felt talked out of what you had wanted
3  to do, is that the basis for your claim
4  that your attempt to get FMLA leave was
5  interfered with?
6  A       I don't think that it's the
7  base. I think it's the -- no.
8  **Q       Is there something else that**
9  **happened that told you, hey, someone is**
10 **trying to prevent me from exercising my**
11 **rights?**
12 A       I was waiting on a letter from
13 my father's doctor to forward to Brian
14 Burkhead. I got the letter, forwarded the
15 letter the next day or the day after. I
16 think it was the next day I got a letter in
17 the mail telling me that I had been fired
18 for failure to report to work for three
19 consecutive days. That's the crux of this
20 whole thing to me, honestly.
21 **Q       So, those are the events that**
22 **you think are the most important in terms**
23 **of your claims?**

Page 239

1  A       Well, I think all the events are
2  important. And the combination of all of
3  them rolled up into one is why we sit here.
4  **Q       You don't dispute that you**
5  **didn't call in those three days, though,**
6  **right?**
7          MR. BLYTHE: Object to the form.
8  **Q       Do you understand the question?**
9          MR. BLYTHE: You can answer.
10 **Q       I can ask you a different one if**
11 **you are having trouble answering.**
12 A       Please.
13 **Q       There were days that you did not**
14 **call in, correct?**
15 A       Yes.
16 **Q       Did you have any reason to think**
17 **that you had been fired before you received**
18 **that letter?**
19 A       Not really, no.
20 **Q       Was there any conversation you**
21 **had with any Miltope employee before you**
22 **got that letter that made you worry that**
23 **you were going to be fired?**

**Page 240**

1　A　　I believe there was.
2　Q　　**Tell me about that, please.**
3　A　　Can we go off the record for a
4　second and let me ask Derrick a question?
5　　　(Discussion held off the record)
6　Q　　**Back on the record.**
7　A　　A Miltope employee called a
8　friend of mine and asked, "Where is Pat?
9　Nobody can find Pat. We've been trying to
10　get in touch with Pat." And at that point
11　they told them, "I don't know where he is.
12　I'll check and see if I can find him." And
13　he got off the phone with that person and
14　called me and said that somebody had called
15　looking for me. And I was like, "Well, why
16　didn't they call me?"
17　　　I was told by someone else that
18　Brian and Gabe were directed not to answer
19　any of my e-mails or return any calls that
20　I might have made.
21　Q　　**Is there anything else?**
22　A　　No.
23　Q　　**Who was the Miltope employee who**

**Page 241**

1　**called your friend?**
2　A　　Darlene Hill.
3　Q　　**And who was the friend she**
4　**called?**
5　A　　Rhonda Blythe.
6　Q　　**The wife of your attorney?**
7　A　　Yes.
8　Q　　**Who told you that Gabe and Brian**
9　**had been instructed not to respond to your**
10　**e-mails?**
11　A　　I believe it was Tina Howell.
12　Q　　**Tina who?**
13　A　　It was either Tina or Darlene.
14　I don't remember which one.
15　Q　　**Do you remember Tina's last**
16　**name?**
17　A　　Howell.
18　Q　　**And she was a Miltope employee?**
19　A　　Yes.
20　Q　　**If I remember your testimony**
21　**correctly before, you communicated via**
22　**e-mail during this month of November. You**
23　**did not make phone calls. Did I**

**Page 242**

1　**misunderstood you?**
2　A　　I might have talked to her. But
3　as far as -- you asked me did I communicate
4　with Gabe or Brian or Mr. Crowell. No, I
5　was not going to communicate with them on
6　the phone. But other people I did talk to
7　on the phone that were friends other than
8　just people that worked there.
9　Q　　**Did you call anyone who was a**
10　**Miltope employee to talk about whether you**
11　**were still going to come back to the**
12　**company after your personal situation**
13　**resolved?**
14　A　　Oh, I had -- I had every
15　intention of going back to work.
16　Q　　**I'm asking a different**
17　**question.**
18　A　　Okay. Please clarify.
19　Q　　**Let me back up and say I**
20　**understand that you didn't call Gabe or**
21　**Brian or Ed on the phone.**
22　A　　Right.
23　Q　　**You sent them e-mails.**

**Page 243**

1　A　　Right.
2　Q　　**But you said you did make phone**
3　**calls to other people who were friends.**
4　A　　Right.
5　Q　　**Were any of those friends**
6　**Miltope employees?**
7　A　　At the time?
8　Q　　**Yes.**
9　A　　Yes.
10　Q　　**Who were those folks?**
11　A　　Tina Howell.
12　Q　　**And Darlene?**
13　A　　I didn't -- the only time I
14　called Darlene was when I was reporting to
15　work that I wouldn't be there, one of those
16　days.
17　Q　　**But you called Tina as a friend?**
18　A　　Right.
19　Q　　**And did you also call Crystal as**
20　**a friend?**
21　A　　Probably, yeah. They kept a
22　boat at my house at that time, if you will
23　recall that. And I might have not called

Page 244

1    and talked to her about it.  I might have
2    talked to her about it when they were at my
3    house.
4    Q        And when you talked to Tina as a
5    friend, did she tell you they really want
6    you to call and talk to them about this?
7    Did she say anything at all about —
8    A        I don't remember exactly.  It's
9    possible that they said that I should
10   call.  You know, I did send e-mails, and I
11   wanted an answer that way.  I didn't —
12   Q        Did you think you had the right
13   to dictate how they could communicate with
14   you?
15   A        I wasn't trying to dictate how
16   they communicated with me.  I was trying to
17   protect myself at that point in time.
18   Because at that point in time I had, like I
19   said, received a letter telling me that I
20   had been fired.  And I did not want to say
21   anything or do anything that -- I just
22   really didn't know what was going on, and I
23   wanted some answers.  But I wanted them

Page 245

1    where I could look at them instead of
2    trying to recall what I had talked to them
3    about on the phone or what they had said to
4    me on the phone.
5    Q        Am I right that you came to this
6    conclusion that you only wanted to talk to
7    them in writing by e-mail after you
8    received that letter from Ed Crowell?
9    A        Probably.
10   Q        You didn't have any reason to
11   distrust them before that letter, did you?
12   A        I had sent the letter prior to
13   that.  And I had told Brian after I asked
14   him to turn that paperwork in, "If there is
15   anything else, please let me know," which
16   would mean if Mr. Crowell is looking for
17   you to call him to discuss this matter
18   about you losing your job, I will let you
19   know.  See, Brian could have let me know.
20   Brian did not let me know.
21   Q        When you said you provided the
22   letter, are you referring to the doctor's
23   letter that you asked the doctor's office

Page 246

1    to fax to Miltope?
2    A        Yes.
3    Q        And you personally did not
4    provide that letter, correct?
5    A        Rephrase it.
6    Q        As I understood your testimony
7    last time, you asked that letter to be
8    faxed on your behalf.
9    A        Right.
10   Q        But you personally did not fax
11   it or hand deliver it?
12   A        I stood at the desk at the
13   doctor's office and watched her walk with
14   the letter to the fax machine, send it, and
15   then brought it back to me.
16   Q        And that's what you mean by
17   providing the letter?
18   A        Right, from the doctor's
19   office.  I don't own a fax machine.
20   Q        What did you tell Tina when you
21   talked to her as your friend during this
22   time period?
23   A        I told her I didn't have any

Page 247

1    clue what was going on.  I told her that
2    Darlene had called looking for me.  And
3    then I believe she told me that Gabe and
4    Brian were directed not to have any further
5    communications with me.  And the only
6    response I got as an e-mail from Gabe
7    regarding anything was that I needed to
8    provide them with the CAV passwords, which
9    I had already done.  I had already given
10   them to Lee Butler who was helping me ship
11   stuff while I was running in and out of the
12   doctor's office on the phone.  There are
13   people that can verify that.
14             I was working shipping things
15   out, getting things done.  Lee was
16   helping.  I had already done that.  And the
17   only answer I got back from him was I need
18   the passwords and I need you to return the
19   company laptop when you can.  No mention of
20   anything else that was going on.  Just I
21   need the passwords and I need this.
22   Q        When Tina said that Gabe and
23   Brian had been instructed not to respond to

Page 248

1  your e-mails, did she say what the source
2  of her information was?
3  A     No.
4  Q     What was Tina's position at
5  Miltope?
6  A     She was a trainer.
7  Q     What kind of trainer?
8  A     She taught classes on
9  certifications that we had to have.
10 Q     She was not in supervision, was
11 she?
12 A     No.
13 Q     Did it occur to you that she
14 might just be passing on idle gossip
15 instead of reliable information?
16 A     No.  I trusted what she said.
17 Q     Did it occur to you she might
18 have been mistaken?
19 A     Ditto.  No.  I can't answer the
20 -- can we take a break, please?  But I need
21 to answer that question first.
22 Q     The question was did it occur to
23 you that she could have been mistaken?

