# EXHIBIT 2
# PART 2

Page 324

1  terminated from Miltope?
2  A      No, sir.
3  Q      Any medical benefits?
4  A      No, sir.
5  Q      Are you currently having some
6  medical problems?
7  A      Financial problems, not medical
8  problems.
9  Q      Well, have you just recently had
10 some surgeries?
11 A      Yes.
12 Q      If you would, briefly tell me
13 what that is.
14 A      The amount or --
15 Q      Just what you had done, what you
16 had performed.
17 A      ACL reconstruction.
18 Q      For us nonmedical people, that's
19 your knee, correct?
20 A      Anterior cruciate ligament.
21 Q      But that's your knee, right?
22 A      It's the one that goes between
23 the two bones of the leg, yes, the

Page 325

1  football-ending injury.
2  Q      How much did you make at
3  Miltope?
4  A      I made about $15 an hour.
5  Q      And that was right before your
6  termination, correct?
7  A      Correct.
8  Q      At that time what was your job?
9  A      CAV administrator, government
10 property administrator.
11 Q      Was that your only obligation or
12 duty with Miltope?
13 A      As I had said before, they were
14 wanting me to add the DPA upgrade
15 responsibility which would require the
16 traveling and that kind of stuff, and I was
17 not in a position to be able to do that.
18 Q      Was that permissible under the
19 contract with the Navy concerning CAV?
20 A      I don't know. CAV is supposed
21 to be dedicated, and the Navy supplements
22 the -- or pays Miltope quarterly for that
23 position to be a dedicated position.

Page 326

1  Q      And to your knowledge, you were
2  to be solely responsible to the Navy for
3  those CAV requirements; is that correct?
4  A      I believe so.
5  Q      So, technically any other
6  assignment or delegation of duty would have
7  been in violation of that contract with the
8  Department of Defense?
9       MS. LINDSAY:  Object to the
10 form.
11 A      I would think so.
12 Q      Did you like working at Miltope?
13 A      I did.
14 Q      Did you like your job?
15 A      I did.
16 Q      In the end, do you feel like you
17 were treated unfairly?
18 A      Yes, I do.
19 Q      Would you have stayed there had
20 none of this occurred?  Would you still be
21 working at Miltope today?
22      MS. LINDSAY:  Object to the
23 form.  You can answer.

Page 327

1  A      I can still answer?
2  Q      Yes.
3  A      My intention with the whole
4  thing was to go home, take care of my
5  father and get everything going for a
6  couple of weeks.  And I had even told
7  Brian, "If I get things to where I can come
8  back, I'll come right back.  But I just
9  need to be home."  And it was not -- they
10 had given my daddy about three months, the
11 doctor said, when we were in the hospital.
12 We were about three months from there when
13 all this was going on.  I felt I needed to
14 be there and at least make sure that I was
15 doing everything I could for him.
16      And I told Brian of my intention
17 to try to come down there and catch things
18 up when I could, even though I wasn't
19 getting paid, just to be able to keep my
20 job.  But when I got the letter and
21 everything else, I felt very mistreated,
22 violated, lied to, everything else.
23 Q      If you were still working for

Page 328

1   Miltope, would it have been -- and I guess
2   this question should be phrased this way.
3   Would it have been financially possible for
4   you to make other arrangements to care for
5   your father if you were still employed with
6   Miltope today?
7   A       Probably.
8   Q       You think you could hire
9   someone, a sitter or someone like that?
10  A       Yes.
11  Q       And your father today, is he --
12  is he well?
13  A       No.
14          MS. LINDSAY: Object to the
15  form. You were too fast for me.
16  Q       On Exhibit 3, what's marked as
17  SR619, in the middle of that page what does
18  it say as reason for admission?
19  A       Mr. Bailey is an 84-year-old
20  white male with the above-mentioned medical
21  problems, including tobacco dependency, who
22  presently (sic.) initially to clinic with a
23  two to three-day history of rigors and mild

Page 329

1   to moderate cough with some associated
2   fever and chills. No knowledge of
3   vomiting, diarrhea. On arrival he was
4   noted to be hypoxic with an 02 sat in the
5   81 to 91 percent range. And I don't know
6   what that word means right there, with a
7   temperature of 100.7. Physical exam
8   revealed decreased breathing sounds at
9   right base. Subsequent chest X-ray
10  revealed right lower lobe infiltrate with
11  diffusion. He was subsequently admitted.
12  IV fluid, hydration, nebulized treatments
13  and IV --
14  Q       Let me stop you for a second.
15  When he was admitted, did you understand
16  him to have lung cancer?
17  A       Yes, I did.
18  Q       And on this document does it
19  give a long-term prognosis for him?
20  A       I don't know.
21  Q       Just take a second and look at
22  it.
23  A       "The Patient's long-term

Page 330

1   prognosis, as mentioned above, is poor.
2   His son wishes for no aggressive measures,
3   and this has been discussed on several
4   occasions."
5   Q       And the very first sentence in
6   the discharge summary addresses the same
7   thing, does it not?
8   A       "Discussion was made with his
9   son at length in regards to his poor
10  overall long-term prognosis."
11  Q       To you, when you were discussing
12  this with the doctor, as he documented in
13  his discharge summary, what did that mean
14  to you about your daddy?
15  A       That he wasn't going to be
16  around much longer. Can I elaborate on
17  that?
18  Q       Let me move on. What is
19  hospice? What's its purpose or mission, as
20  best you know?
21  A       To help the family and a patient
22  that is terminally ill in their last days.
23  Q       And was your father being -- was

Page 331

1   he admitted to hospice care?
2   A       Yes, he was.
3   Q       If I told you that it was around
4   July 22nd 2003, would you dispute that?
5   A       No.
6           MS. LINDSAY: It's already been
7   answered, but I won't object.
8   Q       During this time period when you
9   were working and trying to care for your
10  father and your daughter, this is the time
11  period when Brian made the comment
12  regarding you getting married; is that
13  correct?
14          MS. LINDSAY: Object to the
15  form.
16  A       Yes.
17  Q       In regards to that comment about
18  you needing to get married and your, I
19  guess, offense to that, did Brian ever
20  offer any meaningful defense to that
21  comment?
22          MS. LINDSAY: Object to the
23  form.

Page 332

1  Q      Go ahead and answer.
2  A      Not really.
3  Q      Now, was it easy to get in to
4  see Mr. Crowell?
5          MS. LINDSAY: Object to the
6  form. We are getting into a lot of asked
7  and answered stuff. You can answer.
8          MR. BLYTHE: I have never asked
9  that question.
10          MS. LINDSAY: It's been covered
11  in prior deposition testimony, and he's
12  gone on at length about that. If y'all
13  want to keep on going so that I can ask
14  more clarifying questions, that's fine.
15  A      No.
16  Q      Let's look at Exhibit 5. When
17  was Exhibit 5 from?
18  A      '97.
19  Q      To your knowledge, is there any
20  similar document where you agreed to
21  conform to the company policies after being
22  rehired a second time with Miltope
23  Corporation?

