IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| **PATRICK BAILEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No.:  2:05-cv-1061-MEF-DRB** |
| | ) | |
| **MILTOPE CORPORATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANT MILTOPE CORPORATION'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

## I.    INTRODUCTION

This is a case arising from poor communication by the plaintiff, Patrick Bailey, who refused to follow company policy of which he was well aware allegedly to spend more time with his elderly father, whom Bailey believed to be suffering from lung cancer despite diagnostic testing to the contrary.  Rather than acknowledge his poor communication surrounding his absenteeism in November 2003, Bailey instead claims that Miltope Corporation's reasonable conclusion that Bailey had abandoned his job after failing to call in on three consecutive days he was absent constituted interference with his attempt to assert an alleged entitlement to leave pursuant to the Family & Medical Leave Act ("FMLA").  Bailey failed to provide proper notice of his desire for leave and failed to ensure that Miltope

received the information necessary to approve his request.  Nonetheless, he insists he was entitled to leave based on his mistaken belief that his father would die within three months.  Not only are his claims meritless, but he is collaterally estopped from relitigating the reason for the separation of his employment, which was contested during an unemployment compensation proceeding and fundamental to Bailey's disqualification from receiving benefits.  Because no genuine issue of material fact exists, Bailey's claims should be dismissed with prejudice.

## II.    STATEMENT OF FACTS

### A.    Background

The plaintiff Patrick Bailey was first employed at Miltope first in 1996. (Evid. Ex. 1, p. 11, ll. 20-22.)  He was hired by Edward F. Crowell, the Vice President of Administration at Miltope.  (Evid. Ex. 3, ¶¶ 2, 3.)  When working at Miltope, Bailey tried to tackle a world he was not used to after spending much of his adult life pursuing success as a drummer in local and regional bands.  (Evid. Ex. 1, p. 8, l. 23 – p. 9, ll. 1-11; p. 20, ll. 22-23 – p. 21, ll. 1-2; p. 23, ll. 7-8, 11-13, 16-18; p. 24, ll. 3-9; p. 29, 7-17; p. 30, ll. 2-7; p. 42, ll. 18-23; p. 43, ll. 5-7; p. 43, ll. 1-11; p.  51, ll. 20-23; p. 52, ll. 1-3; p. 54, ll. 3-13; p. 55, ll. 3-6; p. 56, ll. 9-13, 23; p. 59, ll. 14-18; p. 61, ll. 13-21; p. 64, ll. 6-12; p. 65, ll. 2-3, 12-16; p. 66, ll. 1-3; p. 102, ll. 8-11; Evid. Ex. 2, p. 321, ll. 1-7.)  He left Miltope the first time because of an opportunity to work closer to home at a car dealership.  (Evid. Ex. 1,

p. 66, ll. 21-23 - p. 67, ll. 1-2.)  Bailey returned to Miltope in 2001 after interviewing with Crowell.  (Evid. Ex. 1, p. 76, lines 12-16; Evid. Ex. 2, p. 322, ll. 18-19.)

During his second term of employment, Bailey functioned as CAV[1] administrator and government property administrator.  (Evid. Ex. 2, p. 220, ll. 17-18.)  Bailey's duties included being responsible for the computer system that made it possible for the Navy to view their assets in Miltope's possession for repair.  (Evid. Ex. 2, p. 221, ll. 1-4.)  He was also responsible for maintaining, storing, and tracking in a secure manner government property.  (Evid. Ex. 2, p. 223, ll. 6-14.)  Bailey reported to Brian Burkhead, who was responsible for overhaul and repair.  (Evid. Ex. 2, p. 220, ll. 6-14.)  Gabriel Riesco, the director of product support, was the person to whom Burkhead reported.  (Evid. Ex. 2, p. 224, ll. 4-8.)  The transition went well for Bailey's return to Miltope.  (Evid. Ex. 1, p. 77, ll. 9-11.)  He had good relationships with Crowell, Burkhead and Riesco.  (Evid. Ex. 1, p. 77, ll. 12-20.)