Page 249

1  A     No.
2        MS. LINDSAY:  We can take a
3  break.  I need one, too.
4        (Short break was taken.)
5  Q     Back on the record.  Earlier you
6  testified that you were wondering why they
7  had not tried to call you at home, the
8  Miltope folks.  Do you remember that?
9  A     Yes.
10 Q     How do you know they weren't
11 trying to call you at home?
12 A     I would have seen the number on
13 the phone or either answered the phone.
14 Q     Were there times you saw their
15 number on the phone and you just didn't
16 want to pick up and talk to them?
17 A     I don't think so.
18 Q     Isn't it possible there were
19 times you weren't home to pick up the phone
20 and they tried to call you?
21 A     It's possible.
22 Q     When you say you gave the
23 passwords to Lee Butler, you didn't give

Page 250

1  them to him in writing, did you?
2  A     I probably gave them to him over
3  the phone when I was talking to him over
4  the phone.
5  Q     And it's possible that Brian and
6  Gabe did not know you had conveyed that
7  information to Lee, isn't it?
8  A     It would be hard for them not to
9  know, because Lee was shipping an order out
10 that needed work done in the computer that
11 Lee would have had to have done.
12 Q     How do you know that?
13 A     Because those documents have to
14 have what's called -- or those items have
15 to have what's called a DD-1348, which is a
16 form that the items would have to have on
17 them to be shipped according to procedure.
18 Q     Did Lee complete such a form for
19 you when you were out?
20 A     I walked him through doing
21 those.  I think I've got an e-mail from
22 Melody Orr, who was my contact person at
23 NAV ICP.

Page 251

1  Q     And her e-mail would establish
2  what?
3  A     That we were getting the 1348's
4  printed out to ship those.
5  Q     Was this while your dad was at
6  that appointment?
7  A     Yes.  I was in the doctor's
8  office with my father, and he was back I
9  think doing blood work while I was doing
10 this with Lee on the phone.
11 Q     According to your calendar, that
12 occurred on November 6th, a Thursday.  Do
13 you have any reason to think your calendar
14 is incorrect?
15 A     I would have to go back and
16 check, but I don't think so.
17 Q     According to your calendar note,
18 you said, "Took dad to doctor.  Spoke to
19 Lee Butler on phone regarding Order Number
20 5071 three times.  Called Mech" —
21 A     Mechanicsburg.
22 Q     Mechanicsburg, an abbreviation,
23 M-E-C-H, Mel Orr to get CAV link sent to my

Page 252

1  house.  She did.
2  A       Right.
3  Q       So, if the CAV link was sent to
4  your house, would you have been able to
5  work from home?
6  A       She told me that I would be able
7  to work from home and get those forms
8  printed out, but my computer was not quite
9  up to par on doing that.
10 Q       So, when the forms did not get
11 printed out from your home for order number
12 5071, what did you do next?
13 A       Melody went in the system and
14 completed them, which is something that has
15 to be done.  And I had given Lee the
16 passwords, and Lee would have printed the
17 forms out.
18 Q       Why would Lee need the passwords
19 if Mel had already completed them?
20 A       Melody could not -- when I say
21 completed, that is a status code in the
22 system to show that that item is repaired
23 and finished, completed.  But those

Page 253

1  documents that have to be shipped with them
2  have to be printed out and attached to
3  them.  So, she could not have done that
4  short of printing them out and faxing all
5  of them to him to put on there.  And then
6  the bar codes would probably not have read
7  correctly at that point.
8  Q       On your calendar entry for
9  November 7th, you say, "Worked with Lee on
10 phone.  Talked to Brian Goff, 6487."
11 A       That might have been when we
12 were trying to get those printed out.
13 Q       So, you were trying to get Order
14 5071 shipped out on that Friday?
15 A       Exactly.
16 Q       When you couldn't get it done at
17 home?
18 A       Right.
19 Q       And on that same day, you were
20 also preparing to go to Atlanta for a
21 McQueen Street rehearsal, correct?
22 A       I believe so.  I think it was on
23 Sunday we had that rehearsal.

Page 254

1  Q       According to your notes, it says
2  on Saturday, "McQueen Street load-in."
3  A       That was when we met there and
4  got the gear out.  And we might have
5  rehearsed for a little bit, but not much.
6  The rehearsal was basically Sunday.
7  Q       And then according to your
8  calendar, the rehearsal also occurred on
9  Monday, November 10th?
10 A       Probably Monday morning.  I
11 think we had to leave by a little after
12 lunch.
13 Q       Did you ever tutor someone named
14 Josh?
15 A       Josh Brewer.
16 Q       On your November 11th entry it
17 just says, "Josh PMT due 7/30."  Was that a
18 payment due to you?
19 A       For his lessons.
20 Q       So, you were tutoring Josh?
21 A       Yes.
22 Q       When you were picking up Sydney
23 from visiting her mom that prior weekend,

Page 255

1  do you remember how you told me you had a
2  flat tire and you got in real late?
3  A       Right.
4  Q       You were picking her up on
5  Sunday night, right?
6  A       Correct.
7  Q       That following Monday you said
8  you were too tired to come to work, right?
9  A       Right.
10 Q       And that's when you called in to
11 Darlene and told her you had a flat tire?
12 A       Right.
13 Q       So, I guess it's inaccurate on
14 your calendar when you wrote on the 3rd,
15 which was that Monday, "Worked.  Syd went
16 to school"?
17 A       It could be, yes.  Let me look
18 at that, please.
19 Q       Let me give you another copy.
20 A       Yeah, that's not correct.
21 Q       Okay.
22 A       Because that was the Monday that
23 she was down there for Halloween.  This is

(Pages 256 to 259)                                                    13

---

Page 256

1  November 3rd. I believe Halloween was over
2  that weekend or the end of that week.
3  **Q      And, in fact, the Miltope**
4  **records in terms of your time worked**
5  **reflect that you were absent on that**
6  **Monday, as well.**
7  A      Yes. You are correct in that.
8  **Q      So, is it possible there are**
9  **other inaccuracies on this Exhibit 9?**
10  A      I'm sure it's possible. I mean,
11  I don't -- I don't think there is. If you
12  would like for me to review that, I will.
13  **Q      Well, did you fill it out after**
14  **the fact, after these dates?**
15  A      No. It was around the same time
16  all this was going on. I just made a
17  mistake.
18  **Q      Did you look for any other**
19  **calendars that you had for July, August,**
20  **September, October?**
21  A      No.
22  **Q      Did you have any more?**
23  A      I might have had one like on the

---

Page 257

1  refrigerator at home or something, but I
2  don't have it. I've got one that was in my
3  office, but I think it's mostly -- this was
4  '04, so it's not pertinent.
5  **Q      Before your father had pneumonia**
6  **in July, you were good friends with Rhonda**
7  **Blythe, right?**
8  A      Yes.
9  **Q      Did you have any information**
10  **about any complaints she may have had**
11  **against Miltope at that time?**
12  A      Not really.
13  **Q      What do you know, if anything,**
14  **about complaints she may have had against**
15  **Miltope?**
16  A      All I know about that is she was
17  working there and she had complications
18  with her pregnancy, and then after that she
19  was not working there. But I don't know
20  any details.
21  **Q      Did you ever hear that she was**
22  **claiming she was being paid differently**
23  **from men?**

---

Page 258

1  A      No.
2  **Q      In your discussions with Rhonda,**
3  **did she indicate that she had something**
4  **against Miltope?**
5  A      Not -- I mean, no.
6  **Q      Do you know why -- when she was**
7  **called by a Miltope employee looking for**
8  **you, do you know why she didn't just tell**
9  **them, "Yeah, I know where he is"?**
10  A      She probably said, "I don't know
11  exactly where he is. Have you tried his
12  house?" I mean, I was not a party to the
13  conversation. I don't know what exactly
14  she said. I do know that some time after
15  that conversation that they had, I was
16  called and I was at home.
17  **Q      And did you pick up the phone?**
18  A      Yeah.
19  **Q      Who did you talk to?**
20  A      Derrick.
21  **Q      Oh. You are not talking about a**
22  **Miltope employee calling you, then.**
23  A      No. I don't recall anyone