Page 333

1          MS. LINDSAY: Object to the
2  form.
3  A      No, sir, there is not.
4  Q      Exhibit 6. Have you ever seen
5  this particular document before these
6  depositions?
7  A      No.
8          MS. LINDSAY: I'm sorry. I
9  didn't know what Exhibit 6 was when you
10  asked that. Object to form.
11  Q      Exhibit 8. Exhibit 8 I believe
12  concerns the fax from the doctor; is that
13  correct?
14  A      Yes.
15  Q      Just before -- before I even ask
16  you these other questions, what is at the
17  bottom of that e-mail?
18  A      My cell phone number and my home
19  phone number.
20  Q      Are those numbers still good?
21  A      Yes, they are.
22  Q      Even today?
23  A      Even today.

Page 334

1  Q      And I know that Heather asked
2  you a few questions about the possibilities
3  of the fax and what could or might have
4  been. Is it also possible that Miltope
5  actually received the fax from Dr. Law?
6  A      Yes, it is possible.
7  Q      Did the lady at the doctor's
8  office indicate to you that she had any
9  trouble faxing the document?
10          MS. LINDSAY: Object to the
11  form.
12  A      No.
13  Q      Did it appear from your
14  observations that she had any problem
15  faxing the letter from the doctor's office?
16  A      No, sir.
17  Q      And then you went to a meeting
18  with Mr. Crowell. That would have been
19  about October 27th?
20          MS. LINDSAY: Object to the
21  form.
22          MR. BLYTHE: I'm just really
23  trying to clarify it. I'm talking out

Page 335

1  loud.
2  Q      What was your purpose of going
3  to meet with Mr. Crowell?
4          MS. LINDSAY: Object to the
5  form.
6  A      Can I answer now?
7  Q      Sure.
8  A      To tell Mr. Crowell that I
9  wanted to take the Family Medical Leave
10  Act.
11  Q      Did you have the paperwork with
12  you when you went?
13  A      I don't think I had it with me.
14  I was on my desk filled out.
15  Q      So, you had already filled it
16  out?
17  A      Yes, sir.
18  Q      And I know you've told us here
19  today and the other day when we were taking
20  your testimony that when you left there,
21  you were confused; is that right?
22  A      Yes.
23  Q      Why?

**Page 336**

1    MS. LINDSAY: Object to the
2    form, asked and answered. You can answer
3    again.
4    A    Because I knew what I needed to
5    do when I went in there. And when I came
6    out, I wasn't sure.
7    Q    So, you went in there to ask for
8    family leave?
9    MS. LINDSAY: Object to the
10   form.
11   A    I pretty much went in to tell
12   him that I needed to take family medical
13   leave.
14   Q    Did Mr. Crowell discuss your
15   duty and obligations to the company?
16   MS. LINDSAY: Object to the
17   form.
18   A    Yes, he did.
19   Q    If you had not talked to him
20   about this, would you have just went ahead
21   and taken family leave?
22   MS. LINDSAY: Object to the
23   form.

**Page 337**

1    A    Yes.
2    Q    And you went in there with that
3    intention?
4    MS. LINDSAY: Object to the
5    form.
6    A    Yes.
7    Q    So, would it be safe to
8    characterize this as Mr. Crowell talked you
9    out of taking the leave?
10   MS. LINDSAY. Object to the
11   form. Are you going to lead him a lot
12   more?
13   MR. BLYTHE: I'm trying to just
14   get us through.
15   MS. LINDSAY: It's already been
16   covered. Object to form. You can answer.
17   A    Yes, I feel like he talked me
18   out of it.
19   Q    On that Monday that you were out
20   with your daughter, did you call Miltope?
21   A    The Monday I was out with myself
22   for being up all night with a flat tire.
23   She was at school. And yes, I did call

**Page 338**

1    Miltope.
2    Q    And did you keep calling until
3    you got a person?
4    A    I got Brian's voice mail. I
5    called Shelly's number. She sent me to
6    Darlene. I talked to Tongie, and Tongie
7    finally got me to Darlene and I explained
8    to Darlene what happened.
9    Q    Did you also send an e-mail to
10   Brian about being out that day?
11   A    I'm not sure if I did that day.
12   MS. LINDSAY: If there is one, I
13   would sure like to see it.
14   MR. BLYTHE: Hold on one
15   second. For some reason I thought you gave
16   it to me.
17   A    I know there's an e-mail in
18   there.
19   MS. LINDSAY: Are you referring
20   to notes to answer the question,
21   Mr. Bailey?
22   THE WITNESS: No. I was looking
23   for a copy of that e-mail.

**Page 339**

1    Q    Actually, I think that it was
2    covered on -- look on Defendant's Exhibit
3    8. Look on Exhibit 8 right there, if you
4    would.
5    A    Got you.
6    Q    The one we were just talking
7    about.
8    A    All right.
9    Q    What is the very first sentence
10   in that e-mail?
11   A    "I called in both Monday and
12   Tuesday, asked you to return the call both
13   times. Still no response from you. What
14   are you trying to say? Hopefully it is
15   different than what I am hearing."
16   Q    What's the date on that e-mail?
17   A    November 5th.
18   Q    So, the Monday I just asked you
19   about would have been addressed in this
20   e-mail on the 5th; is that correct?
21   MS. LINDSAY: Object to the
22   form.
23   A    Correct.

Page 340

1  Q        Did you ever get any type of
2  denial from Brian about the first sentence
3  in this e-mail of November 5th?
4  A        No, sir, I did not.
5  Q        Did he ever indicate to you that
6  there was any untruth in this e-mail —
7  A        No, sir, he did not.
8  Q        Let me finish.
9  A        I'm sorry.
10 Q        Depicted in Defendant's Exhibit
11 8?
12 A        No.
13 Q        Did it seem proper to you on
14 that Monday just to leave a voice mail on
15 somebody's message system and tell them you
16 are not coming?
17          MS. LINDSAY: Object to the
18 form.
19 Q        Let me rephrase the question.
20 Why did you call around looking for a live
21 human?
22 A        Because on September 5th of that
23 year, I had sent an e-mail to Mr. Burkhead

Page 341

1  to tell him that I would not be in that
2  day, and I neglected to put a subject on
3  the e-mail. That e-mail went directly into
4  his trash file because of the way he had
5  his settings on his e-mail. And he had
6  told me that if I was ever going to be out
7  again, I needed to try to get in touch with
8  somebody and let somebody know.
9          Well, I had sent this e-mail,
10 and it says I will not be in today. Sydney
11 is sick, throwing up. I am at home with
12 her. I will get with Lee and try to get
13 com order 34704, Navy Surface Warfare
14 Center Division, out. Call me on my cell
15 or e-mail me if you need to contact me.
16 Have fun in the new boat. See you
17 Tuesday. That was on a Friday.
18          And it was a big to-do at work
19 because he said he never got an e-mail from
20 me. And I told him that I had sent it. I
21 had to print that off from my home computer
22 to let him have it and let him find it in
23 his computer, because it was in his garbage