### B.    Bailey's understanding of Miltope policy

When employed at Miltope during his first term, he was given a handbook.  (Evid. Ex. 1, p. 169, ll. 18-20.)  He acknowledged receipt of the handbook by

---

[1] CAV is an acronym for commercial asset visibility.  (Evid. Ex. 2, p. 220, ll. 20-21.

signing for it on July 2, 1997.  (Evid. Ex. 1, p. 169, ll. 22-23; dep. ex. 5.)[2]  He was

aware during his second term of employment that the handbook existed and that it

was available to him.  (Evid. Ex. 1, p. 170, ll. 5-6, ll. 21-23.)  He also understood

that he continued to be bound by the policies in the handbook.  (Evid. Ex. 1, p.

171, ll. 1-3.)  He further understood that regular, timely attendance at Miltope was

an essential part of his job.  (Evid. Ex. 1, p. 171, ll. 9-15; Evid. Ex. 1, dep. ex. 4 at

M#00126.)  He knew that he was required to call his supervisor between 8:00 and

9:00 a.m. on any occasion he could not come to work because of illness or some

other reason.  (Evid. Ex. 1, p. 171, ll. 16-21; Evid. Ex. 1, dep. ex. 4 at M#00127.)

Failure to provide acceptable notice for three consecutive workdays is grounds for

being considered to have "resigned without notice."  (Evid. Ex. 3, ¶ 4 & decl. ex.

A.)[3]

## C.    Bailey's personal circumstances

Shortly after his first term of employment at Miltope, Bailey's father

suffered a stroke.  (Evid. Ex. 1, p. 11, ll. 7-14, 19-23 – p. 12, ll. 1-5.)  From that

period to the present, Bailey and his daughter have resided with the elder Mr.

Bailey.  (Evid. Ex. 1, p. 12, ll. 6-10.)  Bailey divorced the mother of his child on

August 9, 2002.  (Evid. Ex. 2, p. 227, ll. 15-21.)

---

[2] Exhibits attached to deposition testimony are designated with the abbreviation, "dep. ex."
[3] Exhibits to the declaration of Edward F. Crowell are designated by the abbreviation "decl. ex."

While his father was in the hospital for pneumonia from June 30 until July 12, 2003, Bailey took time off work after obtaining approval from his supervisor, Brian Burkhead.  (Evid. Ex. 1, p. 131, ll. 12-20; p. 133, ll. 3-6, 16-20.)  During that hospitalization, Bailey's supervisor was accommodating about his absenteeism.  (Evid. Ex. 1, p. 134, ll. 19-23; p. 145, ll. 17-20.) For three weeks following the discharge from the hospital after experiencing pneumonia, Bailey's father received physical therapy at Chapman Health Care.  (Evid. Ex. 1, p. 97, ll. 10-21.)  Bailey said that his father seemed to respond well to the therapy there.  (Evid. Ex. 1, p. 130, ll. 7-11.)

During this time period in July 2003, Bailey believed[4] that his father had terminal cancer and that the condition qualified his father for hospice care.  (Evid. Ex. 1, p. 82, ll. 21-22; p. 151, ll. 6-11.)  Bailey furthermore believed as of July 2003 that his father would likely succumb to cancer within three to six months.  (Evid. Ex. 1, p. 83, ll. 17-20.)  Bailey also claims that he was told his father would not survive invasive surgery to biopsy or remove the mass observed on test results.  (Evid. Ex. 1, p. 95, ll. 10-13; p. 99, ll. 16-22.)  Admittedly, he was not told that his father had a malignancy.  (Evid. Ex. 1, p. 89, ll. 1-2.)

---

[4] Bailey ultimately admitted that a diagnostic scan revealed that there was no tumor.  (Evid. Ex. 1, p. 83, ll. 2-4.)

Faith Hospice provided his father with care from July 2003 through the end of Bailey's employment with Miltope, and it included skilled staff visiting his father to monitor his vital statistics, care for his daily needs, volunteer assistance, and chaplain care. (Evid. Ex. 1, p. 91, ll. 21-23; p. 92, ll. 1-9.) Bailey did not feel it was right that his father be left alone all day under the circumstances. (Evid. Ex. 1, p. 152, ll. 9-11.)