---

Page 259

1  calling me. I think Tina might have called
2  me or e-mailed me or something of that
3  nature.
4  **Q      Do you remember asking Ed**
5  **Crowell if you could buy some audio**
6  **equipment that Miltope was going to discard?**
7  A      I remember Miltope having some
8  television production equipment, which did
9  include some audio equipment, that was from
10  a lessor of part of the building.
11  **Q      When was that?**
12  A      I do not have a clue. I don't
13  remember.
14  **Q      Do you remember asking if you**
15  **could have a microphone from that set of**
16  **equipment?**
17  A      I remember asking -- no, it was
18  not a microphone. I might have asked about
19  a microphone. But he told me that there
20  was a small mixing board, and I asked him
21  about that. And I found someone that
22  purchased the lot of that, and it was my
23  understanding that he had let me have that

---

Page 260

1 little mixing board for helping them
2 liquidate that equipment.
3 Q        Do you remember being quoted
4 that if you would give -- if you would pay
5 $200, you could have that equipment, that
6 mixing board?
7 A        I remember him saying something
8 about that. But after I -- he told me I
9 could purchase it outright for that. But
10 then after I found someone that bought the
11 lot of it, no mention was made of money at
12 all after that.
13 Q        When you were employed at
14 Miltope the first time, you received a
15 handbook like this here (indicating),
16 correct?
17 A        Yes.
18 Q        And do you still retain a copy
19 of that handbook?
20 A        I don't know. I don't think so.
21 Q        Were you ever asked to give it
22 back?
23 A        I don't recall that.

Page 261

1 Q        Between the time that you left
2 Mr. Crowell's office on October 27th and
3 the time you picked up your daughter that
4 following weekend, did you have any
5 conversations with Gabe or Brian about
6 possibly taking leave?
7 A        I might have talked to both of
8 them about it, but I don't remember an
9 exact conversation.
10 Q        If I understood your testimony
11 correctly, you left Mr. Crowell's office
12 wondering if you could possibly manage to
13 continue your job and care for your dad
14 based on what Mr. Crowell's story was about
15 his own father's illness; is that right?
16 A        Maybe. But I -- go ahead.
17 Q        And if I understood you
18 correctly, you reconsidered that position
19 when this week of November 3rd became so
20 difficult to manage with the illness of
21 your daughter and your father's needing
22 care?
23 A        Yes.

Page 262

1 Q        So, am I understanding how you
2 were making decisions at that time period,
3 or is there something else you need to tell
4 me so I can understand your decision-making
5 process?
6 A        Could you clarify that, please?
7 Q        Sure. If I understand you
8 right, after the conversation with Mr.
9 Crowell on October 27th until the week of
10 November 3rd when things became very hectic
11 for you, in that interim period you were
12 considering managing your job as well as
13 the care of your dad? In other words, you
14 were --
15 A        Was I entertaining the idea of
16 trying to do that? Yes. I was trying to
17 figure out how I would be able to do both.
18 Q        So, you were debating whether to
19 take leave at all in that week period?
20 A        Well, I had already filled out
21 the paperwork. It was more or less I was
22 debating on whether or not to turn it in.
23 And then when all those events took place,

Page 263

1 there was no other option. I thought about
2 it. And when everything started happening,
3 there was just no way.
4 Q        So, as things became difficult
5 the week of November 3rd, that prompted you
6 to call or to discuss with Brian your
7 request that he turn in the paperwork for
8 you?
9 A        Exactly.
10 Q        Was there anything else that
11 prompted you to ask Brian to turn in the
12 paperwork for you?
13 A        I just think the situation as a
14 whole was what prompted me to turn the
15 paperwork in.
16 Q        That situation being the events
17 of the week of November 3rd?
18 A        The events of that, yeah, the
19 events as a whole.
20 Q        When you asked Brian to turn the
21 paperwork in for you, did you tell him that
22 there was a date certain that you wanted
23 your leave to begin?

Page 264

1  A       The paperwork had a place on it
2  for the requested date of the leave to
3  begin, and the blank had "immediately"
4  filled in. So, as of that moment.
5  **Q       After you received the letter**
6  **from Ed Crowell telling you that you had**
7  **violated the no call-no show policy and**
8  **were considered terminated, did you**
9  **understand that you could be reinstated to**
10 **your job if you requested reconsideration**
11 **and tried to correct any policy violations?**
12 A       I could not believe that I had
13 gotten that letter. And I did not take
14 that letter as you need to call and
15 straighten all this out. I took that
16 letter as I had been terminated. It had
17 date of termination on there. So, in other
18 words, I had been fired.
19        Now, after all the events that
20 had taken place getting that letter, the
21 part on there that stuck out the most was
22 you've been terminated or your employment
23 has been terminated as of this date.

Page 265

1  **Q       But there's nothing in that**
2  **letter that says you are not eligible for**
3  **rehire, is there?**
4  A       I didn't understand at that
5  point why I would have to be rehired if I
6  had filled out paperwork for a leave.
7  **Q       My question is --**
8  A       No.
9        (Defendant's Exhibit 11
            was marked for.
10          identification)
11 **Q       I'm going to show you what I've**
12 **marked as Exhibit 11. If I understand**
13 **correctly your testimony, this is the**
14 **document that the hospice employee was**
15 **directed to fax to Miltope; is that correct?**
16 A       No. Let me clarify that. The
17 hospice employee picked this letter up for
18 me from Dr. Law's office and brought it to
19 my house. At that point I took the letter
20 back to the doctor's office and had her fax
21 it, because I do not have a fax machine.
22 And I was asked to provide a letter from
23 the doctor's office, and that's exactly

Page 266

1  what I did. I took it back up there and
2  had her fax it. Because I kept telling
3  her, "I need to get this letter from the
4  doctor." I told her I needed to get that
5  letter from the doctor, and she called up
6  there and checked into why the letter
7  wasn't ready yet and that kind of thing.
8  And I think the next time she came down was
9  when she came and brought the letter.
10 **Q       So, the letter you were**
11 **referring to is what we have designated as**
12 **Exhibit 11, right?**
13 A       Yes.
14        (Defendant's Exhibit 12
            was marked for.
15          identification)
16 **Q       Let me show you what I've marked**
17 **as Exhibit 12.**
18 A       That's that letter, other
19 letter.
20 **Q       Be aware if you are going to**
21 **rely on notes while we are talking, I get**
22 **to look at them. So, you might want to**
23 **close your notebook**

Page 267

1  A       I'm making notes as we go. I'm
2  writing as we go. I mean, this is just
3  stuff I'm writing down as we go here.
4  **Q       Did you ask the doctor to do**
5  **this letter dated November 29th, Exhibit**
6  **12?**
7  A       Yes, I did.
8  **Q       And did you obtain a copy of**
9  **this letter from Temple Medical Clinic?**
10 A       Yes, I did.
11 **Q       What was the purpose for getting**
12 **this letter dated November 29th?**
13 A       After I received the letter from
14 Miltope telling me that I had terminated or
15 been terminated or terminated my position
16 for failure to report for three consecutive
17 days, I had no idea in the world what that
18 would be the cause of. I sent e-mails
19 asking why. I had no idea why. I thought,
20 you know, maybe I need to call the doctor
21 and get a better explanation of this. No
22 one ever told me I needed another letter.
23 Nobody ever contacted me about a letter.

Page 268

1    But I had another letter done detailing
2    everything that was going on with my dad.
3    Q      Did anyone give you the idea
4    that you should get this detailed letter?
5    A      I came up with that all by
6    myself.
7    Q      Why didn't you mail this letter
8    or have this letter faxed to Miltope?
9    A      Well, it says on the previous
10   letter please feel free to contact me for
11   any questions from the doctor's office.
12   After some after-thought about having this
13   other letter done, I thought if there's a
14   reason that Miltope needed to contact the
15   doctor's office, they could clarify this
16   and it would be a mute point.  Because they
17   had a way to contact the doctor and the
18   medical clinic for clarification or either
19   for anything else they might need to figure
20   out or to go with that leave paperwork that
21   I had turned in.
22   Q      So, rather than provide this
23   November 29th letter to — strike that.