Page 342

1  on the computer desktop.
2          MS. LINDSAY: Can I have a copy
3  of that? I've never seen that before.
4  A        I just found it.
5          MR. BLYTHE: Actually, I don't
6  have a copy of it.
7  A        Neither one of y'all have it.
8          MR. BLYTHE: I would like to go
9  ahead and enter that as Plaintiff's Exhibit
10 1.
11          (Plaintiff's Exhibit 1
              was marked for
12            identification)
13 A        So, I did not want to go through
14 that with him. I wanted to speak to
15 somebody to avoid any problems with that,
16 because he could have had the same problem
17 with the voice mail.
18 Q        Were you still in communication
19 with your supervisor and Miltope employees
20 up and until the time you received that
21 termination letter?
22          MS. LINDSAY: Object to the
23 form.

Page 343

1  A        I was in touch with some
2  employees. I had been sending e-mails to
3  employees that were my superiors that I
4  received no response from. And I had also
5  cc'd Mr. Crowell on every one of those I
6  sent to Brian and Gabe. No response from
7  him either.
8  Q        So, this entire time that you
9  were sending e-mails to work from the
10 November 5th date on, those were also going
11 to Mr. Crowell, is that what you are
12 telling me?
13 A        Some of them had courtesy cc's
14 to Mr. Crowell. Some of them had them to
15 Gabe and Mr. Crowell. Some of them -- I
16 don't think I sent anything just to Brian.
17 Q        So, it would be safe to say that
18 you made sure there was more than one
19 person in any given situation that knew
20 what your situation was and you were
21 communicating with several people at one
22 time?
23          MS. LINDSAY: Object to the

Page 344

1  form.
2  A     Yes, sir.
3  Q     Now, when you actually got the
4  medical family leave paperwork -- let me
5  back up.
6          What did you do as far as
7  preparing to get family leave?
8          MS. LINDSAY: Object to the
9  form.
10 Q     What was the first step?
11 A     What was the first step?
12 Q     Yes.
13 A     I mentioned it to somebody, and
14 they told me I needed to -- I think Gabe
15 and Brian told me I probably needed to talk
16 to Ed. And I had said something to someone
17 who sent Dee over to see me. I don't
18 remember calling Dee and asking her to come
19 over. I remember her walking by and I
20 might have just asked her in passing.
21 Q     Dee who?
22 A     Coulter.
23 Q     And what was her job?

Page 345

1  A     She was the human resources
2  benefits coordinator. I think that's what
3  her title was.
4  Q     Is that who you got the
5  paperwork for the family leave from?
6  A     Yes.
7  Q     What did you do with the
8  paperwork?
9  A     I filled it out and put it on my
10 desk.
11 Q     Now, at this point after your
12 meeting with Mr. Crowell and it became
13 apparent that you needed to leave, what did
14 you do to facilitate that?
15 A     Called --
16         MS. LINDSAY: Object to the
17 form.
18 Q     Who did you call?
19 A     I called my supervisor and asked
20 him to turn the paperwork in. And if there
21 was anything else he needed, let me know.
22 Q     So, you actually spoke to him?
23         MS. LINDSAY: Object to the

Page 346

1  form. You are leading him.
2  Q     How did you communicate with
3  him?
4  A     I talked to him on the phone
5  that time.
6  Q     Did you follow this up with any
7  other form of communication?
8          MS. LINDSAY: Object to the
9  form. I feel like we are going through the
10 same old process again.
11 A     This is just a brief synopsis of
12 the --
13         MS. LINDSAY: I object to
14 redoing the testimony that's already in
15 place. Go ahead. You can answer. You are
16 just covering ground already covered.
17 A     I sent e-mails asking was there
18 anything else we needed, and I was in
19 contact with Lee Butler doing some work
20 with him, that kind of stuff.
21 Q     Did Brian, Ed or Gabe ever pick
22 up the phone and call you?
23 A     Not to my knowledge.

Page 347

1  Q     In fact, during this whole time
2  period you were still working even from the
3  doctor's office using your cell phone,
4  using e-mail from home and other things; is
5  that correct?
6          MS. LINDSAY: This is all
7  leading. Object to form. Go ahead. You
8  can answer the question.
9  A     Yes.
10         MS. LINDSAY: Are you going to
11 help me pay for the court reporter's time,
12 by the way?
13 Q     Did you perform work for Miltope
14 after November 3rd?
15 A     Yes.
16 Q     How about after November 5th?
17 A     Yes.
18 Q     The CAV codes. To your
19 knowledge, would there be any reason for
20 Brian or Gabe to know that you actually
21 gave the codes or passwords to Lee?
22         MS. LINDSAY: Object to the
23 form.

Page 348

1  **Q      Go ahead.**
2  A      Not unless Lee told them after
3  that point.
4  **Q      I mean, there's no set up**
5  **operating procedure or anything --**
6       MS. LINDSAY:  Object to the
7  form.
8  **Q      -- for conveying those**
9  **passwords?**
10  A      No.
11       MS. LINDSAY:  Object to the
12  form.
13  **Q      Do you have any reason to**
14  **believe that Lee would conceal the fact**
15  **that you gave the passwords to him?**
16  A      No.
17       MS. LINDSAY:  Object to the
18  form.
19  **Q      On the calendar, there were some**
20  **questions earlier about the November 3rd**
21  **entry.**
22  A      Yes.
23  **Q      Is it possible that you did, in**

Page 349

1  **fact, perform some work for Miltope that**
2  **day?**
3  A      Yeah.  I mean, I would have done
4  some stuff at home.  I was trying to do
5  stuff at home.  As far as did I make it to
6  work, no.  That would just have been a
7  mistake.
8  **Q      Now, as far as you are concerned**
9  **in this story, when did you effectuate**
10  **turning in your paperwork?**
11       MS. LINDSAY:  Object to the
12  form.
13  A      That Wednesday when I saw my
14  father was sick.  I knew I had to get him
15  taken care of and I had to get him to the
16  doctor.  And I just -- there was no way
17  that I could do what I thought I could do.
18  I had to -- I had to get things under
19  control.  And the only way to do that would
20  have been to take the leave.
21  **Q      And when did you set the wheels**
22  **in motion for that?**
23       MS. LINDSAY:  Object to the

Page 350

1  form.
2  A      The Wednesday when I asked Brian
3  to turn the paperwork in.
4  **Q      I notice in Defendant's Exhibit**
5  **13 there were several communications from**
6  **Gabe or at least a communication from Gabe**
7  **concerning the laptop.**
8  A      Yes.
9  **Q      Did his communication in any way**
10  **address the previous communication from**
11  **you?**
12       MS. LINDSAY:  Object to the
13  form.
14  A      That I had sent?
15  **Q      Yes.**
16       MS. LINDSAY:  Same objection.
17  A      No.
18  **Q      He just basically asked for the**
19  **laptop and the password; is that right?**
20       MS. LINDSAY:  Object to the
21  form.
22  A      Yes, much as the termination
23  letter.