Bailey made sure that his father had meals that could be easily prepared with a microwave so that his father could feed himself while Bailey was at work. (Evid. Ex. 1, p. 154, ll. 13-21; Pg. 155, ll. 6-7.) Bailey understood that allowing his father to do things to care for himself was good for his father's health. (Evid. Ex. 1, p. 154, ll. 21-23; p. 155, ll. 1-2.) Bailey was also able to ensure that his father took his medication properly. (Evid. Ex. 1, p. 155, ll. 8-18.) During the time that Hospice cared for Bailey's father, Bailey learned how to provide some of the care himself; accordingly, he was not worried that his father would suffer from a lack of care if his father no longer qualified for Hospice benefits. (Evid. Ex. 1, p. 101, ll. 3-13.)

When asked by the leader of the Rat Race to join the McQueen Street band for a reunion show in 2003, Bailey was honored. (Evid. Ex. 1, p. 24, ll. 10-15.) This occurred sometime prior to September 5, 2003, which was the first practice for the reunion show. (Evid. Ex. 1, p. 157, ll. 8-20.) It was an escape for Bailey.

(Evid. Ex. 1, p. 24, ll. 19-22; Evid. Ex. 2, p. 225, ll. 16-19.)  He was the drummer and back up vocals for McQueen Street. (Evid. Ex. 1, p. 18, ll. 5-10.)  There were preliminary practices, contacts, and negotiations before the reunion show.  (Evid. Ex. 1, p. 20, ll. 15-20.)  On November 29, 2003, the McQueen Street performed the reunion show.  (Evid. Ex. 1, p. 17, ll. 7-9; p. 32, ll. 11-18.)

### D.   Bailey's decision to seek a leave of absence

During the fall of 2003, Bailey was offered a new role within Miltope that would have taken him away from home for two weeks at a time.  (Evid. Ex. 1, p. 119, ll. 7-12.)  Significantly, while he was visiting Redstone Arsenal to evaluate the offer, Bailey met a man at work there whose wife was home dying of cancer. (Evid. Ex. 2, p. 235, ll. 1-7.) Bailey decided then not to take the job when he realized this man was at work instead of with his seriously ill wife.  (Evid. Ex. 1, p. 121, ll. 9-11, ll. 14-15; evid. Ex. 2, p. 235, ll. 1-7, 10-12.)

No care provider for Bailey's father told him to quit his job or criticized him for not being more available to his father.  (Evid. Ex. 1, p. 158, ll. 13-20; p. 158, ll. 22-23 – p. 159, ll. 1-2.)  Bailey was aware of the possibility that his father could be moved into an assisted living facility or nursing home, and this concerned him because it was against his father's wishes.  (Evid. Ex. 1, p. 159, ll. 3-11.)  Bailey wanted to respect his father's wishes about remaining in his own home.  (Evid. Ex. 1, p. 160, ll. 8-10.)

### E.    Bailey's attempt to apply for approval of leave

In September or October 2003, Bailey asked human resources employee Dee Colter about leave paperwork and she provided it to him.  (Evid. Ex. 1, p. 163, ll. 10-21.)  Bailey testified that he completed the paperwork on or about October 27, 2003.  (Evid. Ex. 1, p. 164, ll. 9-13; p. 168, ll. 17-18.)  Bailey claimed that he wrote on the paperwork that he needed leave to begin "immediately."  (Evid. Ex. 1, p. 190, ll. 6-15.)  He understood that he needed Mr. Crowell's approval for the leave of absence.  (Evid. Ex. 1, p. 165, ll. 17-23,  p. 166, ll. 1-3.)  Bailey recalls completing the paperwork, but admittedly failed to give it to either Ms. Colter or to Mr. Crowell.  (Evid. Ex. 1, p. 165, ll. 12-16; Evid. Ex. 3, ¶¶ 6-8.)

Bailey claimed that he had a meeting with Crowell on October 27, 2003 and explained that he needed some time off to sort out things at home because of his father's illness and because of his responsibilities as a single parent to his daughter. (Evid. Ex. 1, p. 180, ll. 15-23 – p. 181, l. 1.)  Crowell assured him of how valued Bailey was at Miltope.  (Evid. Ex. 1, p. 181, ll. 2-5.)  Crowell also talked about his own father's death in a manner that was sympathetic of Bailey's situation.  (Evid. Ex. 1, p. 181, ll. 6-8; p. 203, ll. 2-8.)   Bailey left the meeting feeling guilty about taking the leave, but he could not identify any one thing Crowell said that discouraged him from taking a leave of absence.  (Evid. Ex. 1, p. 181, ll. 10-17; Evid. Ex. 1, p. 206, ll. 19-21; p. 208, ll. 4-8.)  In fact, after listening to Crowell talk

about his own father's illness, Bailey thought that perhaps he could manage his personal situation and also remain at work. (Evid. Ex. 2, p. 236, ll. 12-18.)