Page 269

1    This letter is dated November 29th 2004.
2    Is that the correct date?
3    A      Right.
4    Q      So, this was done over a year
5    after you left Miltope?
6    A      Right.  Well, I don't know.  It
7    says right there since July 2003, if you
8    will read in the letter.  It could be a
9    typographical error.  I'm not sure.  We
10   would have to contact Temple Medical Clinic
11   to find out.
12   Q      Let's look at the letter,
13   because I think we can establish it was
14   2004.  He states towards the middle of the
15   letter, "A repeat CT of the chest done in
16   November of 2004 revealed no sign of
17   malignant tumor."
18   A      Then the date is correct.
19   Q      Was your idea that you could use
20   this letter with another potential employer
21   other than Miltope?
22   A      No, no, no.
23   Q      So, your primary purpose in

Page 270

1    getting this letter was to assist you in
2    pursuing your claims against Miltope?
3    A      After a lot of thought about the
4    whole thing, the only thing I could come up
5    with was maybe this letter did not satisfy
6    what Miltope needed.  So, I just wanted him
7    to detail in a letter the situation, how it
8    was, how it was then, everything else, and
9    then there would be no question of it.  But
10   as I said before, they had a way to contact
11   the doctor's office if the letter had been
12   the problem.  That was never done.  So, I
13   had to think after that fact that that
14   could not have been what it was.
15   Q      So, rather than provide this
16   letter to Miltope, your expectation was
17   that Miltope would contact the doctor
18   directly based on the prior letter of
19   November 5th, correct?
20   A      Right.
21   Q      So, you did not make a phone
22   call or send an e-mail to Gabe or Brian to
23   say, hey, by the way, I do have a better

Page 271

1    letter that may answer any questions y'all
2    may have had?  You never did that, right?
3    A      I don't think so.  Not after
4    that period of time, no.
5    Q      Look back at what was Exhibit 7,
6    if you would.  Go to the page that at the
7    very bottom right-hand corner has the
8    number 121 at the bottom.  It's labeled
9    Decision on Unemployment Compensation
10   Claim.  Do you see that?
11   A      Right.
12   Q      You appeared for a hearing on
13   your unemployment claim against Miltope,
14   correct?
15   A      Right.
16   Q      And you were represented by
17   counsel, correct?
18   A      Right.
19   Q      And when you appeared at that
20   hearing, you were attempting to establish
21   that you were entitled to benefits, right?
22   A      Yes.  I thought so.
23   Q      There are some findings.  Do you

Page 272

1  see the paragraphs under the word
2  "Findings"?  If you will go to the second
3  paragraph, it says, "The claimant worked."
4  Do you see that line?
5  A    Right.
6  Q    That first sentence says, "The
7  claimant worked for the listed employer
8  from February 12, 2001, until November 11,
9  2003, as a government property
10  administrator."  Is that a correct fact?
11  A    Well, it's not a complete fact.
12  But what is listed is correct.
13  Q    And when you say it's not
14  complete, you are saying it doesn't
15  reference the prior term of employment with
16  Miltope?
17  A    No.  It doesn't -- that was not
18  my sole title.
19  Q    There's something else that you
20  did for Miltope that you've told us about?
21  A    Right.
22  Q    The CAV administrator position;
23  is that right?

Page 273

1  A    Right.
2  Q    So, that was omitted.  But
3  otherwise that statement --
4  A    That would be a correct
5  statement.
6  Q    The next statement is, "The
7  claimant was considered to have abandoned
8  his job after being absent for more than
9  three consecutive working days without
10  proper notice to or permission from the
11  employer."  Do you see that statement
12  there?
13  A    Yes, I do.
14  Q    It is accurate, isn't it, that
15  there were three consecutive working days
16  when there was not notice provided that you
17  were going to be absent, correct?
18  A    I think in -- I don't agree with
19  that.
20  Q    There were three consecutive
21  working days where you didn't actually call
22  in to say, "Hey, I'm not going to be there
23  today," correct?

Page 274

1  A    After I turned the paperwork in
2  for the leave, I told them that they could
3  reach me at home or on my cell phone.  And
4  I did not -- I did not know that I had to
5  call in those days.  If they needed me,
6  they could have gotten me.
7  Q    Are you saying that you told
8  Brian, "You can call me at home or on my
9  cell"?
10  A    Right.
11  Q    Did you tell anybody else, "You
12  can call me at home or on my cell"?
13  A    Brian was my supervisor.  If
14  anyone else needed to know, they could have
15  asked Brian.
16  Q    So, this communication you just
17  referenced was what happened on November
18  5th, Wednesday?
19  A    When he told me he needed a
20  letter.
21  Q    This was the day that you asked
22  him to turn in your leave paperwork, right?
23  A    Exactly.

Page 275

1  Q    So, from that day forward, you
2  didn't think you were obligated to call in?
3  A    No.
4  Q    I'm correct?
5  A    Yes.  And I told him I would
6  keep him abreast of the situation.  As I,
7  you know, had things, I sent him an e-mail
8  telling him about the tests and stuff my
9  father had on the 7th -- on the 6th and
10  that kind of thing.  I told him I was going
11  to help Lee get that order out of there.
12  Q    And did you also say that you
13  were going to try to come in the next day
14  to catch up on some work?
15  A    I don't recall if I told him
16  that.  I might have.
17  Q    If it's in an e-mail that you
18  wrote, you wouldn't have any reason to
19  dispute that, would you?
20  A    No.
21  Q    And as things became more
22  complicated at home, you tried to work from
23  home using your telephone and your

Page 276

1   computer?
2   A       I tried.
3   Q       Before you had that conversation
4   with Brian about the doctor's letter, you
5   already knew that a doctor's substantiation
6   would be required, didn't you?
7   A       He asked for the letter from the
8   doctor, and that's what I tried to provide.
9   Q       And prior to that time when you
10  had talked with Brian, Gabe and Ed Crowell
11  and Dee Coulter, you were aware that a
12  doctor's letter was going to be required,
13  right?
14  A       I honestly don't remember
15  anything about a doctor's letter or
16  anything.  I remember filling out the
17  paperwork.  I remember having it in the
18  folder on my desk.  I told him if there's
19  anything else he needed, let me know.  And
20  that's when he told me he needed a letter.
21  That's all it said, a letter.  So, I called
22  the doctor's office and requested a letter.
23  Q       You were aware, weren't you,

Page 277

1   that if something didn't qualify for family
2   medical leave, you could still get a
3   medical leave of absence with a doctor's
4   note, even if it wasn't a serious health
5   condition, right?
6   A       No.
7   Q       Do you remember the policy in
8   the handbook that said that an employee
9   requesting a medical leave of absence is
10  required to submit a statement from his
11  physician indicating the need for such a
12  leave?
13  A       I don't remember it from the
14  handbook, no.
15  Q       Would you look at what is --
16  keep that one handy, because we are going
17  to go back to it.  Take a look at Exhibit
18  4.  If you will, look on page -- it says
19  129 according to our stamp.  It's actually
20  Page 10 of the handbook.  Do you see that
21  in that exhibit about three pages back?
22  A       All right.
23  Q       Do you remember testifying that

Page 278

1   you were aware of the policies that are in
2   this Exhibit 4?  Do you remember that,
3   Mr. Bailey?
4   A       In our last meeting?
5   Q       Yes.
6   A       I think it -- I remember saying
7   that I remembered that.  I did not have or
8   rely on a handbook as I was making these
9   decisions because I was talking to people
10  in positions that would be able to guide me
11  correctly on how to do this.  I didn't sit
12  down and figure out how I was going to do
13  this.  What I did was I -- Dee had told me
14  that I would qualify.  So, that pretty much
15  told me that I would qualify.  So, I didn't
16  -- I didn't spend a lot of time researching
17  it in the book.
18  Q       When we last spoke, you did not
19  recall Dee saying that you would qualify.
20  A       When she came -- well, she
21  brought me the paperwork.
22  Q       But you had not completed it
23  yet, so how could she know whether you

Page 279

1   would qualify?
2   A       Because I told her when she came
3   into my cube about the situation that was
4   going on, and she told me that I would
5   qualify.
6   Q       So, did you just remember that
7   since we last met?
8   A       I don't know if I -- I might
9   have gotten something confused before.  But
10  she brought me the paperwork to fill out.
11  Q       Then I'm sure you recall, if she
12  did say that, that she also told you that
13  you would have to submit the doctor's
14  certification to substantiate that?
15  A       I don't remember anything period
16  about a doctor's certification.  I had
17  someone get me up a copy of the actual form
18  for family medical leave.  Since Brian had
19  turned mine in, I did not have a copy of
20  that to look at.  And there is a part of
21  that that is several pages into it where it
22  has a section for the doctor to complete.
23  I don't recall ever having seen that

Page 280

1   before. I don't know if it's two separate
2   parts, and then this detaches and goes to
3   the -- I don't know how that works. But
4   the part that I got to fill out did not
5   have the doctor's certification in it.
6   Q       Well, you couldn't fill out the
7   doctor's certification yourself, could you?
8   A       I realize that. But I could
9   take that to a doctor and have it filled
10  out.
11  Q       Let's back up. You don't know
12  whether Brian ever turned in that
13  paperwork, correct?
14  A       I would have to think that he
15  did, because when I e-mailed him -- or when
16  I told him to turn it in and let me know if
17  there was anything else he needed, he
18  responded back to me that he needed a
19  letter. So, I would assume that he turned
20  that in.
21  Q       That's just an assumption on
22  your part, correct?
23  A       No, I don't think so, because he