Page 351

1       MS. LINDSAY:  Object to the
2  form.
3  **Q      Did it seem fair to you to have**
4  **some third party come to you for this**
5  **information rather than them addressing you**
6  **directly?**
7       MS. LINDSAY:  Object to the
8  form.
9  A      It didn't seem very
10  professional.
11  **Q      Would it have been better if**
12  **Gabe had called you?**
13       MS. LINDSAY:  Object to the
14  form.
15  A      I would -- it would have been
16  better if they had answered my e-mail like
17  I asked.  That would have been better,
18  because that's the way I requested the
19  information.
20       (Plaintiff's Exhibit 2
          was marked for
21          identification)
22  **Q      Tell me what Plaintiff's Exhibit**
23  **2 is, Pat.**

Page 352

1 A    "Mr. Crowell, I have a very
2 serious situation." It's my request to
3 have a meeting with him. It says further
4 down, "My father is very ill, and it has
5 reached the point that I need to be more
6 available to help him. Hospice does come
7 to the house now, but his needs are
8 increasing. His condition is terminal. I
9 would like to discuss my options with you."
10 **Q    So, that's initially how you**
11 **initiated the conversation prior to the**
12 **October 27th meeting with Mr. Crowell; is**
13 **that correct?**
14    MS. LINDSAY: Object to the
15 form.
16 A    Well, the one above that is the
17 second e-mail I sent requesting the
18 meeting. That was the one that actually we
19 worked from.
20    (Plaintiff's Exhibit 3
      was marked for
21    identification)
22 **Q    Mr. Bailey, read Exhibit 3,**
23 **because we haven't beat this to death.**

Page 353

1 A    This is from one of the -- oh, I
2 forgot about another responsibility. I was
3 excess inventory something or another,
4 too. I don't know what they called that.
5 I dealt with different clearinghouses
6 trying to sell scrap off. "Hi Pat. I
7 understand that you are having some medical
8 problems at home. I hope things get
9 better. Sorry to have bothered you with
10 all the messages this past week. We are
11 moving forward with the sale of the LCD
12 displays that you sent me. Again, I hope
13 things get better at home. Best regards,
14 Herb."
15 **Q    Who is Herb?**
16 A    Herb is the point of contact at
17 Harry Krantz, which is a clearinghouse for
18 excess inventory that we have, things that
19 are out of date that we used.
20 **Q    So, there were other -- what was**
21 **the date of that e-mail?**
22 A    November 11th.
23 **Q    So, there were individuals that**

Page 354

1 **you worked with that were aware of your**
2 **situation?**
3 A    Absolutely. Do you have this
4 one (indicating)?
5    MR. BLYTHE: No.
6 A    I just found some of these.
7    MS. LINDSAY: You are making my
8 job kind of hard.
9    MR. BLYTHE: I don't think it
10 shows anything except that he was doing
11 work from home.
12 A    That's come up in conversation.
13 I just found the e-mail.
14 **Q    Let's mark that.**
15    (Plaintiff's Exhibit 4
      was marked for
16    identification)
17 **Q    What is Plaintiff's 4?**
18 A    This is an e-mail that Melody
19 Orr from Mechanicsburg, Pennsylvania, NAV
20 ICP sent me discussing that order that I
21 was working on with Lee from the doctor's
22 office on the phone. It says I've
23 completed all 20 items for you -- 25 items

Page 355

1 for you. Good luck with the 1348's. I
2 know for a fact that you can get CAV from
3 any computer as long as you have the
4 correct address and user ID and password.
5 We have people in CAV that have worked from
6 home. She sent me the link, told me that I
7 could download the plug-ins. And I was on
8 dial-up is why it took so long to download
9 it. So, she gave me other people that I
10 could call if I had any problem because she
11 only works Monday through Thursday.
12 **Q    Just a couple of follow-up**
13 **questions. How did -- and I'm asking this**
14 **because this has become a point of some**
15 **issue. How did Brian convey to you that**
16 **you needed to get a letter from the doctor?**
17    MS. LINDSAY: Object to the
18 form, asked and answered.
19 A    He said, "You need a letter from
20 your father's doctor."
21 **Q    How was that communicated to**
22 **you?**
23 A    I think he told me that on --

Page 356

1  no.  Yeah, he told me that on the phone or
2  either sent me an e-mail, one of the two.
3  I don't recall which.
4  Q      Or both?
5  A      Maybe both.
6        MR. BLYTHE:  That's all I have.
7        (Short break was taken.)
8  EXAMINATION BY MS. LINDSAY:
9  Q      Mr. Bailey, we are back on the
10 record.  I have some follow-up questions
11 for you.  We've talked about what your
12 impression was when your father saw a
13 doctor in July 2003 regarding his
14 pneumonia.  Do you remember that testimony?
15 A      Yes.
16 Q      As I understood that testimony,
17 you heard him say that there was a tumor.
18 Do you recall that?
19 A      A mass.
20 Q      A mass.  And because of your
21 mother's untimely death from cancer, you
22 were thinking the worst, correct?
23 A      Well, he gave my mother --

Page 357

1  excuse me.  Gave my father three months or
2  so to live.  So, yes, I thought the worst.
3  Q      Your prior testimony was that he
4  told you he had three to six months if it
5  was malignant.
6  A      He said three to six months.  He
7  didn't say anything about malignant.
8  Q      And you have reviewed with me,
9  I'm sure you'll recall, the documents that
10 establish that there was no malignancy
11 detected in July 2003, correct?
12 A      Some of that paperwork I only
13 saw and knew that any of it meant after the
14 fact.
15 Q      The doctor never said your dad
16 had lung cancer, correct?
17 A      He said he thought it was
18 cancer.  And he wasn't even sure, since the
19 pneumonia was that bad, that he would even
20 make it home, much less worry about the
21 cancer getting him.  He said the reason not
22 to do this invasive of a procedure would be
23 that we don't know if his cancer will get

Page 358

1  him before his general poor health will.
2  Q      Why would the doctor have put in
3  the notes that he was released in stable
4  condition, if that was the case?
5  A      He was doing better.  I mean,
6  this was early in the scenario.  He was in
7  there 12 days.  So, in the very beginning
8  things did not look very good for him at
9  all.
10 Q      But he managed to recover from
11 the pneumonia and was released to get into
12 physical therapy at Chapman, right?
13 A      Correct.
14 Q      And ultimately he recovered
15 entirely based on the 11/06/03 visit in
16 that report, right?
17 A      Recovered from the pneumonia.
18 Q      And at that time you were
19 reassured that there actually wasn't any
20 cancer, correct?
21 A      No.  I didn't know for a fact
22 there was no cancer at all until the CAT
23 scan that was done in November of '04,