### F. Bailey's violation of the call in policy

Bailey called in sick on November 3 after an exhausting trip transporting his daughter back home from a visit with her mother out of state. (Evid. Ex. 1, p. 182, ll. 1-8.) Bailey called in the following day, November 4, because his daughter was ill. (Evid. Ex. 1, p. 182, ll. 9-10.) On November 5, Bailey called and told his supervisor that his father was sick again and asked his supervisor to submit the leave paperwork on his behalf. (Evid. Ex. 1, p. 176, ll. 20-21; p. 182, ll. 12-15.) Bailey expected his leave to begin immediately, as he had noted on the paperwork he claims to have completed. (Evid. Ex. 2, p. 263, ll. 20-23; p. 264, ll. 1-4.) Bailey did not consider himself obliged to call in about his absences after November 5, 2003, the date he told his supervisor to locate his leave paperwork and submit it to Crowell. (Evid. Ex. 2, p. 275, ll. 1-5.) On the following day, Bailey recalls he took his father to a follow up doctor's appointment, at which time he learned that his father's health was much better. (Evid. Ex. 1, p. 103, ll. 1-3; p. 104, ll. 13-21; Evid. Ex. 1, dep. ex. 3 at SR#00576.)

Bailey also testified that his supervisor informed him on November 5, 2003 that a doctor's letter was needed to substantiate the absences. (Evid. Ex. 1, p. 176, ll. 22-23; p. 177, ll. 1-2.) Bailey claimed that the letter was sent via facsimile to

Miltope's product support fax line.  (Evid. Ex. 1, p. 177, ll. 3-6.)  Bailey admitted that he could not be sure that the document was ever received by Miltope.  (Evid. Ex. 1, p. 178, ll. 2-5, 16-18; p. 179, ll. 12-14.)  In fact, Miltope never received any notification from a physician regarding Bailey's absenteeism.  (Evid. Ex. 3, ¶ 8.)

After Bailey failed to call in his absences for three consecutive days, Crowell, enforcing policy of which Bailey was well aware, notified him by letter that Bailey was considered to have abandoned his employment.  (Evid. Ex. 3, ¶¶ 4, 6.)  Bailey admittedly did not call Crowell to question this decision or discuss with him of his attempt to submit his paperwork through Brian Burkhead.  (Evid. Ex. 1, p. 199, ll. 5-10.)   He stated that he would not have spoken with Burkhead, Riesco, or Crowell by telephone during that time.  (Evid. Ex. 2, p. 242, ll. 2-6.)  He wanted answers via email.  (Evid. Ex. 2, p. 244, ll. 8-11.)

Crowell directed employees to contact the plaintiff about his absenteeism before sending the letter notifying him of the separation of his employment.  (Evid. Ex. 3, ¶ 5.)  Had the paperwork been received, Crowell could have evaluated a request for leave and approved it if circumstances reflected that Bailey was entitled to it.  (Evid. Ex. 3, ¶ 8.)  Without receiving any response to Crowell's letter, Crowell lacked the information necessary to do anything other than enforce the policy according to his duties.  (Evid. Ex. 3, ¶¶ 2, 8.)

Miltope held open Bailey's job until December 15, 2003.  (Evid. Ex. 3, ¶ 9.)

### G.    Bailey's pursuit of unemployment compensation benefits

Bailey thought about suing Miltope after he did not receive unemployment compensation because he considered the decision unfair.  (Evid. Ex. 1, p. 189, ll. 8-12, 18-19.)  Bailey considered the denial of benefits unfair because he had been in the process of obtaining approval for leave when he received notice that he was considered to have abandoned his job.  (Evid. Ex. 1, p. 189, ll. 21-23 – p. 190, ll. 1-5.)  Bailey, represented by counsel, appeared for a hearing on his unemployment claim against Miltope.  (Evid. Ex. 2, p. 271, ll. 12-14, 16-18.) During the hearing, Bailey attempted to establish his entitlement to benefits by arguing that he had been entitled to FMLA leave when his employment relationship with Miltope ended.  (Evid. Ex. 2, p. 271, ll. 19-22; evid. ex. 1, dep. ex. 7.)