Page 281

1   would have had to have someone tell him
2   that the letter was necessary.
3   Q       If we need to go back over the
4   testimony you gave last time, we can. I
5   don't want to have to go through that
6   time-consuming process. The last time we
7   met, you admitted that you didn't know one
8   way or the other whether Brian ever turned
9   that paperwork in. So, are you changing
10  your testimony?
11  A       No. I'm adding to my testimony.
12  Q       And you are adding to the
13  testimony by saying you think it's a fair
14  assumption on your part that he actually
15  turned it in?
16  A       I asked him to turn it in. He
17  came back and asked me for a letter to go
18  with it. So, I am assuming -- and I'm
19  pretty sure that he had to have taken it to
20  either Dee or someone else for them to tell
21  him, "Oh, he needs this letter."
22  Q       And if Brian testifies under
23  oath that he never saw that paperwork in

Page 282

1   your cube and, therefore, never turned it
2   in, you wouldn't say that he's lying, would
3   you?
4           MR. BLYTHE: I'm going to object
5   to the form of that question.
6           THE WITNESS: Please do.
7           MR. BLYTHE: Reword that a
8   little bit.
9   Q       If I represent to you that Brian
10  never saw the paperwork and never turned it
11  in, do you think that I've been lied to?
12  A       Yes.
13  Q       And you think Brian would lie?
14          MR. BLYTHE: Object to the form
15  of the question. Here again, it assumes
16  facts not in evidence. We are assuming
17  stuff that Brian may or may not say or do.
18          MS. LINDSAY: That's my whole
19  concern. I think the initial phase that
20  we've come to here is all about an
21  assumption, and I'm trying to clarify
22  that.
23  A       Brian was my supervisor. I

Page 283

1   asked Brian to turn in the paperwork.
2   Brian tells me I need a letter from my
3   father's doctor to go with that paperwork.
4   So, he had to have turned that in to know
5   that a letter was needed.
6   Q       He never told you he turned it
7   in, did he?
8   A       I e-mailed back telling him that
9   I had requested the letter from the
10  doctor. I think I even thanked him for
11  turning it in.
12  Q       The question is he never told
13  you he turned it in, correct?
14  A       He never told me he didn't.
15  Q       He never told you he turned it
16  in, did he?
17  A       I would have to look back
18  through my e-mails to see if there was
19  anything in there about it.
20  Q       I have that exhibit, too. If we
21  need to go through it, we can. So, you
22  don't know one way or the other how to
23  answer that question? All right. Well,

Page 284

1  let's go back to the policy, then.
2  A        Can you just rephrase the
3  question so we can get to an answer on
4  that?
5  Q        I asked you he never told you
6  that he turned it in, did he?  And you
7  haven't answered it yet.  Do you have an
8  answer?
9  A        Wow.  I had no reason to think
10 anything other than he turned it in.  No,
11 he did not tell me he turned it in.  But
12 nothing in the verbiage of any of his
13 statements back to me or requesting the
14 letter indicated that he had not turned it
15 in.  Is that fair?
16 Q        I think I understand you.
17 A        I'm sorry.  I can't be more
18 clear on that.
19 Q        If you look back at the policy
20 excerpt that we have labeled Exhibit 4, do
21 you see there that an employee requesting a
22 medical leave of absence is required to
23 submit a statement from his physician,

Page 285

1  correct?
2  A        Hold on.
3  Q        Do you see that at the bottom of
4  Page 10?
5  A        Yes, I see that.
6  Q        Do you understand that this is
7  something that's entirely independent of
8  FMLA, or do you not know one way or the
9  other?
10 A        I don't know.
11 Q        Do you expect Brian to have
12 followed the policies in this Miltope
13 handbook?
14 A        I have no -- I have no -- I
15 would --
16 Q        Do you think he would follow the
17 policy in the handbook?
18 A        Yes.
19 Q        Do you think Dee Coulter was
20 trained to follow the policy in the
21 handbook, as well?
22 A        I'm sure she was.
23 Q        And if her training included

Page 286

1  that FMLA leave included the requirement
2  that there should be a physician statement,
3  do you think that she would have conveyed
4  that to you?
5  A        Probably through Brian.
6  Q        You don't think she would have
7  told you that herself when she gave you the
8  paperwork?
9          MR. BLYTHE:  I think that
10 question has been asked and answered two or
11 three times.
12 A        I don't know.
13 Q        Well, last time you didn't
14 remember that conversation with her the
15 same way you remember it today, so I'm just
16 trying to make sure.  Do you remember
17 anything else she may have said to you?
18 A        Nothing stood out other than she
19 told -- I remember her telling me that I
20 would qualify because I was an only child.
21 I remember her saying something about
22 that.  I don't recall anything about a
23 physician's statement, a physician's

Page 287

1  letter, anything like that.  I don't recall
2  that.
3  Q        And this is the conversation
4  where Brian Goff was with you?
5  A        I believe so.  I think he was
6  working on my computer or something.  If
7  Brian had told me, "We need the physician's
8  statement part of the FMLA paperwork filled
9  out by your father's doctor," then I would
10 have probably said, "What is that?" and
11 then we would have proceeded on from
12 there.  But I was told I needed a letter,
13 and that's all I was told.  So, that's what
14 I did the very same day.  In fact, five
15 minutes after I got off with him, I called
16 the doctor's office and requested a letter
17 to go with my FMLA paperwork.
18 Q        So, are you saying today that
19 Dee Coulter, without having your completed
20 paperwork in hand, without having the
21 opportunity to discuss with Ed Crowell the
22 circumstances of your situation, that she
23 actually told you, "Yes, you will qualify"?

Page 288

1  A       I don't know if she worded it
2  you will qualify, you will probably
3  qualify, I think you qualify. I don't
4  know. But I got the impression that I
5  would qualify for FMLA after having the
6  conversation.
7  Q       **Do you admit that when you had**
8  **conversations with Brian and Gabe, they**
9  **both told you that you needed to get in**
10 **touch with human resources about any**
11 **requirements in particular to qualify for**
12 **this FMLA leave?**
13 A       Well, I mean, that's why I got
14 the paperwork from her.
15 Q       **And --**
16 A       I -- go ahead. I'm sorry.
17 Q       **If you will, look back on Page 9**
18 **of the policy.**
19 A       That would be 128?
20 Q       **That's right. Under Sick Time**
21 **it says, "The company reserves the right to**
22 **require medical substantiation following**
23 **three days of consecutive absence." Hadn't**

Page 289

1  **you been required before to submit medical**
2  **substation when your dad --**
3  A       Never.
4  Q       **You are saying you never had to**
5  **do that before?**
6  A       Never. I also never had to fill
7  out the first piece of paperwork when I was
8  off work for a week after my child was
9  born.
10 Q       **You were actually at the**
11 **hospital at that time, weren't you?**
12 A       I was at the hospital with my
13 child when she was born, yes.
14 Q       **And there wasn't time for you to**
15 **fill out paperwork when your wife was in**
16 **labor, was there?**
17 A       It was a planned C-section. So,
18 I knew exactly when she was going to be
19 born.
20 Q       **So, you didn't tell your**
21 **supervisor, hey, the c-section is on this**
22 **date and fill out any paperwork?**
23 A       I didn't fill out the first

Page 290

1  piece of paperwork. But I told them that
2  her birthday is going to be the 21st of
3  February. I want to be off on that Friday
4  and the following week. That way I would
5  have the whole weekend. She was born on
6  Friday, and I would have the week. I never
7  filled out any paperwork on that at all.
8  Q       **How much advance notice did you**
9  **give to your supervisor about that?**
10 A       Probably a week or so at least.
11 Q       **When was the c-section**
12 **scheduled? When was it decided that it**
13 **would be on February 21st?**
14 A       I'm doing good to remember all
15 the others. I can't remember the day we
16 decided.
17 Q       **Was it a couple of weeks in**
18 **advance at least?**
19 A       I'm not sure. I don't know. It
20 was -- probably that would be fair. I
21 don't recall exactly the amount of time
22 that passed between the day we decided and
23 the actual day.