Page 359

1  which would have been over a year later,
2  because he had come off of hospice.
3  Q      Were you surprised that your
4  father was still apparently doing fairly
5  well considering your belief that he had
6  lung cancer?
7  A      Yes, I was.
8  Q      He was still able to feed
9  himself, as you told me before, right?
10 A      Yes.
11 Q      He was still able to attend to
12 his basic needs if you were not there,
13 correct?
14 A      Some of them, yes.
15 Q      Before you told me that he was
16 able to tend to those needs so that you
17 were free to go to those band practices.
18 A      Yes.
19 Q      You didn't feel bad about that,
20 right?
21 A      I mean, could he pay bills?
22 No.  Not that kind of thing.  He couldn't
23 do stuff like that.  As far as eat, take a

(Pages 360 to 363)                                                                         39

Page 360

1  bath at that point in time, yes, he could.
2  Q       You took care of his finances,
3  right?
4  A       Yes.
5  Q       And you testified earlier about
6  your inability to support your family on
7  the income from your bands.
8  A       Right.
9  Q       And I suppose, then, that your
10 father receives some income based on his
11 status as a veteran and his --
12 A       Right.
13 Q       And he probably receives social
14 security?
15 A       Right.
16 Q       And he receives veteran's
17 benefits?
18 A       Right.
19 Q       So, you manage all that income
20 for him and pay the family bills, right?
21 A       Correct.
22 Q       So, your father's income
23 supports you, Sydney and him, correct?

Page 361

1  A       Right.
2  Q       And that's been true for several
3  years now, right?
4  A       Several is a bad way to put it.
5  No, it's not been several years.
6  Q       Has it been true since you
7  stopped working at Miltope?
8  A       I had to be approved by the
9  Veterans Administration to care for him.
10 So, it was several months after I worked at
11 Miltope.
12 Q       Didn't you have that approval
13 prior so that you could get that medication
14 that you were trying to --
15 A       No. He's had veteran's benefits
16 since he retired from the Marine Corp in
17 1968 and has always gotten his medicines
18 through the VA pharmacy.
19 Q       What type of approval process
20 are you referring to?
21 A       I had to meet with the veteran's
22 representative in Alexander City and submit
23 paperwork to be approved to help him take

Page 362

1  care of his basic needs.
2  Q       When you say that, you are
3  saying you were being approved to receive
4  access to the veteran's benefits, the
5  financial benefits?
6  A       No. I have power of attorney
7  over my dad's affairs now and have had for
8  a couple of years.
9  Q       When did that begin? Was that
10 after you left Miltope that you got the
11 power of attorney?
12 A       No. I had it before that.
13 Q       Then what special approval
14 process were you required to go through?
15 A       Aide in attendance is what it's
16 called.
17 Q       Pardon?
18 A       Aide in attendance. His -- go
19 ahead.
20 Q       After that approval was given to
21 you, what did you have the power to do that
22 you didn't have the power to do before?
23 A       I was able to take care of my

Page 363

1  father.
2  Q       What does that mean, take care
3  of your dad, as far as the Veteran's
4  Administration is concerned?
5  A       Well, you know, hospice is
6  licensed care, that kind of thing. I
7  wanted to be able to take care of him.
8  Q       Did you receive any special
9  training from the Veteran's Administration
10 on how to take his vital statistics?
11 A       No. But I've learned how to do
12 that.
13 Q       You learned that from hospice?
14 A       I have a machine that takes his
15 blood pressure and he has a nebulizer for
16 his breathing treatments.
17 Q       And do you have CPR training?
18 A       I have had it. I probably am
19 not certified right now. But if I had to
20 administer it, I could.
21 Q       What special status do you have
22 with the Veterans Administration as a
23 result of this approval? Are you able to

Page 364

1  use money on his behalf that the Veterans
2  Administration pays to him?
3  A       It's just to allow me to be able
4  to stay home with him.  It helps supplement
5  the income to allow me to stay home with
6  him rather than him be put in a government
7  facility.
8  Q       What paperwork did you have to
9  submit to get that approval?
10  A       I would have to go back and look
11  at the records from the files that we sent
12  in.
13  Q       What did you have to prove to
14  them about yourself to get that approval?
15  A       I don't know.  I mean, we would
16  have to talk to the veteran's
17  representative.
18  Q       Did they have the power to put
19  him in an assisted living facility without
20  your consent?
21  A       No, probably not.  But it was
22  just -- I don't know how to answer what you
23  are asking.  If I knew where you were

Page 365

1  going, I could probably have a better
2  chance to answer that question.
3  Q       I'm just confused about why you
4  needed some special approval from the
5  Veterans Administration if you already were
6  able to manage his financial affairs and
7  you already knew how to handle taking care
8  of his vital statistics and measurements.
9  I don't understand what else you would need
10  from the Veterans Administration.
11  A       I guess the okay, them saying
12  it's okay.  I don't know.
13  Q       And as a result of their okay,
14  did they give him a greater amount of
15  money?
16  A       There is an increased benefit
17  for that.
18  Q       How much does he receive every
19  month?
20  A       I would have to go look at the
21  records.
22  Q       And you applied for that
23  increased benefit in November of 2003?

Page 366

1  A       I'm not sure when we applied for
2  it.
3  Q       Are there records that exist
4  that would show us that?
5  A       Probably so.
6  Q       Although there is not before us
7  a similar document from 2001 that shows you
8  signed off on receiving the handbook, you
9  did agree to conform to all Miltope
10  policies, correct?
11  A       It says in the last statement in
12  the handbook -- where is the handbook?
13  Q       It's here (indicating).
14  A       Read the last sentence in the
15  handbook.
16  Q       "I have read the handbook and
17  agree to conform to the rules of Miltope
18  Corporation."  That's what's on the
19  acknowledgment.  Is that what you are
20  talking about?
21  A       No.  On the last page of the
22  book itself.
23  Q       That is the last page of my

Page 367

1  book.
2  A       Does it not say something in
3  there about Miltope reserves the right to
4  change any of these without notice?  So, I
5  don't know if it was the same book that I
6  would have gotten the second time or not.
7  Q       My question is you agreed to
8  conform to the policies to the extent you
9  understood them?
10  A       Okay.  That's fair.
11  Q       And you understood what the
12  policies were in 1996, '97, correct?
13  A       For the most part.  I had not
14  had to refer to them.
15  Q       But you had had access to them
16  and you still had access to them, right?
17  A       Yes.
18  Q       And there was never a time you
19  had a question about a policy that you
20  couldn't get answered, right?
21  A       Probably not.
22  Q       I thought on September 5th,
23  based on your rehearsal schedule, that you

Page 368

1  were rehearsing for the McQueen Street
2  reunion show. Am I wrong?
3  A    I don't know.
4  Q    There was a September 5th e-mail
5  that your lawyer designated as Plaintiff's
6  Exhibit 1 indicating that you sent an
7  e-mail to Brian saying that Sydney was
8  throwing up and you had to stay home.
9  A    Okay. And what did that
10 rehearsal schedule say?
11 Q    According to other e-mails, that
12 was a rehearsal weekend.
13 A    Okay. If I was gone to
14 rehearsal, how could I have sent an e-mail
15 from my house.
16 Q    That's my question to you, sir.
17 A    I'm asking.
18 Q    Sir, I'm the one who is trying
19 to ask the questions to know your
20 situation, because I didn't live these
21 events.
22     MR. BLYTHE: Let me go off the
23 record for a second.