### H.    Bailey's current priorities prevent reinstatement

Bailey is currently playing about twice a week in a band called the Cold Hard Truth.  (Evid. Ex. 1, p. 15, ll. 3-6; p. 38, l. 8.)  Because he has a lot of responsibility at home that prevents the required amount of travel, he does not consider his primary occupation a musician.  (Evid. Ex. 1, p. 21, ll. 3-12.)  Bailey stated that he is committed to being as available as possible to his father and daughter.  (Evid. Ex. 1, p. 80, l. 23 – p. 81, ll. 1-4.)  Bailey testified that his current schedule of working two days a week with the Cold Hard Truth is the best arrangement for his family and that working an alternative schedule would not suit

his family.  (Evid. Ex. 1, p. 71, ll. 6-9, 12-13; p. 72, ll. 10-13; p. 81, ll. 5-13.)

Knowing that he would have to work an eight-to-five business day at Miltope if he

returned to that job, he testified that he would not want to be reinstated because of

the impact that would have on his father and daughter.  (Evid. Ex. 1, p. 80, ll. 9-

13.)  Moreover, he testified that he believes he was treated unfairly at Miltope and

therefore would not want to return to work there.  (Evid. Ex. 1, 80, ll. 17-21.)  If he

were to accept full-time employment, he would hire someone to care for his father

during the day.  (Evid. Ex. 1, p. 82, ll. 6-11.)

## III.  ARGUMENT

### A.    Summary Judgment Standard

Summary judgment is proper under Fed. R. Civ. P. 56(c) "if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and

that the moving party is entitled to summary judgment as a matter of law."

Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  While all reasonable doubts must

be resolved in the non-movant's favor, the trial court is not required to "resolve all

doubts in such a manner."  Barnes v. Southwest Forest Indus., Inc., 814 F.2d 607,

609 (11th Cir. 1987).  Summary judgment is proper unless there is sufficient

evidence favoring the non-movant for the finder of fact to find for that party.  See

Earley v. Champion Int'l Corp., 907 F.2d 1077, 1080 (11th Cir. 1990).

Although the movant has the initial responsibility of informing the court of the basis for its motion and identifying the evidence that demonstrates the absence of any genuine issue of material fact, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322-23.

### B.     Bailey is collaterally estopped from pursuing his FMLA claims.

The foundation of Bailey's lawsuit against Miltope concerns how his employment ended after he failed to follow procedure with respect to reporting absences. Following a hearing on February 3, 2004, the Alabama Department of Industrial Relations determined that the plaintiff voluntarily left his most recent bona fide work without good cause connected with such work, and disqualified him for unemployment compensation benefits pursuant to Alabama Code § 25-4-78(2). (Evid. Ex. 1, dep. ex. 7.) Specifically, the hearing officer determined that "[t]he claimant was considered to have abandoned his job after being absent for more than three consecutive working days without proper notice to or permission from the employer." (Evid. Ex. 1, dep. ex. 7 at M#00121.) Following the hearing officer's determination, the plaintiff did not successfully appeal within the Department of Industrial Relations, as permitted by Alabama law, nor did he seek a trial *de novo* in state circuit court. (Evid. Ex. 2, p. 296, ll. 20-22.) Accordingly,

the reason for the plaintiff's employment separation has been litigated and determined, and he is collaterally estopped from relitigating that reason.

In Wal-Mart Stores, Inc. v. Smitherman, the Supreme Court of Alabama applied the doctrine of collateral estoppel to preclude a plaintiff from relitigating the reason for her discharge where the reason had been determined during an administrative hearing before the Alabama Department of Industrial Relations. 743 So. 2d 442, 448 (Ala. 1999). The court determined that the five elements necessary to establish collateral estoppel – (1) identity of the parties; (2) identity of the issues; (3) an adequate opportunity to litigate the issues in the administrative proceeding; (4) the issues were actually litigated and determined in the administrative proceeding; and (5) the findings on the issues to be estopped were necessary to the administrative decision – were all satisfied with respect to the issue of the reason for the plaintiff's discharge. Id. at 445-47.