Page 291

1  Q       **Going back to Exhibit 7, the**
2  **unemployment compensation claim decision,**
3  **do you agree that the last time you worked**
4  **was November 3rd?**
5  A       Define work. The last time I
6  was at work or the last time I was doing
7  something for Miltope?
8  Q       **I guess the real question is,**
9  **just to clarify, you didn't actually report**
10 **to work on November 3rd, correct?**
11 A       I called in.
12 Q       **And you attempted to do work by**
13 **telephone when you were not reporting to**
14 **work that week of November 3rd, correct?**
15 A       Right.
16 Q       **So, with those clarifications --**
17 well, strike that.
18 **You agree that you were out on**
19 **November 4th 2003 when your daughter was**
20 **sick, correct?**
21 A       Correct.
22 Q       **You agree that you notified the**
23 **employer at that time, correct?**

Page 292

1    A       Yes.
2    Q       You agree with the statement
3    that on November 5th you were out again due
4    to your father's illness?
5    A       Right. And that's the day I
6    asked Brian to turn the paperwork in,
7    November 5th.
8    Q       According to this statement,
9    "The claimant had requested a Family
10   Medical Leave of Absence related to his
11   father's illness in October 2003." That's
12   correct, right?
13   A       Yes, because I filled the
14   paperwork out in that week prior to -- the
15   week before. I filled the paperwork out
16   the week before.
17   Q       According to your testimony,
18   before you filled that out on October
19   27th. Is that still your testimony today?
20   A       I'm not sure. It was the week
21   of the 27th.
22   Q       According to your testimony
23   before, you filled out that paperwork the

Page 293

1    same day you had the meeting with Ed
2    Crowell on October 27th. Does that refresh
3    your memory?
4    A       It was that week. I'm not
5    exactly sure if it was that day, but it was
6    that week I can say.
7    Q       When you went in to tell Ed
8    Crowell that you wanted to take leave,
9    hadn't you already completed the paperwork?
10   A       I believe so.
11   Q       It says here you left the
12   paperwork on your desk and asked your
13   supervisor to turn in the paperwork.
14   That's correct, right?
15   A       True. That's correct.
16   Q       It says, "The claimant did not
17   provide the required medical documentation
18   with the paperwork to justify the request
19   for a Family Medical Leave of Absence."
20   Now do you disagree with that statement?
21   A       In hindsight, yes.
22   Q       At the time you thought you had
23   provided the November 5th letter to

Page 294

1    Miltope, correct?
2    A       Right.
3    Q       And is that the reason for your
4    disagreement with that statement?
5    A       Yes.
6    Q       There is a statement here that
7    the claimant was considered to have
8    abandoned his job because he had been
9    absent from November 6, 2003, through
10   November 11, 2003, without notice to or
11   permission from the employer. Do you
12   disagree with that statement?
13   A       Please do that again.
14   Q       It states here, "The claimant
15   was considered to have abandoned his job
16   because he had been absent from November 6,
17   2003, through November 11, 2003, without
18   notice to or permission from the employer."
19   Do you agree or disagree with that
20   statement?
21   A       I disagree with that because I
22   had turned that paperwork in and asked if
23   there was anything else they needed, please

Page 295

1    let me know.
2    Q       So, your disagreement is based
3    on the fact that you told Brian on the 5th,
4    "Turn in that paperwork for me" and you
5    didn't hear anything else from Miltope --
6    A       Right.
7    Q       -- about what else might be
8    needed?
9    A       You know, nobody came back and
10   said that the letter wasn't sufficient.
11   Nobody came back and said anything.
12   Q       So, the answer to my question is
13   yes?
14   A       Yes.
15        MR. BLYTHE: Wait a minute.
16   What was that question?
17        MS. LINDSAY: I asked him if he
18   disagreed with the statement because, one,
19   he had asked Brian to turn in the paperwork
20   and, two, he says he didn't hear back
21   anything.
22   A       So, that's yes. I'll go with
23   that.

Page 296

1  Q      Sometimes if I ask a yes-or-no
2  question and it really is yes or no, go
3  ahead and answer it that way. We'll get
4  done faster.
5  A      All right.
6  Q      If you need to tell me more to
7  make me understand, that's fine.
8  A      Okay.
9  Q      When it says without notice to
10 or permission from the employer, you
11 disagree with that because you assumed that
12 you did have the leave approved, correct?
13 A      Yes.
14 Q      And did you raise these
15 objections at the hearing, your
16 disagreements with these statements?
17 A      Yes, I did.
18 Q      The next statement says, "The
19 claimant was never advised his request for
20 a Family Medical Leave of Absence had been
21 approved because the medical documentation
22 to justify the Family Medical Leave of
23 Absence was not submitted until after the

Page 297

1  claimant was separated." Did you disagree
2  with that statement?
3  A      Let me read this myself one more
4  time.
5  Q      Go ahead. It's the last
6  sentence of that Findings section.
7  A      No, I was never advised. I
8  agree with that statement. I was never
9  advised that my paperwork was not adequate.
10 Q      Well, this says -- it's a little
11 different statement -- that you were never
12 advised it was actually approved.
13 A      I was not notified if it had
14 been approved or disapproved.
15 Q      Thank you. That answers my
16 question. And did you appeal that
17 decision?
18 A      Yes, because I did not agree
19 with it.
20 Q      Was your unemployment
21 compensation claim ultimately denied?
22 A      Yes.
23

Page 298

1              (Defendant's Exhibit 13
                was marked for.
2              identification)
3  Q      Looking at Exhibit 13, it
4  appears that y'all were e-mailing back and
5  forth about your return of the laptop to
6  Miltope; is that correct?
7  A      Correct.
8  Q      And do you see there on November
9  19th he said, "We need you to return the
10 company laptop and provide passwords to CAV
11 system ASAP"?
12 A      Right.
13 Q      So, at that point it was your
14 position you had already conveyed those
15 passwords to Lee?
16 A      Right.
17 Q      How long did it take you to
18 return that laptop?
19 A      It was a while. I just -- you
20 know, I had all my personal items in my
21 cubical at work, and I had the laptop. It
22 was a while. There's a record of that
23 somewhere. I think I Fed-Exed it back to

Page 299

1  them or Derrick's office Fed-Exed it back
2  to them.
3  Q      And that was after many requests
4  that you return the laptop, correct?
5  A      To give you a little groundwork
6  on this e-mail right quick, what started
7  this e-mail was the gentleman that kept his
8  boat at my house told me that Gabe had
9  instructed him to let me know I needed to
10 return that laptop. And that upset me
11 quite a bit because I could have somebody
12 sent down there as a messenger to tell me
13 something, but I could not get anything
14 from anybody else.
15 Q      Don't you recall getting that in
16 a letter? Don't you recall that was in
17 your letter from Ed Crowell to return the
18 company laptop?
19 A      I don't -- it probably was. I
20 don't deny that. You don't have to get
21 it. I don't deny that.
22 Q      So, you knew as of the time you
23 were terminated that you were supposed to

Page 300

1  call him to arrange return of the laptop,
2  right, according to Exhibit 10?
3  A       Yeah.  That's fine.  But I
4  responded to Gabe with the first thing at
5  the bottom of the page, please direct all
6  communication directly to me.  I've sent a
7  number of e-mails to Brian, no response,
8  with cc's to you and Mr. Crowell.  You have
9  a way to contact me, please do so.
10 Q       So, when you wrote that, you
11 were responding to someone being sent as a
12 messenger to tell you something?
13 A       Exactly.
14 Q       Was that John Reeves?
15 A       Yes, it was.
16 Q       And he told you to return the
17 laptop, and that upset you that he was
18 being sent to do that?
19 A       Yes.  I thought they could have
20 -- no one was answering my e-mails that I
21 had sent, but then he could send somebody
22 down there as a messenger to tell me
23 something.

Page 301

1  Q       When Gabe e-mailed you on
2  November 11th, "You need to call me or
3  Brian ASAP," why didn't you call them?
4  A       I had been e-mailing them.
5  Remember I told you that I didn't want to
6  --
7  Q       Why didn't you just write him
8  back and say, "I'm not comfortable talking
9  to you on the phone.  E-mail me your
10 questions and I'll respond"?
11 A       I didn't think of that at that
12 time.
13 Q       On Tuesday, November 11th, when
14 he said that to you, that was prior to you
15 getting your termination letter, correct?
16 A       It was prior to me getting it.
17 Q       Right.  So, why would you be
18 afraid to talk to Gabe on the phone at that
19 point?
20 A       I did not -- what was the --
21 Q       Let's go back.  At that point
22 you thought your leave was approved, right?
23 A       Yes.