Page 369

1     (Discussion held off the record)
2  A    I don't know.
3  Q    So, you don't know how to
4  explain that. All right.
5     You wouldn't have lied to Brian,
6  would you? You weren't trying to hide that
7  you were involved in this band, were you?
8  A    No, no, no.
9  Q    The sign-in sheets that you were
10 shown earlier for weeks ending 11/2 and
11 11/9, you testified that those were not
12 your signatures on those sheets. Do you
13 remember that testimony?
14 A    Yes, I do.
15 Q    And I believe we've looked at
16 those sheets together before, and I just
17 want to make sure I understood you
18 correctly. You don't dispute what's listed
19 on those sheets in terms of your time,
20 right?
21 A    No.
22 Q    I'm correct?
23 A    Yes.

Page 370

1  Q    In your testimony we've gone
2  over these documents a couple of times, and
3  I'm confused. This is Exhibit 6. You see
4  that it says Miltope on it, right?
5  A    Right.
6  Q    And you see that it appears to
7  be forms that one would fill out for family
8  medical leave, right?
9  A    It says physician's
10 certification for family medical leave.
11 Q    That's the first page of that
12 exhibit?
13 A    Yes.
14 Q    What's the next page?
15 A    Request for family medical
16 leave.
17 Q    And what's the third page?
18 A    Employee acknowledgment.
19 Q    Are you trying to say that you
20 never saw page one of that exhibit when Dee
21 Coulter gave you those materials?
22 A    I don't recall seeing page one.
23 Q    Did you see page two and page

Page 371

1  three?
2  A    I don't see page numbers on
3  them.
4  Q    I'm just talking about the
5  exhibit itself. Did you see the other
6  pages within that exhibit?
7  A    I saw this and filled that out
8  (indicating), and I saw this (indicating)
9  and filled that out. Wait a minute. I
10 signed that. And it said leave to start,
11 and I put immediately.
12 Q    Those are the --
13 A    This doesn't really look like
14 the same thing I saw. Have they had a form
15 change since I did this?
16 Q    Someone represented to me that
17 those were the forms that were given to
18 you. But you are telling me that you think
19 it might be different?
20 A    Well, it's possible. Do they
21 have the forms that I -- don't ask her
22 questions.
23 Q    They don't. And if you had a

42

Page 372

1  copy of them, I would love to see what you
2  filled out. But you don't have a copy,
3  correct?
4  A     No.
5  Q     Was there anything else that you
6  filled out other than the two pages that
7  you just talked about?
8  A     I don't think so.
9  Q     I've heard you testify to having
10  some e-mail communications. And as I
11  understand your testimony, you came to a
12  point where you only e-mailed Gabe and
13  Brian and you wanted them to e-mail you
14  back?
15  A     No.
16  Q     You did not want to discuss
17  things by telephone?
18  A     Right.
19  Q     Did this preferred approach on
20  your part in terms of e-mail communication
21  begin as of November 5th?
22  A     I'm not sure of the exact date
23  that it began. But when I could get no one

Page 373

1  to give me any straight answers, the
2  answers or any communications that I got at
3  that point I wanted in writing.
4  Q     As I understand it, you did have
5  a phone conversation with Brian on November
6  5th.
7  A     That was me asking or telling
8  him to turn the paperwork in.
9  Q     I'm just asking you did have a
10  phone conversation, yes or no.
11  A     Yes, on the 5th.
12  Q     Was that the last phone
13  conversation you had with Brian?
14  A     I think so. The next thing I
15  got from Brian was an e-mail telling me
16  that I need a letter or a --
17  Q     All I need is a yes or no.
18  A     I'm not sure. I don't remember
19  if it was an e-mail or a phone call.
20  Q     According to this Exhibit 8,
21  there is an e-mail from you to Brian saying
22  you have requested a letter from the
23  doctor. Now, is it a fair assumption that

Page 374

1  you sent this e-mail on November 5th at
2  8:29 a.m. after you had that conversation
3  with Brian?
4  A     Can I see that, please?
5  Q     Sure.
6  A     Okay. This is the same Exhibit
7  8.
8  Q     Exactly.
9  A     Yes, it is fair to think that
10  this was after that.
11  Q     After that conversation with
12  Brian by phone, right?
13  A     Yeah, it would have been after
14  because it says, "I have requested a letter
15  from the doctor detailing my father's
16  condition to satisfy the approval for
17  leave. I will forward it to your attention
18  when I receive it."
19  Q     Based on your testimony and your
20  e-mails, I believe that was the last
21  telephone conversation you had with any
22  management employee at Miltope. Am I
23  right?

Page 375

1  A     That's possible.
2  Q     If your testimony reflects that
3  that's accurate -- I mean, your memory is
4  not the same as it was last time. It's
5  important that I understand what your
6  communications were, and this is my chance
7  to find out. Can you be more certain?
8  A     I think that is the last phone
9  conversation I had with management.
10  Q     As far as your e-mails, as I
11  understand it, Exhibits 8, 13 and 14
12  reflect all of your e-mail communications
13  that would have been directed to either Ed
14  Crowell as a cc or directly to Brian
15  Burkhead or directly to Gabe Riesco. Can
16  you look at these and tell me whether
17  there's anything else? Because if there's
18  anything else, I need to see it today.
19  A     I think so.
20  Q     You have e-mails with you that
21  you've referred to during this deposition.
22  Are there other e-mails in your stack?
23  A     I don't think so.