Judges in this district have followed Smitherman and applied the doctrine of collateral estoppel to federal employment claims previously determined by the Alabama Department of Industrial Relations. See Land v. Glover, 404 F. Supp. 2d 1335, 1339 (M.D. Ala. 2005) (noting that the hearing officer's determination provided sufficient information regarding the reason for the plaintiff's employment separation and that the plaintiff failed to appeal the finding); Williams v. Ala. Indus. Dev't Training, 146 F. Supp. 2d 1214, 1223 (M.D. Ala. 2001) (precluding

the plaintiff from contesting the articulated reasons for his discharge where the Alabama Department of Industrial Relations had determined that he was discharged for a dishonest or criminal act); Rigby v. Marshall, 134 F. Supp. 2d 1259, 1262 (M.D. Ala. 2000) (holding that plaintiff was collaterally estopped from arguing a reason for termination other than the one articulated by the Alabama Department of Industrial Relations and noting that "[t]he facts of Smitherman are indistinguishable in any material way from the present case and govern this court's conclusion").

Here, all elements necessary to establish collateral estoppel are present. The parties are identical in both proceedings. The reason for the plaintiff's employment separation was at issue in the administrative proceeding and is at issue in the instant action. (Evid. Ex. 1, dep. ex. 7.) The plaintiff had an adequate opportunity to litigate the reason for his employment separation in the administrative forum and was represented by counsel at the administrative hearing. (Evid. Ex. 1, dep. ex. 7; Evid. Ex. 2, p. 271, ll. 12-14, 16-18; p. 296, ll. 14-17; Evid. Ex. 3, ¶ 6 & decl. ex. D.) Following the administrative hearing, the plaintiff did not file an application for leave to appeal to the Board of Appeals, as was his right under Alabama law. Consequently, the administrative hearing officer's finding became final on February 26, 2004. (Evid. Ex. 1, dep. ex. 7 at M#00122.) Moreover, the reason for the plaintiff's employment separation – that he "was

absent from scheduled work for more than three consecutive working days without proper notice to or permission from the employer" – was actually determined through the administrative process and was necessary to the hearing officer's determination of unemployment compensation eligibility. (Evid. Ex. 1, dep. ex. 7 at M#00122.) Accordingly, the plaintiff's reason for employment separation is absenteeism, and he is collaterally estopped from relitigating the issue in this or any other court.

### C.    Bailey's FMLA claim fails on the merits.

Even if Bailey were not collaterally estopped from relitigating the reason for his employment separation, Bailey cannot establish a violation of the FMLA as alleged in his Complaint. Bailey's complaint is understood to be raising interference claims rather than retaliation claims. (Compl. ¶¶ 9, 14.) Because he is asserting violation in the context of alleged interference, Bailey's burden is to show, by a preponderance of the evidence, that he was entitled to a right under the FMLA and that Miltope interfered with or denied that right. See O'Connor v. PCA Family Health Plan, Inc., 200 F.3d 1349, 1353-54 (11th Cir. 2000). Specifically, Bailey alleges that the FMLA was violated because he requested leave but Miltope denied him the opportunity to take that leave. He further asserts that he was discouraged from taking leave by Edward Crowell, the Vice President of Administration at Miltope, in violation of 29 C.F.R. § 825.220(b). The evidence

demonstrates that the plaintiff was neither entitled to leave nor discouraged from exercising his rights under the FMLA.  His claims are therefore without merit and due to be dismissed.

1.    Bailey did not provide reasonable notice concerning the foreseeable leave he allegedly required.

Pursuant to 29 U.S.C. § 2612(a)(1)(C), an employee is entitled to leave "to care for" the employee's parent with a serious health condition, but here the plaintiff did not provide reasonable notice of the alleged need for leave.  When leave is foreseeable, the FMLA and implementing regulation require the employee to provide the employer with thirty days' advance notice or as much notice as is practicable.  See 29 U.S.C. § 2612(e)(2)(B); 29 C.F.R. § 825.302(a).  The notice an employee provides must be "sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave."  29 C.F.R. § 825.302(c).