Page 302

1  Q       You hadn't received a letter,
2  but you thought your leave was approved.
3  You also knew that if they needed you, they
4  could call you, right?
5  A       Right.
6  Q       So, when they e-mailed you, "You
7  need to call me or Brian ASAP," did it
8  occur to you that maybe they had been
9  having trouble reaching you and they needed
10 you to take the initiative to call them?
11 A       But when did I get the e-mail?
12 When did I check my e-mail?  I'm not sure.
13 There must be some reason that I didn't
14 respond to that.  It may have been after
15 the fact.  I don't recall.
16 Q       According to -- just for the
17 record, it's what we produced as Bailey
18 versus Miltope Corp 00149.  According to
19 that piece of paper, you were e-mailed on
20 November 11th.  Do you have any reason to
21 think you didn't receive it?
22 A       No.  I'm asking what day did I
23 receive it.

Page 303

1  Q       Well, I wouldn't know that.
2  A       That's my question.  I mean, it
3  was sent on the 11th because it says that.
4  Q       Did you not check your e-mail
5  every day?
6  A       I might not have checked it.
7  That's on a Tuesday.
8  Q       According to your calendar, you
9  had returned from your Atlanta rehearsal
10 and you were tutoring Nicky and Josh that
11 day.
12 A       That's possible.
13 Q       So, wouldn't you have had time
14 to check your e-mail if that's all you were
15 doing that day?
16 A       If I was teaching that day, I
17 was at home.  So, I mean --
18 Q       And you had your laptop there,
19 right?
20 A       Well, I had a home computer.
21 Q       And you could access your work
22 e-mail from your home computer, right?
23 A       No.

Page 304

1  Q     Why didn't you just access it
2  off your laptop?
3  A     I did.
4  Q     In fact, that's what you had to
5  do to send all those e-mails you were
6  sending from home, right?
7  A     No.  I could send an e-mail from
8  home, but I could not access my work e-mail
9  from my home computer.
10 Q     But you could access it from
11 your laptop?
12 A     Right.
13 Q     And you had your laptop
14 available to do that if you chose to?
15 A     I had just gotten it.  I wasn't
16 real good with that laptop because -- I
17 mean, I had gone on there and -- I went on
18 there and checked some of my e-mails and
19 that kind of thing.
20 Q     Wasn't part of your job with
21 Miltope involving computer expertise to
22 manage the tracking and --
23 A     Inventory.

Page 305

1  Q     So, you didn't --
2  A     I'm not a technician.  I was not
3  a technician.
4  Q     Prior to November you had had
5  some absences from Miltope because of
6  rehearsals with the band, correct?
7  A     There might have been one or
8  two.
9  Q     According to one of your
10 e-mails, you had a rehearsal on October
11 13th, which was a Monday.  Do you remember
12 that?
13 A     I don't remember it, but yes,
14 that's possible.
15 Q     And according to company
16 records, you took a vacation day that
17 Monday, the 13th.
18 A     That's possible.
19 Q     So, you don't have any reason to
20 dispute that you actually attended a
21 rehearsal that day?
22 A     No, not at all.
23 Q     Do you recall in early October

Page 306

1  2003 doing Rick and Bubba's Fast Fest at
2  Oak Mountain Amphitheater?
3  A     What's that?
4  Q     It's your e-mail.  It says Rick
5  and Bubba's Fast Fest at Oak Mountain
6  Amphitheater.  You wrote Derrick Welsh
7  about that.  Do you remember?
8  A     No, I didn't do that.  There's
9  probably a lot more to it other than just
10 what you are reading.  I have never done
11 anything with Rick and Bubba.  It would be
12 cool, though.
13 Q     The president says those guys
14 are dog-gone funny.  I heard that on the
15 radio this morning.  So, you don't recall
16 that?
17 A     No.  I have never done Rick and
18 Bubba.  I don't have any idea.  Read that
19 whole thing, and it will probably clear
20 that up.
21 Q     Do you remember a man named
22 Danny Johnson asking you to help him get a
23 job at Miltope?

Page 307

1  A     Yes, I do.
2  Q     Did you ever discuss with Mr.
3  Crowell Danny Johnson potentially being
4  employed there?
5  A     I don't recall if I did or not.
6  I think I had mentioned that I had -- or
7  either to Brian that I had someone that --
8  I think Danny had gotten A Plus
9  certification for computers or something.
10 He had gone to school, and I had asked if
11 there were any openings and that kind of
12 thing.  But I don't think anything ever
13 came out of that.
14 Q     Do you remember attending a
15 rehearsal for the band the weekend of
16 September 5th?
17 A     I think so.
18 Q     According to your work schedule,
19 you took a sick day on that Friday, the
20 5th, and a vacation day that Monday, the
21 8th.
22 A     (Witness nods head.)
23 Q     So, that would have been so you

Page 308

1  could handle the rehearsal with the band?
2  A      Right.
3  Q      Earlier you testified that there
4  was an e-mail where you said to Brian and
5  Gabe, "If there's anything else you need,
6  please let me know," right?  Do you
7  remember that testimony?
8  A      Yes.  That was the e-mail around
9  the time I told them that I had requested
10 the doctor's letter.  If there was anything
11 else he needed, let me know.
12 Q      This is the e-mail I found
13 (indicating).  Is that the e-mail that you
14 sent?
15         MS. LINDSAY:  For the record,
16 that's Bates stamped 152.
17 A      Right, I sent that.  Yes, I
18 remember that.
19 Q      And that was the e-mail you were
20 referring to about following up with them
21 to find out if there was anything else they
22 needed?
23 A      Yes.

Page 309

1  Q      Was there any other
2  communication between the 5th and the 14th?
3  A      I don't remember.
4  Q      And if there isn't a document
5  that reflects that there was a
6  communication, do you have any reason to
7  believe that we are missing documents?
8  A      Between the 5th and the 14th
9  there was communication.  There was phone
10 communication.  You know, I told you on the
11 7th that I was working with Lee.  On the
12 6th I was working with Lee.  I was talking
13 to people in Pennsylvania.  But as far as
14 is there an e-mail, I don't know.
15 Q      Let me ask a better question.
16 What I was thinking about is in terms of
17 you e-mailing Brian or Gabe about whether
18 more documentation was needed.  The only
19 two e-mails I found are November 5th and
20 November 14th.
21 A      Okay.
22 Q      So, would there be any other
23 e-mails do you think that specifically

Page 310

1  address that to those people?
2  A      I don't know.  I don't think so.
3         MS. LINDSAY:  I think I'm
4  probably done, but I want to look at my
5  notes.  Do you want to take a brief lunch
6  break?
7         MR. BLYTHE:  That's fine.
8         (Lunch break was taken)
9  Q      Mr. Bailey, we are back on the
10 record after lunch.  Is there anything that
11 you need to say to clarify any prior
12 answers?
13 A      Not at this time.
14 Q      I was going to ask you why Tina
15 Howell is not listed as one of your
16 witnesses on your initial disclosures.  Do
17 you know?
18 A      I didn't think about it until in
19 the middle of all this.  She can be added,
20 if you like.
21 Q      Are you going to -- do you want
22 to call her to testify if there's a trial?
23 A      I guess, yes.

Page 311

1  Q      Do you know if she still works
2  at Miltope?
3  A      I don't think she does.
4  Q      Do you know how I can reach her?
5  A      I may have a phone number for
6  her.  If I don't, I can probably get one.
7  Q      Would you provide that to your
8  lawyer so that can be shared with me?
9  A      Sure.
10 Q      Going back to your conversation
11 with Dee -- which I understand there was
12 just one.  Am I right?
13 A      I believe so.
14 Q      If she says that she told you
15 that your leave would have to be approved
16 by Brian Burkhead and Ed Crowell, would you
17 dispute that?
18 A      No, I wouldn't dispute it.  I
19 think when the conversation was had and she
20 told me that I would qualify, it was
21 probably more, "Well, if everything is as
22 you say it is, you probably qualify," that
23 kind of thing.  It was not that she was

Page 312

1  saying you can be off as of -- what date do
2  you want to be off?  It wasn't set in
3  stone.  She said if everything -- let me
4  rephrase this.  I think she was saying if
5  the conditions were as I had said, then I
6  would qualify.
7  Q       You understood that she did not
8  have the authority to authorize the leave
9  on her own, right?
10  A       I wouldn't think so.
11  Q       You didn't think she had that
12  authority?
13  A       Well, I didn't really even think
14  about that at the time.
15  Q       Would you look back at Exhibit
16  10?  I wanted to call your attention to
17  where it says, "You may be considered to
18  have resigned without notice and removed
19  from the payroll."  Do you see that part of
20  the letter?
21  A       Right.
22  Q       And then he states, "Your
23  actions meet this requirement of having