Page 376

1  Q      If there are and they come up
2  after today, I'm going to object to their
3  being used in this litigation because I
4  think I was entitled to see them before
5  today. So, this is your chance. Are you
6  sure?
7         THE WITNESS: Do you want me to
8  dig through and see if I can find anything,
9  or do you want to let that be it?
10        MR. BLYTHE: Flip through there
11 and see.
12 Q      Let me put it this way: You
13 don't have to flip through right now. But
14 if there's something else, I need it this
15 week.
16 A      Okay. That's fair.
17        MS. LINDSAY: And if there's
18 something else, then I reserve the right to
19 reopen.
20 Q      Based on my understanding that
21 these three exhibits represent your e-mail
22 communications to these management
23 employees, my understanding is that your

Page 377

1  final e-mail was the one sent November
2  18th, Tuesday, Gabe, could you direct any
3  communication to me.
4  A      That's not the final e-mail.
5  There were ones like that one that was
6  further down the line. There's another one
7  further out than that.
8  Q      To Gabe?
9  A      What was the date on this one
10 right here to Gabe (indicating)?
11 Q      I'm sorry. On November 19th he
12 e-mailed you. And then you e-mailed him
13 back, but there's no date on that. Do you
14 know why there's no date?
15 A      I do not.
16 Q      And this was apparently printed
17 off from your computer based on the line at
18 the top. Am I right?
19 A      Yes.
20 Q      So, in response to Gabe's
21 November 19th e-mail, according to that
22 piece of paper, you e-mailed him back. But
23 there's no date reflected as to when that

Page 378

1  e-mail occurred. Am I right?
2  A      I don't see anything on here.
3  Q      And it's your testimony that you
4  wrote that and e-mailed that to Gabe?
5  A      Yes.
6  Q      Why wouldn't there be a date on
7  there?
8  A      I don't know that.
9         MS. LINDSAY: I think that's
10 it. Thanks.
11   (Discussion was held off the record.)
12        THE WITNESS: Hang on one
13 second. Here is one thing I want to say.
14 You know the paper that you've got that
15 looks like this from the doctor's office
16 (indicating)?
17        MR. BLYTHE: It's Exhibit 3.
18        THE WITNESS: This ain't the
19 same paper. Let's see Exhibit 3 right
20 quick. What does yours say for result down
21 there?
22        MR. BLYTHE: Negative.
23        THE WITNESS: Well, mine says

Page 379

1  atypical. Why would that be?
2         MR. BLYTHE: That's 7/16, the
3  run date.
4         THE WITNESS: And this is 7/8.
5  Why does that say atypical?
6         MR. BLYTHE: You've got me.
7         THE WITNESS: Atypical means
8  what?
9         MS. LINDSAY: May I look at the
10 document you are referring to?
11        THE WITNESS: Not normal.
12        MR. BLYTHE: The comments are
13 different, too.
14        THE WITNESS: Eight days apart.
15 That's what I made my decision off of.
16 Q      (By Ms. Lindsay) When was this
17 produced to us?
18 A      I just have gone through a bunch
19 of stuff at the house. I thought that this
20 paper was the same as that paper
21 (indicating). But when we went through
22 this earlier and you read that negative for
23 malignancy, remember I told you I hadn't

Page 380

1   heard anything about malignancy?
2   Q       Right.
3   A       That's what I saw.  It says
4   atypical.
5   Q       So, people didn't use the word
6   "malignancy."  They used the word
7   "atypical" with you?
8   A       That's what that says.  Read
9   down there where it says squamous.
10  Q       Squamous epithelium are
11  identified.  Atypical group, and I can't
12  pronounce that word.
13  A       Squamous cell carcinoma is a
14  form of cancer that happens from the sun.
15  The word "squamous" when I sold insurance
16  was in the definition of cancer.  When I
17  saw squamous on there, that looks like
18  cancer to me.
19  Q       Did you ask Dr. Law if that
20  meant cancer?
21  A       I'm not sure if I did or not.
22  When I was told that my father had a mass
23  in his lung and then the doctor tells me

Page 381

1   that they went in there to try to get it
2   and couldn't get it and there was going to
3   be all this invasive surgery and everything
4   else, the --
5   Q       And you didn't want to put your
6   dad through that invasive --
7   A       He couldn't have lived through
8   it.  There was no way he could live through
9   it.  That's why we decided not to have all
10  that invasive procedure done.  Because he
11  had told me if you go in there and try to
12  get this out, it will reduce the quality of
13  life he has right now.  If we can just get
14  this pneumonia cleared out, we can get him
15  home.  He will probably have some time.
16  But he said that his long-term prognosis is
17  not good with his health the way it is, and
18  that is what was given to me.  That's what
19  hospice had and everything like that.
20  Q       So, you did receive a copy of
21  this piece of paper I'm holding while you
22  were visiting with the doctor?
23  A       No.  I got that from hospice.

Page 382

1   Q       When did you get that from
2   hospice?  What are you referring to?
3   A       I am looking at this other piece
4   of paper I was about to give you.
5           THE WITNESS:  Have you got that
6   (indicating)?
7           MR. BLYTHE:  I don't think so.
8   A       I've been doing some digging and
9   finding other stuff, too.
10  Q       Good for you.  Bad for me.
11  A       The reason I sit here and
12  torture myself over the answers is I'm just
13  trying to tell the truth.
14          MR. BLYTHE:  And that's --
15  Q       That's what we want you to do.
16  It's just that it's hard for us to manage
17  the deposition if we don't have the
18  documents in advance.
19          MR. BLYTHE:  There was something
20  else here that had me very confused.  I was
21  like what does that have to do with --
22          THE WITNE4SS:  Dogs do not bite.
23          MR. BLYTHE:  Now I understand.

Page 383

1   Q       Referring to your lab at home,
2   at Lake Martin?
3   A       Yeah, the Lake Martin lab.
4           MS. LINDSAY:  May I look at this
5   document?  This is Faith Hospice Patient
6   Information, and it's dated --
7   A       That's probably just something
8   that was in a file.
9   Q       I can't tell when it's dated.
10  Based on the appearance of the document,
11  you kept it in a three-ring binder?
12  A       I think they kept it in a
13  three-ring little paper folder with the
14  little things on it.
15  Q       And they gave you their
16  original?
17  A       That's probably the initial one
18  that they had.
19          MS. LINDSAY:  I guess what we
20  will do is make a copy of this.  Can we
21  just make this an exhibit to the record and
22  get copies of it that way?
23          MR. BLYTHE:  You can do it with

(Pages 384 to 386)                                                          45

Page 384

1  that one, too, if you want to (indicating).
2        MR. LINDSAY:  We don't have to.
3  I think we've got it in the records we
4  subpoenaed.
5            (Plaintiff's Exhibit 5
              was marked for
6             identification)
7  **Q      The doctor did not discuss with**
8  **you this comment on Exhibit 5 that you've**
9  **shown me, the atypical squamous cells?**
10 A      There were two doctors.  There
11 was an attending physician and there was a
12 specialist.
13 **Q      Did either one of them explain**
14 **to you that comment?**
15 A      The one doctor told me that
16 there is a mass in his lungs.
17 **Q      And you've told me about that**
18 **conversation, right?**
19 A      Yeah.  That's the same old
20 conversation over and over.
21 **Q      And that's Dr. Law?**
22 A      Exactly.
23       MS. LINDSAY:  I'm done.