Bailey testified that he believed in July 2003, contrary to medical documentation, that his father was diagnosed with terminal cancer.  (Evid. Ex. 1, p. 82, ll. 21-22; p. 151, ll. 6-11.)  The medical documentation references that Bailey was told his father's long term prognosis was poor.  (Evid. Ex. 1, dep. ex. 3 at SR#00620.)  The basis for this prognosis, however, could not have been, as Bailey claimed, terminal cancer because, according to a laboratory report in July 2003,

testing was performed on pleural fluid that revealed no malignancy. (Evid. Ex. 1, dep. ex. 3 at SR# 560.) Moreover, the discharge notes specifically state that diagnostic testing in July 2003 revealed no malignancy in Bailey's father's lungs. (Evid. Ex. 1, dep. ex. 3 at SR#00619.)

Taking Bailey's version of events as true, he was told in July 2003 that his father's condition was likely to deteriorate over the next three to six months. (Evid. Ex. 2, p. 357, ll. 3-7.) The sequence of events reflects that Bailey failed to comply with the FMLA's obligation that he provide thirty days' notice to Miltope for the requested leave. Strangely, although he understood that he required Crowell's approval for leave, he waited until October 23, 2003 to request a meeting with him to discuss whether he was entitled to leave. (Evid. Ex. 1, p. 165, ll. 17-23, p. 166, ll. 1-3; p. 180, ll. 15-23, p. 181, l. 1.) He testified that he did in fact meet with Crowell on October 27 after completing paperwork requesting "immediate" leave under the FMLA. (Evid. Ex. 1, p. 180, ll. 15-23, p. 181, l. 1; p. 190, ll. 6-15.) Bailey admitted that he did not submit to Crowell or any other human resources employee his paperwork requesting leave and that he was unsure about taking the leave at that time. (Evid. Ex. 1, p. 165, ll. 12-16; Evid. Ex. 2, p. 236, ll. 12-18; Evid. Ex. 3, ¶¶ 6-8.)

In addition to failing to give adequate advance warning, on November 5, 2003, Bailey attempted to gain approval for an extended leave of undetermined

duration contrary to the requirements of 29 C.F.R. § 825.302(c).   The only occasion he stated a firm commitment that leave would begin on a date certain was on November 5, when he asked his supervisor to submit the paperwork for immediate FMLA leave on Bailey's behalf.  (Evid. Ex. 1, p. 176, ll. 20-21; p. 182, ll. 12-15; p. 190, ll. 11-19.)   Bailey has no evidence that he identified a date certain that he would return, which is required by the regulation.  In fact, the only reasonable inference is that Bailey would not have returned after exhausting an FMLA leave.   (Evid. Ex. 1, p. 82, ll. 6-11.)

> 2.    Bailey cannot substantiate that he was discouraged from taking leave.

Bailey has asserted that he was discouraged from taking FMLA leave by Crowell, but his testimony does not establish this claim.  Bailey's testimony is vague and ambiguous on this point, suggesting merely that he doubted whether it was necessary to take leave at that time under the circumstances after listening to Crowell's description of his own father's illness and death.  (Evid. Ex. 1, p. 181, ll. 6-8; p. 203, ll. 2-8; Evid. Ex. 2, p.236, ll. 12-18.)   Moreover, the only specific statement he attributed to Crowell concerned how much Bailey's skills were valued and how important Bailey's contribution to Miltope was.  (Evid. Ex. 1, p. 181, ll. 2-5.)  Significantly, Bailey had previously been permitted leave to take his father to doctor's appointments as well as to attend to his father during his

hospitalization in July 2003 at Russell Medical Center for bilateral pneumonia. (Evid. Ex. 1, p. 134, ll. 19-23; p. 145, ll. 17-20; Evid. Ex. 1, dep. ex. 3 at SR#00619.)   Moreover, even if he felt temporarily doubtful about whether to take leave on October 27, he decided to take it without waiting for approval as of November 5, 2003.   (Evid. Ex. 263, ll. 20-23; p. 264, ll. 1-4; p. 275, ll. 1-5.)

> 3.   Bailey failed to comply with Miltope's reasonable call in procedure

Furthermore, Bailey offered no explanation at his deposition for failing to follow the call in procedure at Miltope on the days he was absent after he had requested leave from his supervisor but prior to completing the process to obtain approval for such leave.  Specifically, after November 5, 2003, Bailey admittedly did not call in to report his absences.  (Evid. Ex. 2, p. 275, ll. 1-5.)  In fact, he testified that he did not consider himself obligated to follow the call in procedure despite the fact that he knew Crowell had to approve his leave request.  (Id.; Evid. Ex. 1, p. 165, ll. 17-23, p. 166, ll. 1-3.)