Page 313

1  voluntarily resigned."  Do you see that
2  part?
3  A       Right.
4  Q       As I understood your testimony,
5  you considered this letter to fire you; is
6  that right?
7  A       Correct.
8  Q       But you understand and agree
9  with me, don't you, that this letter states
10  that according to Miltope, you voluntarily
11  resigned?  Do you understand that?
12  A       I keep reading the first line.
13  Q       Okay.  So, the word "terminated"
14  is what raises a red flag for you?
15  A       Yes.  And there is no mention in
16  the second paragraph of please contact me
17  to make arrangements to clarify your need
18  for leave or the leave you have requested
19  or anything.  It says to return the
20  company's laptop.  It makes no effort to --
21  it didn't read very much like a request for
22  a clarification or anything.  It reads as a
23  termination letter, because they want

Page 314

1  strictly the computer back and no other
2  communication.
3  Q       My question is --
4  A       I took this as a direct
5  termination letter.
6  Q       And do you understand that the
7  word "termination" could include an ending
8  of employment that is not because you are
9  fired?  Let me ask a better question.
10          Do you understand that you,
11  yourself, can terminate your own employment
12  from a company?
13  A       I'm sure a person could.
14  Q       You've probably seen that in
15  handbooks before, that employment at-will
16  in Alabama means you can terminate or I can
17  terminate your employment with or without
18  cause at any time, right?
19  A       I'm not really up on that.
20  Q       Let me show you in the Miltope
21  handbook.  It says in the last paragraph,
22  "Either the employee or Miltope may
23  terminate the employment relationship at

Page 315

1  any time."  Do you see that in the last
2  paragraph?
3  A       Yeah, I see that.
4  Q       So, do you understand that to
5  mean that you would have the right to
6  terminate the relationship yourself?
7  A       I'm certain that that would
8  be -- according to that paragraph that that
9  would be the case.
10          (Defendant's Exhibit 14
             was marked for.
             identification)
11
12  Q       Let me show you Defendant's
13  Exhibit 14.  If you would, look at the
14  middle e-mail from you to Brian on November
15  17th.  Do you see that?
16  A       Right.
17  Q       This appears to me to be your --
18  to be a follow-up e-mail after you received
19  your termination letter.
20  A       Right.
21  Q       And in response to that e-mail,
22  you were asked by John Reeves to return the
23  company laptop?  Is that kind of the way

Page 316

1   you felt the events transpired?
2   A      No. I think that would be --
3   according to this other e-mail that I sent
4   to Gabe on the 18th, if I responded to
5   Brian on the 17th, that means that John
6   would not have responded to me -- or John
7   would not have told me that yet. Because
8   it says --
9   Q      Let me ask you a better
10  question. After you sent this e-mail on
11  November 17th, was that when John Reeves
12  came to see you?
13  A      What was the day of the week of
14  November 17th?
15  Q      According to your e-mail, it was
16  a Monday.
17  A      Okay. I see that now. Sorry.
18  Q      That's okay.
19  A      Maybe John did tell me -- maybe
20  it was over the weekend that they came down
21  for the boat or something and he told me
22  that. That's possible.
23  Q      I assume that no one responded

Page 317

1   to your questions that you asked in your
2   November 17 e-mail. Is that correct?
3   A      No.
4   Q      I am correct?
5   A      No one responded to me. Yes,
6   you are correct.
7   Q      No one answered these questions?
8   A      I'm trying to follow that
9   around.
10  Q      Let me try to clean up the
11  question. No one at Miltope answered the
12  questions you raised in your November 17th
13  e-mail, correct?
14  A      Yes.
15  Q      According to the chaplain notes
16  about your dad the week before your
17  September 5th rehearsal for the McQueen
18  Street show, your dad was feeling hopeless
19  and it suggested in the note that it had to
20  do with you. Was your dad against you
21  working with the McQueen Street band?
22  A      No, ma'am.
23  Q      Do you know why he would have

Page 318

1   been upset concerning you the week before
2   you went to that rehearsal?
3   A      I am an only child. My father
4   has probably three things in his life that
5   he loves and cares about. One would be me,
6   one would be my daughter, and the other
7   would be a hundred-pound black lab. And
8   I'm sure that that's why he would be
9   concerned about me.
10  Q      So, you are saying he would be
11  preoccupied with you regardless of what was
12  going on with you?
13  A      Probably.
14  Q      Have you and your dad had any
15  conflicts concerning your participation in
16  the McQueen Street, Rat Race or Cold Hard
17  Truth bands?
18  A      No.
19         MS. LINDSAY: Unless there are
20  other documents that come into play -- I
21  know we talked about this before. I don't
22  think y'all have any other documents. But
23  if some come to light, I would reserve the

Page 319

1   opportunity to ask about those. Otherwise,
2   I think I'm done.
3   EXAMINATION BY MR. BLYTHE:
4   Q      I'll just start back when we
5   were here the first time. There was a
6   couple of things that needed clarifying.
7         On the November 29th 2003
8   McQueen Street, was that the 19th or the
9   29th that that was to be played, do you
10  recall?
11  A      As I said when she asked before,
12  I somehow thought it was the 19th, but I
13  might have made a mistake. It was the
14  29th.
15  Q      And y'all played where and when?
16  A      It was a place in Montgomery
17  called Carerra's, and we played that
18  Saturday. And it was from -- we had an
19  itinerary which I'm sure is in these
20  exhibits somewhere of every place we had to
21  be that whole day.
22  Q      Was that the fundraiser for the
23         --

Page 320

```
 1   A      No.
 2   Q      When you played at all with any
 3   of these bands, were they primarily local
 4   or regional affairs?  In other words, you
 5   didn't have to go very far, such as Los
 6   Angeles and —
 7   A      No.  In that aspect, they would
 8   be local.  Because the two McQueen Street
 9   shows I've done, one was in Montgomery and
10   the other was in Prattville.
11   Q      Just let me be frank.  Could you
12   support yourself by playing in a band
13   solely?
14   A      Solely?
15   Q      Yes.  I mean you and your
16   family.
17   A      Not really.
18   Q      And back with the -- and I'm
19   just following up on a question that
20   Heather had asked you.  Imposter, was it
21   ever a break-even proposition?
22   A      Never.  It was a broke
23   proposition.
```

Page 321

```
 1   Q      And you haven't made enough
 2   money in the music industry to really
 3   amount to anything, maybe to pay for a set
 4   of drums here and there or something like
 5   that?
 6   A      Yeah.  But that all falls back
 7   into expenses and tools.
 8          MS. LINDSAY:  I feel like I
 9   should object to the form of that one.  To
10   really amount to anything is kind of harsh,
11   Derrick.
12   Q      Let me move on.
13   A      So now I know how you really
14   feel.
15   Q      Tell me just briefly what your
16   work history is with Miltope, just the
17   dates and times that you went to work, left
18   work and then came back to work.
19   A      The first time I was with
20   Miltope, I had -- sometimes I was on a
21   project and I would go in to work at 6:30
22   in the morning, and sometimes I wouldn't
23   leave until 7:00 o'clock at night.  Things
```

Page 322

```
 1   were different then.  The situation was
 2   different then.
 3   Q      Let me interrupt you.
 4   A      Please do.
 5   Q      When did you go to work for
 6   Miltope the very first time?
 7   A      The year?
 8   Q      Yes.
 9   A      '96, I think.
10   Q      And when did you leave working
11   for them the very first time?
12   A      Either early '98 or late '97.
13   Q      And how long were you gone from
14   Miltope?
15   A      Three and a half years.
16   Q      And then you came back?
17   A      Right.
18   Q      What year did you come back?
19   A      2001, I think.
20   Q      And then you finished with
21   Miltope I guess the date of the letter of
22   termination, correct?
23   A      Yes.
```

Page 323

```
 1   Q      That's what I was wanting to get
 2   to.  There was some reference made earlier
 3   in the deposition to a time sheet for the
 4   week ending November 2nd 2003 and November
 5   9th 2003, and I just wanted to clarify
 6   this.  Those are not your signatures on
 7   these time sheets?
 8   A      Right.
 9   Q      On either one; is that correct?
10   A      Right.
11   Q      I just wanted to clarify that.
12   Those are actually, I believe --
13   A      Brian Burkhead signing my name.
14   Q      And he initialed beside it?
15   A      Right.
16   Q      He wasn't trying to conceal it.
17   Who is Darrell Cook, just briefly?
18   A      Darrell Cook is in the Miltope
19   information systems, MIS.  I think he may
20   be the supervisor over MIS, but I'm not
21   exactly sure.
22   Q      Did you ever receive any
23   unemployment compensation after being
```