Page 385

1        MR. BLYTHE:  I don't have
2  anything else.
3
4        (END OF DEPOSITION)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 386

1            C E R T I F I C A T E
2
3  STATE OF ALABAMA )
4  JEFFERSON COUNTY )
5
6        I hereby certify that the above
7  and foregoing deposition was taken down
8  by me in stenotype, and the questions and
9  answers thereto were reduced to computer
10 print under my supervision, and that the
11 foregoing represents a true and correct
12 transcript of the deposition given by
13 said witness upon said hearing.
14
15       I further certify that I am
16 neither of counsel nor of kin to the
17 parties to the action, nor am I in
18 anywise interested in the result of said
19 cause.
20
21       _____
       LeAnn Maroney, Commissioner
22
23



# TEMPLE MEDICAL CLINIC, P.C.

1120 AIRPORT DR., SUITE 102
P.O. BOX 268
ALEXANDER CITY, AL 35011
PHONE: (256) 234-4295
FAX: (256) 329-1024

JAMES P. TEMPLE, M.D.
TIMOTHY J. CORBIN, M.D.
VINCENT LAW, M.D.

November 5, 2003

RE:  Lemuel Bailey
     DOB:

To Whom It May Concern:

Mr. Bailey is a patient that is under my care.  He has terminal illness that
may require his son's assistance.  Please feel free to call me for any
questions.

Sincerely yours,

Vincent Law, M.D.

VL/kw


DEFENDANT'S
EXHIBIT



# TEMPLE MEDICAL CLINIC, P.C.

1120 AIRPORT DR., SUITE 102
P.O. BOX 268
ALEXANDER CITY, AL 35011
PHONE: (256) 234-4295
FAX: (256) 329-1024

JAMES P. TEMPLE, M.D.
TIMOTHY J. CORBIN, M.D.
VINCENT LAW, M.D.

November 29, 2004

RE: Lemuel Bailey
    DOB:

To Whom It May Concern:

Mr. Bailey is an eight-five year old white male who has been under my care. He has multiple medical problems including significant Alzheimer's dementia and history of hypertension and coronary artery disease. He was hospitalized in July of 2003 for bilateral pneumonia. CT of the chest done at that time revealed possible right lower lobe post obstructive lesion. A bronchoscopy was done at that time by Dr. Stubbs the pulmonologist which revealed no post obstructive processes. He underwent a diagnostic thoracentesis at that time as well. Cytology was negative for any malignancy. After extensive discussion with her son and with Dr. Stubbs it was felt that his long-term prognosis was quite poor. The patient was admitted to hospice at that time. Since that time he has been relatively stable. A repeat CT of the chest done in November of 2004 revealed no sign of malignant tumor however this study was done without contrast. Because of his finding he was disqualified from hospice care. Since July of 2003 the patient has been cared for by his son Patrick Bailey. Because of his Alzheimer's dementia his son's assistance has certainly been quite helpful. Certainly his assistance with caring for his father has improved his quality of life and the patient has been able to stay at home without any consideration for admission to a skilled nursing care facility. Please notify me for any problems or questions.

Sincerely yours,

Vincent Law, M.D.

VL/kw



DEFENDANT'S
EXHIBIT

**Pat Bailey**

| | |
|---|---|
| **To:** | Gabriel Riesco |
| **Subject:** | RE: Please direct all communications to me |

I would be glad to, when I can get down there. I am staying home with my dad in case you have forgotten. As for the passwords I already provided them. Seems the communication factor there IS as good as I thought it was. Do you have any idea why I was terminated? Did you and Brian discuss this? Did Brian recieve the letter from Dr. Law's office? Did he turn in the letter and the leave request? If so, why have these events taken place? If not, why not? You and I talke about this many times as did Brian and I. There needs to be some explanation. I am not at all satisfied with Mr Crowell's letter.
I am facing a very difficult time, and this is not a very supportive show from Miltope. As for acting like no one has had a way to contact me, Brian has had my e-mail and numbers. If I was in danger of being terminated, could you or he have not called or maybe responded to one of the many e-mails I sent with cc's to you and Mr. Crowell?


-----Original Message-----
From: Gabriel Riesco [mailto:Gabe.Riesco@miltope.com]
Sent: Wednesday, November 19, 2003 8:06 AM
To: Pat Bailey
Cc: Ed Crowell; Brian Burkhead
Subject: RE: Please direct all communications to me

Pat,

We need you to return the company laptop and provide passwords to CAV system ASAP.

Gabe

-----Original Message-----
From: Pat Bailey [mailto:streetdrummer@webshoppe.net]
Sent: Tuesday, November 18, 2003 16:43
To: Gabriel Riesco
Subject: Please direct all communications to me

Gabe,
        Could you please direct any future communications directly to me. I have sent a number of e-mails to Brian(no response), with cc's to you and Mr. Crowell. You have a way to contact me. Please do so.



**Pat Bailey**

| | |
|---|---|
| **From:** | Pat Bailey [streetdrummer@webshoppe.net] |
| **Sent:** | Tuesday, November 18, 2003 4:43 PM |
| **To:** | griesco@miltope.com |
| **Subject:** | Please direct all communications to me |

Gabe,

    Could you please direct any future communications directly to me. I have sent a number of e-mails to Brian(no response), with cc's to you and Mr. Crowell. You have a way to contact me. Please do so.

**Pat Bailey**

| | |
|---|---|
| **From:** | Pat Bailey [streetdrummer@webshoppe.net] |
| **Sent:** | Monday, November 17, 2003 4:32 PM |
| **To:** | Brian "William" Burkhead |
| **Cc:** | griesco@miltope.com; ecrowell@miltope.com |
| **Subject:** | o.k. |

Brian,

    Did you get the form I filled out for Family Medical Leave and turn it in? I told you it was on my desk. Remember, you told me I needed a letter from my dad's doctor? Did you get the fax/letter from Dr. Law's office? These are simple yes/no questions. Please answer by replying to this e-mail. Thanks.

Pat

**Pat Bailey**

| | |
|---|---|
| **From:** | Pat Bailey [streetdrummer@webshoppe.net] |
| **Sent:** | Friday, November 14, 2003 8:08 AM |
| **To:** | Brian "William" Burkhead |
| **Cc:** | griesco@miltope.com; ecrowell@miltope.com |
| **Subject:** | Letter/Fax |

Hello Brian. As was requested, I had the doctors office fax the letter. Please confirm receipt of the Letter faxed from Dr. Law's office yesterday. I am not sure why it took so long to get it, but I cannot dictate their schedule. We do not know ther results of the x-rays yet. I believe another doctor is reviewing them and comparing them with the ones taken when my dad was in the hospital a few months back.
Hope all is well with everyone there. Please let me know if there is anything else you need. Thanks, Pat