Bailey's own admissions demonstrate that no evidence can excuse his failure to follow policy.  Therefore, Miltope's application of that policy to Bailey did not interfere with his rights for purposes of establishing a violation of the FMLA.  See Chavez v. Thomas & Betts Corp., 396 F.3d 1088 (10th Cir. 2005) (termination of employee for failure to follow call in policy not violative of FMLA where her

paperwork requesting leave was not received prior to the termination decision); Lewis v. Holsum of Fort Wayne, Inc., 278 F.3d 706 (7th Cir. 2002) (holding that employee could be fired for failing to follow customary call-in policy while taking FMLA leave because she offered no explanation why she could not have called in to report her absences); Medley v. Polk Co., 260 F.3d 1202 (10th Cir. 2001) (discharge of an employee based on honest belief that job was abandoned does not violate FMLA, even if conclusion is mistaken); Gilliam v. United Parcel Service, Inc., 233 F.3d 969, 970-71 (7th Cir. 2000) (employer did not violate FMLA by terminating employee who failed to stay in contact with employer as required by CBA although initially given a few days off for a reason arguably covered by the FMLA).

Here, Miltope did not receive the required paperwork for those absences to be protected, but, more importantly, it was not absenteeism that supported the separation; rather, it was failure to follow call in policy.  (Evid. Ex. 3, ¶¶ 6-8.) Moreover, the letter Bailey secured from his father's physician, had it been received by Miltope, which it was not,[5] does not establish that Bailey required an immediate and indefinite leave of absence.  (Evid. Ex. 2, dep. ex. 11.)  The letter merely states that Bailey's father has "a terminal illness that may require his son's assistance."  (Id.)   Such documentation would not have entitled Bailey to

---

[5] (Evid. Ex. 3, ¶ 8.)

immediate leave because it does not identify the illness or describe what sort of care Bailey's father might need from his son.  <u>See</u>, <u>e.g.</u>, 29 C.F.R. § 825.116(a); <u>Cruz v. Publix Super Markets, Inc.</u>, 428 F.3d 1379 (11th Cir. 2005) (no entitlement to leave shown by doctor's letter stating merely that daughter "feels she needs her mother to come to help with labor etc., as she has no one else to help" as a "labor coach.").   Accordingly, the failed communications by Bailey are such that he cannot establish that he was entitled to FMLA in the first instance.

## IV.   CONCLUSION

The FMLA is not designed to protect employees who, for their own psychological well being, wish to remain close to their loved one during a difficult time period. Here, Bailey understandably wanted to follow his father's wishes to avoid placement in a nursing home, but not every medical crisis is covered by the FMLA.  Tellingly, the positive report Bailey received on his father's health on November 6, 2003 should have encouraged him to return to work; instead, he chose to obstruct meaningful communication with Miltope and appeared to be abandoning his job through his admitted failure to call in his absences.  Even if the Court deems it inappropriate to apply collateral estoppel to prevent Bailey from litigating the reason for his employment separation, his claims fail because he admittedly failed to follow policy and procedure concerning obtaining leave and failed to provide reasonable notice of an alleged need for leave that was

foreseeable.  Miltope respectfully requests that its motion for summary judgment be granted in its entirety.

*s/ Heather F. Lindsay*
Heather F. Lindsay (ASB-0629-D64H)
Johnston Barton Proctor & Powell LLP
2900 AmSouth/Harbert Plaza
1901 Sixth Avenue North
Birmingham, Alabama 35203
Telephone:  (205) 458-9400
Fax:  (205) 458-9500
E-Mail:  hfl@jbpp.com
*One of the Attorneys for Defendant*
*Miltope Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on October 12, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

> Derrick Blythe, Esq.
> 126 Marshall Street
> Alexander City, AL 35010

> _s/ Heather F. Lindsay_
> Heather F. Lindsay (ASB-0629-D64H)
> Johnston Barton Proctor & Powell LLP
> 2900 AmSouth/Harbert Plaza
> 1901 Sixth Avenue North
> Birmingham, Alabama 35203
> Telephone:  (205) 458-9400
> Fax:  (205) 458-9500
> E-Mail:  hfl@jbpp.com
> _One of the Attorneys for Defendant_
> _Miltope Corporation_