# Exhibit A

# Deposition Excerpts of Patrick Bailey
# dated September 29, 2006

1              UNITED STATES DISTRICT COURT

2         FOR THE MIDDLE DISTRICT OF ALABAMA

3                  NORTHERN DIVISION

4

5    PATRICK BAILEY,          )

6                             )

7         Plaintiff,          )

8    VS.                      )     CASE NO:

9    MILTOPE CORPORATION,     )2:05-CV-1061-MEF-DRB

10                            )     DEPOSITION OF:

11        Defendant.     )    PATRICK BAILEY

12                                  VOLUME 2

13

14         S T I P U L A T I O N S

15        IT IS STIPULATED AND AGREED, by and

16   between the parties through their

17   respective counsel, that the deposition

18   of:

19              PATRICK BAILEY,

20   may be taken before LeAnn Maroney, Notary

21   Public, State at Large, at the law offices

22   of Johnston, Barton, Proctor & Powell, 2900

23   AmSouth/Harbert Plaza, Birmingham, Alabama,

Page 212

1  on September 29, 2006, commencing at
2  approximately 10:00 a.m.
3
4      IT IS FURTHER STIPULATED AND AGREED
5  that the signature to and reading of the
6  deposition by the witness is waived, the
7  deposition to have the same force and
8  effect as if full compliance had been had
9  with all laws and rules of Court relating
10  to the taking of depositions.
11
12      IT IS FURTHER STIPULATED AND AGREED
13  that it shall not be necessary for any
14  objections to be made by counsel to any
15  questions, except as to form or leading
16  questions, and that counsel for the parties
17  may make objections and assign grounds at
18  the time of the trial, or at the time said
19  deposition is offered in evidence, or prior
20  thereto.
21          ***
22
23

Page 214

1  EXHIBIT LIST
2
3  Defendant's Exhibit 11 - 265
4  Defendant's Exhibit 12 - 266
5  Defendant's Exhibit 13 - 298
6  Defendant's Exhibit 14 - 315
7  Plaintiff's Exhibit 1 - 342
8  Plaintiff's Exhibit 2 - 351
9  Plaintiff's Exhibit 3 - 352
10  Plaintiff's Exhibit 4 - 354
11  Plaintiff's Exhibit 5 - 384
12
13
14
15
16
17
18
19
20
21
22
23

Page 213

1          APPEARANCES
2  FOR THE PLAINTIFF:
3      DERRICK BLYTHE
4      Attorney at Law
5      126 Marshall Street
6      Alexander City, Alabama  35010
7
8  FOR THE DEFENDANT:
9      HEATHER F. LINDSAY
10     Attorney at Law
11     Johnston, Barton, Proctor & Powell
12     2900 AmSouth/Harbert Plaza
13     Birmingham, Alabama  35203
14
15
16          INDEX
17  MS. LINDSAY: 215-319; 356-385
18  MR. BLYTHE:        319-356
19
20
21
22
23

Page 215

1      I, LeAnn Maroney, a Court
2  Reporter of Birmingham, Alabama, and a
3  Notary Public for the State of Alabama at
4  Large, acting as commissioner, certify that
5  on this date, pursuant to Rule 30 of the
6  Alabama Rules of Civil Procedure and the
7  foregoing stipulation of counsel, there
8  came before me on September 29, 2006,
9  PATRICK BAILEY, witness in the above cause,
10  for oral examination, whereupon the
11  following proceedings were had:
12      PATRICK BAILEY,
13  being first duly sworn, was examined and
14  testified as follows:
15  EXAMINATION BY MS. LINDSAY:
16  Q      Mr. Bailey, we meet again.
17  Thanks for coming back. We'll just finish
18  up this deposition. Hopefully it won't
19  take very long.
20      I have some reminders for you.
21  Try to remember to say yes or no rather
22  than uh-huh or huh-uh. You and I sometimes
23  interrupt each other accidentally. I'll

Page 216

1  try not to do that.  If you would, try to
2  remember just to answer my question.  And
3  if there's something that you haven't had a
4  chance to discuss, I'm sure your lawyer
5  will have a chance to ask you those
6  questions at the end.
7  A      Okay.
8  Q      I have some notes just based on
9  things I wasn't able to wrap it up last
10 time.  These questions may bounce around in
11 different areas, so just bear with me.
12 A      Okay.
13 Q      One question I have is you
14 mentioned having a legal dispute with a
15 Mr. McCorkle and Mr. O'Brien.  Do you
16 remember that?
17 A      Correct.
18 Q      Were y'all in the same band
19 together?
20 A      No.
21 Q      As I recall your testimony, the
22 dispute was over something to do with
23 music.

Page 217

1  A      Correct.
2  Q      Were you in bands with each one
3  of them?
4  A      No.
5  Q      So, you were not in a band with
6  McCorkle?
7  A      No.
8  Q      And you were not in a band with
9  O'Brien?
10 A      No.
11        MR. BLYTHE:  Off the record for
12 a second.
13     (Discussion held off the record)
14 Q      Can you tell me briefly what
15 that dispute was about?
16 A      Totally separate engagements.
17 They had hired a band I was in to play, and
18 they did not pay.  Therefore, we had to
19 seek some sort of action to be paid.
20 Q      And when you say we, which band
21 were you acting on behalf of when you asked
22 McCorkle and O'Brien to pay?
23 A      Imposter.

Page 218

1  Q      That was the band you were in at
2  Auburn, right?
3  A      Correct.
4  Q      Another follow-up question about
5  a time period other than your employment
6  with Miltope.  When you were in the Rat
7  Race prior to your working at Miltope, were
8  you getting paid for your performances with
9  that band?
10 A      With Rat Race?
11 Q      Yes.
12 A      Yes.
13 Q      And I believe that this was
14 probably in the year 1995 or 1996.  Is that
15 correct?
16 A      It was prior to my initial
17 employment with Miltope for a little less
18 than one year.  It was almost a whole year.
19 Q      And this had happened right
20 after your mother passed away, correct?
21 A      Correct.
22 Q      Was the income you received for
23 the Rat Race performances your only source

Page 219

1  of income in that time period?
2  A      Yes.  I was married during that
3  time, also.
4  Q      And your wife was working?
5  A      Yes.
6  Q      Just for clarification, when you
7  interviewed at Miltope with Mr. Ed Crowell,
8  what did you understand his title to be?
9  A      I don't recall.
10 Q      Do you recall Mr. Ed Crowell
11 interviewing you prior to both terms of
12 employment at Miltope?
13 A      I'm not exactly sure about the
14 first term of employment.  But the second
15 term of employment, I did speak to Mr.
16 Crowell.
17 Q      Do you recall receiving offer
18 letters from Mr. Ed Crowell for both terms
19 of employment?
20 A      I believe that's right.
21 Q      Did you understand him to be the
22 one to make the decision to hire you?
23 A      Yes.

Page 220

1  Q    And was that understanding the
2  same both times you were employed at
3  Miltope, that Mr. Ed Crowell hired you both
4  times?
5  A    I believe that to be right.
6  Q    What did you understand Brian
7  Burkhead's position to be when you worked
8  at Miltope the second time?
9  A    The second time, my supervisor.
10  Q    Did you know what area he
11  supervised?
12  A    He supervised O&R and me.
13  Q    What does O&R stand for?
14  A    Overhaul and repair.
15  Q    When you say he also supervised
16  you, what area were you running?
17  A    I was the CAV administrator and
18  the government property administrator.
19  Q    Did you say CAV, C-A-V?
20  A    CAV, commercial asset
21  visibility.
22  Q    What does that mean to a regular
23  person like me?

Page 221

1  A    I was in charge of the computer
2  system that made it possible for the Navy
3  to view their assets in Miltope's
4  possession for repair.
5  Q    Was this a way that they could
6  keep track of the status on repair of their
7  property?
8  A    Exactly, and also for their
9  program managers and people of that nature
10  to be able to tell in what condition each
11  piece of material was. So, if they needed
12  a certain amount, they could look and see
13  how many we had and they could put an order
14  in for that amount or know that they had
15  that many there. And they could also check
16  the status on delivery orders that we had
17  in-house.
18  Q    When you listed your area, you
19  said CAV administrator and government
20  property, I believe.
21  A    Right.
22  Q    How was being over government
23  property different from what you just

Page 222

1  described?
2  A    We had one area that was called
3  NAV IPC Mechanicsburg which was tracked in
4  CAV. That was the Navy ships. We had
5  another area that was NAV ICP Philadelphia
6  which was Navy planes. Those two were the
7  CAV items. The other items that we had
8  in-house were any and all other government
9  property, which would be Army, Air Force,
10  that kind of thing.
11  Q    So, there were two items that
12  fell within the CAV administrator title?
13  A    Two sections I would say would
14  be a better way to say it.
15  Q    And that would have been the
16  Mechanicsburg and —
17  A    Philadelphia.
18  Q    And then there was also a
19  separate administrative duty you had with
20  respect to other government property?
21  A    Correct.
22  Q    Could you tell me more about
23  what that entailed for you, this separate

Page 223

1  administrative duty you had?
2  A    I was sent to school in Ohio for
3  that. That's the IND 101 that you see on
4  there.
5  Q    I got you.
6  A    And I was instructed in ways to
7  maintain and store and secure government
8  property. And I was trying to implement
9  some of the things that I had learned in
10  school, which would mean that the -- some
11  certain things I had to have a security
12  clearance for. Some things I had to be
13  able to show a secure storage for and a way
14  to track them when they were in-house.
15  Q    What type of property were you
16  having to track and store securely?
17  A    S-3 drives.
18  Q    What are S-3 drives?
19  A    Can I go off the record?
20      (Discussion was held off the record.)
21  Q    Back on the record. With
22  respect to the other government property
23  you had to track and secure securely, that

Page 224

1  would have been classified information, as
2  far as you know?
3  A       Yes.
4  Q       What did you understand the
5  position of Gabe Riesco to be?
6  A       He was the director of -- he was
7  Brian's boss.  So, he would have been the
8  director of product support.  And he was
9  also a program manager of a program that I
10 can't recall the name of right now.  But he
11 was Brian's -- Brian reported to him.
12 Q       And you reported to Brian,
13 right?
14 A       Correct.
15 Q       Do you know who Gabe reported
16 to?
17 A       I believe he would report to --
18 I don't know if he reported directly to Ed
19 or directly to the president of the
20 company.  I'm not sure.  I don't know how
21 that went.
22 Q       This is just a follow-up
23 question here.  The last time we were

Page 225

1  together, you indicated that you were asked
2  to join the McQueen Street Band for a
3  reunion show in 2003.  Do you remember that
4  testimony?
5  A       Yes.
6  Q       And when you were talking about
7  that, you said you were honored to be
8  asked.  Do you remember that?
9  A       Right.
10 Q       And you also said I believe
11 something along the lines of with all that
12 was going on, it was also something of an
13 escape.  Do you remember saying that?
14 A       Perhaps.  Would you like me to
15 clarify that?
16 Q       I was just going to ask you what
17 you meant by all that was going on.
18 A       I had a lot of responsibilities,
19 and my father's illness, my daughter.  It
20 was kind of like -- escape was a bad word.
21 It was a very-much-needed temporary
22 distraction.  Not an ongoing one, but just
23 a temporary distraction, something to do

Page 226

1  other than, you know, worry about
2  everything that was going on.  I got to go
3  play and it was fun and I enjoyed it.  It
4  made me feel good, and then it was back to
5  reality.
6  Q       When you talk about having a lot
7  of responsibilities and going back to
8  reality, you are referring to your dad's
9  illness and your responsibilities as a
10 single dad, right?
11 A       Right.  That's a lot of work.
12 Q       I'm sure it is.  And you are not
13 referring to any other problem or issue
14 when you are talking about this, are you?
15 Was there anything else going on?
16 A       I would have to say that before
17 that, you know, getting divorced.  That was
18 a great deal of emotional pressure.  I had
19 done everything for everyone else at that
20 point.  So, doing a little something for
21 myself was kind of a well-needed thing or
22 well deserved.
23 Q       Do you remember what date your

Page 227

1  divorce was final?
2  A       I know the date.  I don't
3  remember what year.  August 9th of -- I
4  don't remember what year.  That's bad.
5  Q       Was it the year prior to the
6  issues with your dad, or had it been
7  several years that you had been divorced
8  from Melissa?
9  A       If you will give me a minute, I
10 can tell you what year it is.  If I could
11 look -- I think I have a copy of my divorce
12 decree.
13 Q       Don't refer to any notes that
14 you don't want me to see.
15 A       If it's my divorce decree, it's
16 public record.  I think I've got a copy of
17 that.  So, it would be August -- does that
18 say '03?
19       MR. BLYTHE:  '02.
20 A       '02.  It was final on August the
21 9th '02.
22 Q       Thanks for checking that.
23 A       No problem.

Page 228

1    Q       The last time we talked, you
2    said that prior to playing in Cold Hard
3    Truth, you played in a band with a friend.
4    Do you remember that testimony? What I'm
5    getting at is was there another band you
6    played in besides McQueen Street, Rat Race
7    and Cold Hard Truth?
8    A       Oh, sure.  I've filled in with
9    bands.  There was never any kind of
10   permanent situation.  I played bass in a
11   band, but that was not a permanent
12   situation.
13   Q       So, since you left Miltope the
14   second time, you are saying that you filled
15   in with bands at various times but not on a
16   permanent basis?
17   A       Right.
18   Q       When you filled in with those
19   bands, did you receive some compensation
20   for those shows?
21   A       Sometimes.  Most of the time,
22   yes, or I wouldn't -- I wouldn't have done
23   it had I not.

Page 229

1    Q       Were you sometimes with the Jeff
2    Golden Band again?
3    A       No.
4    Q       Is it your testimony that your
5    income from filling in was not sufficient
6    to report to the IRS?
7    A       No, it wouldn't have been.  Or I
8    was told by the accountant that it wouldn't
9    have been.
10   Q       You do have an accountant?
11   A       That filed taxes when I did, yes.
12   Q       The last time we talked, you
13   said that working two days a week with Cold
14   Hard Truth I believe you said is the best
15   arrangement considering your family
16   obligations.  Do you remember that
17   testimony?
18   A       Well, I mean, under the
19   circumstances, it works.  Something else
20   would probably work, too, you know.
21   Q       Are you pursuing any other
22   options that you think would work better
23   for your family?

Page 230

1    A       At this moment, no.
2    Q       Have you actively pursued any
3    other options in the last couple of years?
4    A       Actively.  I might have talked
5    to someone about something.  But as far as
6    -- no.  Actively, no.
7    Q       Is there any other work schedule
8    that you think would work better for your
9    family than what you are doing now?
10   A       I'm not sure.
11   Q       You haven't come up with a
12   different idea?
13   A       If the opportunity presented
14   itself, I might consider it and think about
15   it.  But I don't dwell on that.
16   Q       Last time we talked about your
17   dad going to the Presbyterian church at
18   some time in his life.  Does he still
19   attend church today?
20   A       No.
21   Q       Is he physically able to attend
22   church?
23   A       No.

Page 231

1    Q       And why is that?  Can you tell
2    me something about his physical condition
3    that --
4    A       He sometimes cannot -- how do I
5    say that?
6            MR. BLYTHE:  Just say it.
7    A       There have been instances where
8    he has used the restroom on himself and
9    that kind of thing, and that would not be
10   something that I would want to put him
11   through.
12   Q       So, was there a time that you
13   stopped -- well, can you point to a time
14   when he stopped attending church for the
15   reason that you just described?  In other
16   words, is there a time frame for when this
17   began?
18   A       When his dementia started, when
19   the Alzheimer's hit.
20   Q       I want to ask you about this
21   opportunity you had with Tom Bradley, who
22   was a program director.  Do you remember
23   that?

Page 232

1  A    Yes.
2  Q    As I understand it, you were
3  being asked to take on a job that would
4  have taken you away from home for about two
5  weeks; is that right?
6  A    Two weeks at a time is what I
7  was told.
8  Q    Two weeks at a time. And this
9  would be a different role within Miltope
10  that you were being asked to assume; is
11  that right?
12  A    Right.
13  Q    Were you being asked to do this
14  around the time that you were telling me
15  you were seeking leave?
16  A    It was prior to me seeking
17  leave.
18  Q    Do you remember the title of
19  that job?
20  A    I want to say that it was DPA
21  upgrade administrator or something of that
22  nature, something close to that. The
23  program was a DPA upgrade.

Page 233

1  Q    Last time we talked about your
2  meeting with Mr. Crowell on October 27th.
3  Do you remember that meeting you told me
4  about?
5  A    Yes.
6  Q    When y'all were talking about --
7  when y'all were having that meeting, my
8  understanding is that the DP upgrade
9  administrator job was off the table. That
10  was not discussed between you and Mr.
11  Crowell at that time; is that correct?
12  A    I believe I mentioned that, and
13  I also believe that I -- I told him that
14  there was no possible way that I could go
15  and be gone to all these different Army
16  bases for a week or three days or two weeks
17  at a time in the situation that I was in.
18  Q    Had you not already rejected
19  that position, though, by the time you
20  spoke with Mr. Crowell in October 2003?
21  A    I had told Mr. Bradley, I had
22  told Gabe, I had told Brian that we were
23  going to have to find someone else to do

Page 234

1  this. And I don't -- I don't know at that
2  point in time if they had taken it off the
3  table or not.
4  Q    In other words, do you think you
5  were still being encouraged to reconsider?
6  A    Yes.
7  Q    Did all this come up for the
8  first time after July of '03, or do you
9  remember?
10  A    After July of '03 when my father
11  was in the hospital the first time?
12  Q    Yes.
13  A    It came up after that. I think
14  in a way I wanted to try to do more, to be
15  more of a provider for my family, and I
16  really wanted to be, you know, more
17  financially successful. And after looking
18  -- I went to Redstone Arsenal with Mr.
19  Bradley and I saw what truly was involved
20  in the whole thing. And there was no way I
21  was going to be able to fill that role that
22  needed to be filled, and I told him he was
23  going to have to get someone else. And the

Page 235

1  reason that I made that decision and
2  thought that was there was a gentleman
3  there at Redstone whose wife was at home
4  dying of cancer, and he was at work. And I
5  couldn't understand that. That's what made
6  me think of that. I said, "There's just no
7  way I can do this."
8  Q    Did that make you feel that you
9  should be home with your dad at that point?
10  A    Yes, it did. When I saw someone
11  that wasn't at home with their loved one,
12  that's what really made me think that. And
13  things just kept stacking up that made me
14  make my mind up about that. And then we
15  had that meeting. And it was like when I
16  came out of the meeting, I was totally
17  confused again about all those great ideas
18  that I had, I need to do this, I need to do
19  this, I need to do that. And then I left
20  that meeting and I was like, okay, now I
21  feel bad. Now what do I do?
22  Q    What you are referring to I
23  believe is when you left the meeting with

Page 236

1  Mr. Crowell on October 27th. Am I right?
2  A    Right.
3  Q    When you say you left that
4  meeting confused, am I right that at that
5  point you did not specifically say I need
6  my leave to start on such and such date,
7  that you left it open?
8  A    When I went in there, I went in
9  there to tell him I needed to take the
10 leave. And when I told him that and he
11 spent 20 minutes or so -- I don't recall
12 exactly how long the meeting was. But when
13 he had told me the story about his father
14 and that kind of thing, that kind of made
15 me feel like maybe I can work my way
16 through this and get through this and take
17 care of everything I've got to take care
18 of.
19       In other words, after I left the
20 meeting, I had been completely talked out
21 of exactly what I went in there to tell
22 him. So, I went back to my cube and went
23 back to work, and then the events that

Page 237

1  followed that week were the events that
2  made me call Brian and tell Brian to turn
3  that paperwork in.
4  Q    What do you recall of what you
5  were told about his dad's illness?
6  A    I believe he told me that his
7  father also had had cancer. And he told me
8  that even though he was sick, he spent a
9  lot of time with his dad and he was able to
10 -- you know, he had family I believe he
11 told me that helped him. Of course, he was
12 married. He had brothers and sisters and
13 other family that could help and that kind
14 of thing. But, see, I wasn't -- I didn't
15 have that.
16 Q    Did he tell you what kind of
17 treatment his dad was receiving?
18 A    I don't recall.
19 Q    Did he tell you whether his dad
20 was able to drive and take care of himself
21 during his cancer?
22 A    I don't recall.
23 Q    So, when you left that meeting

Page 238

1  with Mr. Crowell and you say you were --
2  you felt talked out of what you had wanted
3  to do, is that the basis for your claim
4  that your attempt to get FMLA leave was
5  interfered with?
6  A    I don't think that it's the
7  base. I think it's the -- no.
8  Q    Is there something else that
9  happened that told you, hey, someone is
10 trying to prevent me from exercising my
11 rights?
12 A    I was waiting on a letter from
13 my father's doctor to forward to Brian
14 Burkhead. I got the letter, forwarded the
15 letter the next day or the day after. I
16 think it was the next day I got a letter in
17 the mail telling me that I had been fired
18 for failure to report to work for three
19 consecutive days. That's the crux of this
20 whole thing to me, honestly.
21 Q    So, those are the events that
22 you think are the most important in terms
23 of your claims?

Page 239

1  A    Well, I think all the events are
2  important. And the combination of all of
3  them rolled up into one is why we sit here.
4  Q    You don't dispute that you
5  didn't call in those three days, though,
6  right?
7       MR. BLYTHE: Object to the form.
8  Q    Do you understand the question?
9       MR. BLYTHE: You can answer.
10 Q    I can ask you a different one if
11 you are having trouble answering.
12 A    Please.
13 Q    There were days that you did not
14 call in, correct?
15 A    Yes.
16 Q    Did you have any reason to think
17 that you had been fired before you received
18 that letter?
19 A    Not really, no.
20 Q    Was there any conversation you
21 had with any Miltope employee before you
22 got that letter that made you worry that
23 you were going to be fired?

Page 240

1   A      I believe there was.
2   Q      **Tell me about that, please.**
3   A      Can we go off the record for a
4   second and let me ask Derrick a question?
5          (Discussion held off the record)
6   Q      **Back on the record.**
7   A      A Miltope employee called a
8   friend of mine and asked, "Where is Pat?
9   Nobody can find Pat. We've been trying to
10  get in touch with Pat." And at that point
11  they told them, "I don't know where he is.
12  I'll check and see if I can find him." And
13  he got off the phone with that person and
14  called me and said that somebody had called
15  looking for me. And I was like, "Well, why
16  didn't they call me?"
17         I was told by someone else that
18  Brian and Gabe were directed not to answer
19  any of my e-mails or return any calls that
20  I might have made.
21  Q      **Is there anything else?**
22  A      No.
23  Q      **Who was the Miltope employee who**

Page 241

1   **called your friend?**
2   A      Darlene Hill.
3   Q      **And who was the friend she**
4   **called?**
5   A      Rhonda Blythe.
6   Q      **The wife of your attorney?**
7   A      Yes.
8   Q      **Who told you that Gabe and Brian**
9   **had been instructed not to respond to your**
10  **e-mails?**
11  A      I believe it was Tina Howell.
12  Q      **Tina who?**
13  A      It was either Tina or Darlene.
14  I don't remember which one.
15  Q      **Do you remember Tina's last**
16  **name?**
17  A      Howell.
18  Q      **And she was a Miltope employee?**
19  A      Yes.
20  Q      **If I remember your testimony**
21  **correctly before, you communicated via**
22  **e-mail during this month of November. You**
23  **did not make phone calls. Did I**

Page 242

1   **misunderstood you?**
2   A      I might have talked to her. But
3   as far as -- you asked me did I communicate
4   with Gabe or Brian or Mr. Crowell. No, I
5   was not going to communicate with them on
6   the phone. But other people I did talk to
7   on the phone that were friends other than
8   just people that worked there.
9   Q      **Did you call anyone who was a**
10  **Miltope employee to talk about whether you**
11  **were still going to come back to the**
12  **company after your personal situation**
13  **resolved?**
14  A      Oh, I had -- I had every
15  intention of going back to work.
16  Q      **I'm asking a different**
17  **question.**
18  A      Okay. Please clarify.
19  Q      **Let me back up and say I**
20  **understand that you didn't call Gabe or**
21  **Brian or Ed on the phone.**
22  A      Right.
23  Q      **You sent them e-mails.**

Page 243

1   A      Right.
2   Q      **But you said you did make phone**
3   **calls to other people who were friends.**
4   A      Right.
5   Q      **Were any of those friends**
6   **Miltope employees?**
7   A      At the time?
8   Q      **Yes.**
9   A      Yes.
10  Q      **Who were those folks?**
11  A      Tina Howell.
12  Q      **And Darlene?**
13  A      I didn't -- the only time I
14  called Darlene was when I was reporting to
15  work that I wouldn't be there, one of those
16  days.
17  Q      **But you called Tina as a friend?**
18  A      Right.
19  Q      **And did you also call Crystal as**
20  **a friend?**
21  A      Probably, yeah. They kept a
22  boat at my house at that time, if you will
23  recall that. And I might have not called

Page 244

1   and talked to her about it.  I might have
2   talked to her about it when they were at my
3   house.
4   Q       And when you talked to Tina as a
5   friend, did she tell you they really want
6   you to call and talk to them about this?
7   Did she say anything at all about --
8   A       I don't remember exactly.  It's
9   possible that they said that I should
10  call.  You know, I did send e-mails, and I
11  wanted an answer that way.  I didn't --
12  Q       Did you think you had the right
13  to dictate how they could communicate with
14  you?
15  A       I wasn't trying to dictate how
16  they communicated with me.  I was trying to
17  protect myself at that point in time.
18  Because at that point in time I had, like I
19  said, received a letter telling me that I
20  had been fired.  And I did not want to say
21  anything or do anything that -- I just
22  really didn't know what was going on, and I
23  wanted some answers.  But I wanted them

Page 245

1   where I could look at them instead of
2   trying to recall what I had talked to them
3   about on the phone or what they had said to
4   me on the phone.
5   Q       Am I right that you came to this
6   conclusion that you only wanted to talk to
7   them in writing by e-mail after you
8   received that letter from Ed Crowell?
9   A       Probably.
10  Q       You didn't have any reason to
11  distrust them before that letter, did you?
12  A       I had sent the letter prior to
13  that.  And I had told Brian after I asked
14  him to turn that paperwork in, "If there is
15  anything else, please let me know," which
16  would mean if Mr. Crowell is looking for
17  you to call him to discuss this matter
18  about you losing your job, I will let you
19  know.  See, Brian could have let me know.
20  Brian did not let me know.
21  Q       When you said you provided the
22  letter, are you referring to the doctor's
23  letter that you asked the doctor's office

Page 246

1   to fax to Miltope?
2   A       Yes.
3   Q       And you personally did not
4   provide that letter, correct?
5   A       Rephrase it.
6   Q       As I understood your testimony
7   last time, you asked that letter to be
8   faxed on your behalf.
9   A       Right.
10  Q       But you personally did not fax
11  it or hand deliver it?
12  A       I stood at the desk at the
13  doctor's office and watched her walk with
14  the letter to the fax machine, send it, and
15  then brought it back to me.
16  Q       And that's what you mean by
17  providing the letter?
18  A       Right, from the doctor's
19  office.  I don't own a fax machine.
20  Q       What did you tell Tina when you
21  talked to her as your friend during this
22  time period?
23  A       I told her I didn't have any

Page 247

1   clue what was going on.  I told her that
2   Darlene had called looking for me.  And
3   then I believe she told me that Gabe and
4   Brian were directed not to have any further
5   communications with me.  And the only
6   response I got as an e-mail from Gabe
7   regarding anything was that I needed to
8   provide them with the CAV passwords, which
9   I had already done.  I had already given
10  them to Lee Butler who was helping me ship
11  stuff while I was running in and out of the
12  doctor's office on the phone.  There are
13  people that can verify that.
14          I was working shipping things
15  out, getting things done.  Lee was
16  helping.  I had already done that.  And the
17  only answer I got back from him was I need
18  the passwords and I need you to return the
19  company laptop when you can.  No mention of
20  anything else that was going on.  Just I
21  need the passwords and I need this.
22  Q       When Tina said that Gabe and
23  Brian had been instructed not to respond to

Page 248

1  your e-mails, did she say what the source
2  of her information was?
3  A      No.
4  Q      What was Tina's position at
5  Miltope?
6  A      She was a trainer.
7  Q      What kind of trainer?
8  A      She taught classes on
9  certifications that we had to have.
10 Q      She was not in supervision, was
11 she?
12 A      No.
13 Q      Did it occur to you that she
14 might just be passing on idle gossip
15 instead of reliable information?
16 A      No. I trusted what she said.
17 Q      Did it occur to you she might
18 have been mistaken?
19 A      Ditto. No. I can't answer the
20 -- can we take a break, please? But I need
21 to answer that question first.
22 Q      The question was did it occur to
23 you that she could have been mistaken?

Page 249

1  A      No.
2         MS. LINDSAY: We can take a
3  break. I need one, too.
4         (Short break was taken.)
5  Q      Back on the record. Earlier you
6  testified that you were wondering why they
7  had not tried to call you at home, the
8  Miltope folks. Do you remember that?
9  A      Yes.
10 Q      How do you know they weren't
11 trying to call you at home?
12 A      I would have seen the number on
13 the phone or either answered the phone.
14 Q      Were there times you saw their
15 number on the phone and you just didn't
16 want to pick up and talk to them?
17 A      I don't think so.
18 Q      Isn't it possible there were
19 times you weren't home to pick up the phone
20 and they tried to call you?
21 A      It's possible.
22 Q      When you say you gave the
23 passwords to Lee Butler, you didn't give

Page 250

1  them to him in writing, did you?
2  A      I probably gave them to him over
3  the phone when I was talking to him over
4  the phone.
5  Q      And it's possible that Brian and
6  Gabe did not know you had conveyed that
7  information to Lee, isn't it?
8  A      It would be hard for them not to
9  know, because Lee was shipping an order out
10 that needed work done in the computer that
11 Lee would have had to have done.
12 Q      How do you know that?
13 A      Because those documents have to
14 have what's called -- or those items have
15 to have what's called a DD-1348, which is a
16 form that the items would have to have on
17 them to be shipped according to procedure.
18 Q      Did Lee complete such a form for
19 you when you were out?
20 A      I walked him through doing
21 those. I think I've got an e-mail from
22 Melody Orr, who was my contact person at
23 NAV ICP.

Page 251

1  Q      And her e-mail would establish
2  what?
3  A      That we were getting the 1348's
4  printed out to ship those.
5  Q      Was this while your dad was at
6  that appointment?
7  A      Yes. I was in the doctor's
8  office with my father, and he was back I
9  think doing blood work while I was doing
10 this with Lee on the phone.
11 Q      According to your calendar, that
12 occurred on November 6th, a Thursday. Do
13 you have any reason to think your calendar
14 is incorrect?
15 A      I would have to go back and
16 check, but I don't think so.
17 Q      According to your calendar note,
18 you said, "Took dad to doctor. Spoke to
19 Lee Butler on phone regarding Order Number
20 5071 three times. Called Mech" --
21 A      Mechanicsburg.
22 Q      Mechanicsburg, an abbreviation,
23 M-E-C-H, Mel Orr to get CAV link sent to my

Page 252

```
 1  house.  She did.
 2  A      Right.
 3  Q      So, if the CAV link was sent to
 4  your house, would you have been able to
 5  work from home?
 6  A      She told me that I would be able
 7  to work from home and get those forms
 8  printed out, but my computer was not quite
 9  up to par on doing that.
10  Q      So, when the forms did not get
11  printed out from your home for order number
12  5071, what did you do next?
13  A      Melody went in the system and
14  completed them, which is something that has
15  to be done.  And I had given Lee the
16  passwords, and Lee would have printed the
17  forms out.
18  Q      Why would Lee need the passwords
19  if Mel had already completed them?
20  A      Melody could not -- when I say
21  completed, that is a status code in the
22  system to show that that item is repaired
23  and finished, completed.  But those
```

Page 253

```
 1  documents that have to be shipped with them
 2  have to be printed out and attached to
 3  them.  So, she could not have done that
 4  short of printing them out and faxing all
 5  of them to him to put on there.  And then
 6  the bar codes would probably not have read
 7  correctly at that point.
 8  Q      On your calendar entry for
 9  November 7th, you say, "Worked with Lee on
10  phone.  Talked to Brian Goff, 6487."
11  A      That might have been when we
12  were trying to get those printed out.
13  Q      So, you were trying to get Order
14  5071 shipped out on that Friday?
15  A      Exactly.
16  Q      When you couldn't get it done at
17  home?
18  A      Right.
19  Q      And on that same day, you were
20  also preparing to go to Atlanta for a
21  McQueen Street rehearsal, correct?
22  A      I believe so.  I think it was on
23  Sunday we had that rehearsal.
```

Page 254

```
 1  Q      According to your notes, it says
 2  on Saturday, "McQueen Street load-in."
 3  A      That was when we met there and
 4  got the gear out.  And we might have
 5  rehearsed for a little bit, but not much.
 6  The rehearsal was basically Sunday.
 7  Q      And then according to your
 8  calendar, the rehearsal also occurred on
 9  Monday, November 10th?
10  A      Probably Monday morning.  I
11  think we had to leave by a little after
12  lunch.
13  Q      Did you ever tutor someone named
14  Josh?
15  A      Josh Brewer.
16  Q      On your November 11th entry it
17  just says, "Josh PMT due 7/30."  Was that a
18  payment due to you?
19  A      For his lessons.
20  Q      So, you were tutoring Josh?
21  A      Yes.
22  Q      When you were picking up Sydney
23  from visiting her mom that prior weekend,
```

Page 255

```
 1  do you remember how you told me you had a
 2  flat tire and you got in real late?
 3  A      Right.
 4  Q      You were picking her up on
 5  Sunday night, right?
 6  A      Correct.
 7  Q      That following Monday you said
 8  you were too tired to come to work, right?
 9  A      Right.
10  Q      And that's when you called in to
11  Darlene and told her you had a flat tire?
12  A      Right.
13  Q      So, I guess it's inaccurate on
14  your calendar when you wrote on the 3rd,
15  which was that Monday, "Worked.  Syd went
16  to school"?
17  A      It could be, yes.  Let me look
18  at that, please.
19  Q      Let me give you another copy.
20  A      Yeah, that's not correct.
21  Q      Okay.
22  A      Because that was the Monday that
23  she was down there for Halloween.  This is
```

Page 256

1  November 3rd. I believe Halloween was over
2  that weekend or the end of that week.
3  Q      And, in fact, the Miltope
4  records in terms of your time worked
5  reflect that you were absent on that
6  Monday, as well.
7  A      Yes. You are correct in that.
8  Q      So, is it possible there are
9  other inaccuracies on this Exhibit 9?
10 A      I'm sure it's possible. I mean,
11 I don't -- I don't think there is. If you
12 would like for me to review that, I will.
13 Q      Well, did you fill it out after
14 the fact, after these dates?
15 A      No. It was around the same time
16 all this was going on. I just made a
17 mistake.
18 Q      Did you look for any other
19 calendars that you had for July, August,
20 September, October?
21 A      No.
22 Q      Did you have any more?
23 A      I might have had one like on the

Page 257

1  refrigerator at home or something, but I
2  don't have it. I've got one that was in my
3  office, but I think it's mostly -- this was
4  '04, so it's not pertinent.
5  Q      Before your father had pneumonia
6  in July, you were good friends with Rhonda
7  Blythe, right?
8  A      Yes.
9  Q      Did you have any information
10 about any complaints she may have had
11 against Miltope at that time?
12 A      Not really.
13 Q      What do you know, if anything,
14 about complaints she may have had against
15 Miltope?
16 A      All I know about that is she was
17 working there and she had complications
18 with her pregnancy, and then after that she
19 was not working there. But I don't know
20 any details.
21 Q      Did you ever hear that she was
22 claiming she was being paid differently
23 from men?

Page 258

1  A      No.
2  Q      In your discussions with Rhonda,
3  did she indicate that she had something
4  against Miltope?
5  A      Not -- I mean, no.
6  Q      Do you know why -- when she was
7  called by a Miltope employee looking for
8  you, do you know why she didn't just tell
9  them, "Yeah, I know where he is"?
10 A      She probably said, "I don't know
11 exactly where he is. Have you tried his
12 house?" I mean, I was not a party to the
13 conversation. I don't know what exactly
14 she said. I do know that some time after
15 that conversation that they had, I was
16 called and I was at home.
17 Q      And did you pick up the phone?
18 A      Yeah.
19 Q      Who did you talk to?
20 A      Derrick.
21 Q      Oh. You are not talking about a
22 Miltope employee calling you, then.
23 A      No. I don't recall anyone

Page 259

1  calling me. I think Tina might have called
2  me or e-mailed me or something of that
3  nature.
4  Q      Do you remember asking Ed
5  Crowell if you could buy some audio
6  equipment that Miltope was going to discard?
7  A      I remember Miltope having some
8  television production equipment, which did
9  include some audio equipment, that was from
10 a lessor of part of the building.
11 Q      When was that?
12 A      I do not have a clue. I don't
13 remember.
14 Q      Do you remember asking if you
15 could have a microphone from that set of
16 equipment?
17 A      I remember asking -- no, it was
18 not a microphone. I might have asked about
19 a microphone. But he told me that there
20 was a small mixing board, and I asked him
21 about that. And I found someone that
22 purchased the lot of that, and it was my
23 understanding that he had let me have that

Page 260

1    little mixing board for helping them
2    liquidate that equipment.
3    Q        Do you remember being quoted
4    that if you would give -- if you would pay
5    $200, you could have that equipment, that
6    mixing board?
7    A        I remember him saying something
8    about that. But after I -- he told me I
9    could purchase it outright for that. But
10   then after I found someone that bought the
11   lot of it, no mention was made of money at
12   all after that.
13   Q        When you were employed at
14   Miltope the first time, you received a
15   handbook like this here (indicating),
16   correct?
17   A        Yes.
18   Q        And do you still retain a copy
19   of that handbook?
20   A        I don't know. I don't think so.
21   Q        Were you ever asked to give it
22   back?
23   A        I don't recall that.

Page 261

1    Q        Between the time that you left
2    Mr. Crowell's office on October 27th and
3    the time you picked up your daughter that
4    following weekend, did you have any
5    conversations with Gabe or Brian about
6    possibly taking leave?
7    A        I might have talked to both of
8    them about it, but I don't remember an
9    exact conversation.
10   Q        If I understood your testimony
11   correctly, you left Mr. Crowell's office
12   wondering if you could possibly manage to
13   continue your job and care for your dad
14   based on what Mr. Crowell's story was about
15   his own father's illness; is that right?
16   A        Maybe. But I -- go ahead.
17   Q        And if I understood you
18   correctly, you reconsidered that position
19   when this week of November 3rd became so
20   difficult to manage with the illness of
21   your daughter and your father's needing
22   care?
23   A        Yes.

Page 262

1    Q        So, am I understanding how you
2    were making decisions at that time period,
3    or is there something else you need to tell
4    me so I can understand your decision-making
5    process?
6    A        Could you clarify that, please?
7    Q        Sure. If I understand you
8    right, after the conversation with Mr.
9    Crowell on October 27th until the week of
10   November 3rd when things became very hectic
11   for you, in that interim period you were
12   considering managing your job as well as
13   the care of your dad? In other words, you
14   were --
15   A        Was I entertaining the idea of
16   trying to do that? Yes. I was trying to
17   figure out how I would be able to do both.
18   Q        So, you were debating whether to
19   take leave at all in that week period?
20   A        Well, I had already filled out
21   the paperwork. It was more or less I was
22   debating on whether or not to turn it in.
23   And then when all those events took place,

Page 263

1    there was no other option. I thought about
2    it. And when everything started happening,
3    there was just no way.
4    Q        So, as things became difficult
5    the week of November 3rd, that prompted you
6    to call or to discuss with Brian your
7    request that he turn in the paperwork for
8    you?
9    A        Exactly.
10   Q        Was there anything else that
11   prompted you to ask Brian to turn in the
12   paperwork for you?
13   A        I just think the situation as a
14   whole was what prompted me to turn the
15   paperwork in.
16   Q        That situation being the events
17   of the week of November 3rd?
18   A        The events of that, yeah, the
19   events as a whole.
20   Q        When you asked Brian to turn the
21   paperwork in for you, did you tell him that
22   there was a date certain that you wanted
23   your leave to begin?

Page 264

1    A       The paperwork had a place on it
2    for the requested date of the leave to
3    begin, and the blank had "immediately"
4    filled in. So, as of that moment.
5    **Q       After you received the letter**
6    **from Ed Crowell telling you that you had**
7    **violated the no call-no show policy and**
8    **were considered terminated, did you**
9    **understand that you could be reinstated to**
10   **your job if you requested reconsideration**
11   **and tried to correct any policy violations?**
12   A       I could not believe that I had
13   gotten that letter. And I did not take
14   that letter as you need to call and
15   straighten all this out. I took that
16   letter as I had been terminated. It had
17   date of termination on there. So, in other
18   words, I had been fired.
19          Now, after all the events that
20   had taken place getting that letter, the
21   part on there that stuck out the most was
22   you've been terminated or your employment
23   has been terminated as of this date.

Page 265

1    **Q       But there's nothing in that**
2    **letter that says you are not eligible for**
3    **rehire, is there?**
4    A       I didn't understand at that
5    point why I would have to be rehired if I
6    had filled out paperwork for a leave.
7    **Q       My question is --**
8    A       No.
9          (Defendant's Exhibit 11
             was marked for.
             identification)
10
11   **Q       I'm going to show you what I've**
12   **marked as Exhibit 11. If I understand**
13   **correctly your testimony, this is the**
14   **document that the hospice employee was**
15   **directed to fax to Miltope; is that correct?**
16   A       No. Let me clarify that. The
17   hospice employee picked this letter up for
18   me from Dr. Law's office and brought it to
19   my house. At that point I took the letter
20   back to the doctor's office and had her fax
21   it, because I do not have a fax machine.
22   And I was asked to provide a letter from
23   the doctor's office, and that's exactly

Page 266

1    what I did. I took it back up there and
2    had her fax it. Because I kept telling
3    her, "I need to get this letter from the
4    doctor." I told her I needed to get that
5    letter from the doctor, and she called up
6    there and checked into why the letter
7    wasn't ready yet and that kind of thing.
8    And I think the next time she came down was
9    when she came and brought the letter.
10   **Q       So, the letter you were**
11   **referring to is what we have designated as**
12   **Exhibit 11, right?**
13   A       Yes.
14          (Defendant's Exhibit 12
             was marked for.
             identification)
15
16   **Q       Let me show you what I've marked**
17   **as Exhibit 12.**
18   A       That's that letter, other
19   letter.
20   **Q       Be aware if you are going to**
21   **rely on notes while we are talking, I get**
22   **to look at them. So, you might want to**
23   **close your notebook**

Page 267

1    A       I'm making notes as we go. I'm
2    writing as we go. I mean, this is just
3    stuff I'm writing down as we go here.
4    **Q       Did you ask the doctor to do**
5    **this letter dated November 29th, Exhibit**
6    **12?**
7    A       Yes, I did.
8    **Q       And did you obtain a copy of**
9    **this letter from Temple Medical Clinic?**
10   A       Yes, I did.
11   **Q       What was the purpose for getting**
12   **this letter dated November 29th?**
13   A       After I received the letter from
14   Miltope telling me that I had terminated or
15   been terminated or terminated my position
16   for failure to report for three consecutive
17   days, I had no idea in the world what that
18   would be the cause of. I sent e-mails
19   asking why. I had no idea why. I thought,
20   you know, maybe I need to call the doctor
21   and get a better explanation of this. No
22   one ever told me I needed another letter.
23   Nobody ever contacted me about a letter.

Page 268

1  But I had another letter done detailing
2  everything that was going on with my dad.
3  Q      Did anyone give you the idea
4  that you should get this detailed letter?
5  A      I came up with that all by
6  myself.
7  Q      Why didn't you mail this letter
8  or have this letter faxed to Miltope?
9  A      Well, it says on the previous
10 letter please feel free to contact me for
11 any questions from the doctor's office.
12 After some after-thought about having this
13 other letter done, I thought if there's a
14 reason that Miltope needed to contact the
15 doctor's office, they could clarify this
16 and it would be a mute point. Because they
17 had a way to contact the doctor and the
18 medical clinic for clarification or either
19 for anything else they might need to figure
20 out or to go with that leave paperwork that
21 I had turned in.
22 Q      So, rather than provide this
23 November 29th letter to — strike that.

Page 269

1  This letter is dated November 29th 2004.
2  Is that the correct date?
3  A      Right.
4  Q      So, this was done over a year
5  after you left Miltope?
6  A      Right. Well, I don't know. It
7  says right there since July 2003, if you
8  will read in the letter. It could be a
9  typographical error. I'm not sure. We
10 would have to contact Temple Medical Clinic
11 to find out.
12 Q      Let's look at the letter,
13 because I think we can establish it was
14 2004. He states towards the middle of the
15 letter, "A repeat CT of the chest done in
16 November of 2004 revealed no sign of
17 malignant tumor."
18 A      Then the date is correct.
19 Q      Was your idea that you could use
20 this letter with another potential employer
21 other than Miltope?
22 A      No, no, no.
23 Q      So, your primary purpose in

Page 270

1  getting this letter was to assist you in
2  pursuing your claims against Miltope?
3  A      After a lot of thought about the
4  whole thing, the only thing I could come up
5  with was maybe this letter did not satisfy
6  what Miltope needed. So, I just wanted him
7  to detail in a letter the situation, how it
8  was, how it was then, everything else, and
9  then there would be no question of it. But
10 as I said before, they had a way to contact
11 the doctor's office if the letter had been
12 the problem. That was never done. So, I
13 had to think after that fact that that
14 could not have been what it was.
15 Q      So, rather than provide this
16 letter to Miltope, your expectation was
17 that Miltope would contact the doctor
18 directly based on the prior letter of
19 November 5th, correct?
20 A      Right.
21 Q      So, you did not make a phone
22 call or send an e-mail to Gabe or Brian to
23 say, hey, by the way, I do have a better

Page 271

1  letter that may answer any questions y'all
2  may have had? You never did that, right?
3  A      I don't think so. Not after
4  that period of time, no.
5  Q      Look back at what was Exhibit 7,
6  if you would. Go to the page that at the
7  very bottom right-hand corner has the
8  number 121 at the bottom. It's labeled
9  Decision on Unemployment Compensation
10 Claim. Do you see that?
11 A      Right.
12 Q      You appeared for a hearing on
13 your unemployment claim against Miltope,
14 correct?
15 A      Right.
16 Q      And you were represented by
17 counsel, correct?
18 A      Right.
19 Q      And when you appeared at that
20 hearing, you were attempting to establish
21 that you were entitled to benefits, right?
22 A      Yes. I thought so.
23 Q      There are some findings. Do you

Page 272

1   see the paragraphs under the word
2   "Findings"? If you will go to the second
3   paragraph, it says, "The claimant worked."
4   Do you see that line?
5   A     Right.
6   Q     That first sentence says, "The
7   claimant worked for the listed employer
8   from February 12, 2001, until November 11,
9   2003, as a government property
10  administrator." Is that a correct fact?
11  A     Well, it's not a complete fact.
12  But what is listed is correct.
13  Q     And when you say it's not
14  complete, you are saying it doesn't
15  reference the prior term of employment with
16  Miltope?
17  A     No. It doesn't -- that was not
18  my sole title.
19  Q     There's something else that you
20  did for Miltope that you've told us about?
21  A     Right.
22  Q     The CAV administrator position;
23  is that right?

Page 273

1   A     Right.
2   Q     So, that was omitted. But
3   otherwise that statement --
4   A     That would be a correct
5   statement.
6   Q     The next statement is, "The
7   claimant was considered to have abandoned
8   his job after being absent for more than
9   three consecutive working days without
10  proper notice to or permission from the
11  employer." Do you see that statement
12  there?
13  A     Yes, I do.
14  Q     It is accurate, isn't it, that
15  there were three consecutive working days
16  when there was not notice provided that you
17  were going to be absent, correct?
18  A     I think in -- I don't agree with
19  that.
20  Q     There were three consecutive
21  working days where you didn't actually call
22  in to say, "Hey, I'm not going to be there
23  today," correct?

Page 274

1   A     After I turned the paperwork in
2   for the leave, I told them that they could
3   reach me at home or on my cell phone. And
4   I did not -- I did not know that I had to
5   call in those days. If they needed me,
6   they could have gotten me.
7   Q     Are you saying that you told
8   Brian, "You can call me at home or on my
9   cell"?
10  A     Right.
11  Q     Did you tell anybody else, "You
12  can call me at home or on my cell"?
13  A     Brian was my supervisor. If
14  anyone else needed to know, they could have
15  asked Brian.
16  Q     So, this communication you just
17  referenced was what happened on November
18  5th, Wednesday?
19  A     When he told me he needed a
20  letter.
21  Q     This was the day that you asked
22  him to turn in your leave paperwork, right?
23  A     Exactly.

Page 275

1   Q     So, from that day forward, you
2   didn't think you were obligated to call in?
3   A     No.
4   Q     I'm correct?
5   A     Yes. And I told him I would
6   keep him abreast of the situation. As I,
7   you know, had things, I sent him an e-mail
8   telling him about the tests and stuff my
9   father had on the 7th -- on the 6th and
10  that kind of thing. I told him I was going
11  to help Lee get that order out of there.
12  Q     And did you also say that you
13  were going to try to come in the next day
14  to catch up on some work?
15  A     I don't recall if I told him
16  that. I might have.
17  Q     If it's in an e-mail that you
18  wrote, you wouldn't have any reason to
19  dispute that, would you?
20  A     No.
21  Q     And as things became more
22  complicated at home, you tried to work from
23  home using your telephone and your

Page 276

1  computer?
2  A      I tried.
3  Q        Before you had that conversation
4  with Brian about the doctor's letter, you
5  already knew that a doctor's substantiation
6  would be required, didn't you?
7  A      He asked for the letter from the
8  doctor, and that's what I tried to provide.
9  Q        And prior to that time when you
10 had talked with Brian, Gabe and Ed Crowell
11 and Dee Coulter, you were aware that a
12 doctor's letter was going to be required,
13 right?
14 A      I honestly don't remember
15 anything about a doctor's letter or
16 anything. I remember filling out the
17 paperwork. I remember having it in the
18 folder on my desk. I told him if there's
19 anything else he needed, let me know. And
20 that's when he told me he needed a letter.
21 That's all it said, a letter. So, I called
22 the doctor's office and requested a letter.
23 Q        You were aware, weren't you,

Page 277

1  that if something didn't qualify for family
2  medical leave, you could still get a
3  medical leave of absence with a doctor's
4  note, even if it wasn't a serious health
5  condition, right?
6  A      No.
7  Q        Do you remember the policy in
8  the handbook that said that an employee
9  requesting a medical leave of absence is
10 required to submit a statement from his
11 physician indicating the need for such a
12 leave?
13 A      I don't remember it from the
14 handbook, no.
15 Q        Would you look at what is --
16 keep that one handy, because we are going
17 to go back to it. Take a look at Exhibit
18 4. If you will, look on page -- it says
19 129 according to our stamp. It's actually
20 Page 10 of the handbook. Do you see that
21 in that exhibit about three pages back?
22 A      All right.
23 Q        Do you remember testifying that

Page 278

1  you were aware of the policies that are in
2  this Exhibit 4? Do you remember that,
3  Mr. Bailey?
4  A      In our last meeting?
5  Q      Yes.
6  A      I think it -- I remember saying
7  that I remembered that. I did not have or
8  rely on a handbook as I was making these
9  decisions because I was talking to people
10 in positions that would be able to guide me
11 correctly on how to do this. I didn't sit
12 down and figure out how I was going to do
13 this. What I did was I -- Dee had told me
14 that I would qualify. So, that pretty much
15 told me that I would qualify. So, I didn't
16 -- I didn't spend a lot of time researching
17 it in the book.
18 Q        When we last spoke, you did not
19 recall Dee saying that you would qualify.
20 A      When she came -- well, she
21 brought me the paperwork.
22 Q        But you had not completed it
23 yet, so how could she know whether you

Page 279

1  would qualify?
2  A      Because I told her when she came
3  into my cube about the situation that was
4  going on, and she told me that I would
5  qualify.
6  Q        So, did you just remember that
7  since we last met?
8  A      I don't know if I -- I might
9  have gotten something confused before. But
10 she brought me the paperwork to fill out.
11 Q        Then I'm sure you recall, if she
12 did say that, that she also told you that
13 you would have to submit the doctor's
14 certification to substantiate that?
15 A      I don't remember anything period
16 about a doctor's certification. I had
17 someone get me up a copy of the actual form
18 for family medical leave. Since Brian had
19 turned mine in, I did not have a copy of
20 that to look at. And there is a part of
21 that is several pages into it where it
22 has a section for the doctor to complete.
23 I don't recall ever having seen that

Page 280

1  before. I don't know if it's two separate
2  parts, and then this detaches and goes to
3  the -- I don't know how that works. But
4  the part that I got to fill out did not
5  have the doctor's certification in it.
6  Q      Well, you couldn't fill out the
7  doctor's certification yourself, could you?
8  A      I realize that. But I could
9  take that to a doctor and have it filled
10  out.
11  Q      Let's back up. You don't know
12  whether Brian ever turned in that
13  paperwork, correct?
14  A      I would have to think that he
15  did, because when I e-mailed him -- or when
16  I told him to turn it in and let me know if
17  there was anything else he needed, he
18  responded back to me that he needed a
19  letter. So, I would assume that he turned
20  that in.
21  Q      That's just an assumption on
22  your part, correct?
23  A      No, I don't think so, because he

Page 281

1  would have had to have someone tell him
2  that the letter was necessary.
3  Q      If we need to go back over the
4  testimony you gave last time, we can. I
5  don't want to have to go through that
6  time-consuming process. The last time we
7  met, you admitted that you didn't know one
8  way or the other whether Brian ever turned
9  that paperwork in. So, are you changing
10  your testimony?
11  A      No. I'm adding to my testimony.
12  Q      And you are adding to the
13  testimony by saying you think it's a fair
14  assumption on your part that he actually
15  turned it in?
16  A      I asked him to turn it in. He
17  came back and asked me for a letter to go
18  with it. So, I am assuming -- and I'm
19  pretty sure that he had to have taken it to
20  either Dee or someone else for them to tell
21  him, "Oh, he needs this letter."
22  Q      And if Brian testifies under
23  oath that he never saw that paperwork in

Page 282

1  your cube and, therefore, never turned it
2  in, you wouldn't say that he's lying, would
3  you?
4      MR. BLYTHE: I'm going to object
5  to the form of that question.
6      THE WITNESS: Please do.
7      MR. BLYTHE: Reword that a
8  little bit.
9  Q      If I represent to you that Brian
10  never saw the paperwork and never turned it
11  in, do you think that I've been lied to?
12  A      Yes.
13  Q      And you think Brian would lie?
14      MR. BLYTHE: Object to the form
15  of the question. Here again, it assumes
16  facts not in evidence. We are assuming
17  stuff that Brian may or may not say or do.
18      MS. LINDSAY: That's my whole
19  concern. I think the initial phase that
20  we've come to here is all about an
21  assumption, and I'm trying to clarify
22  that.
23  A      Brian was my supervisor. I

Page 283

1  asked Brian to turn in the paperwork.
2  Brian tells me I need a letter from my
3  father's doctor to go with that paperwork.
4  So, he had to have turned that in to know
5  that a letter was needed.
6  Q      He never told you he turned it
7  in, did he?
8  A      I e-mailed back telling him that
9  I had requested the letter from the
10  doctor. I think I even thanked him for
11  turning it in.
12  Q      The question is he never told
13  you he turned it in, correct?
14  A      He never told me he didn't.
15  Q      He never told you he turned it
16  in, did he?
17  A      I would have to look back
18  through my e-mails to see if there was
19  anything in there about it.
20  Q      I have that exhibit, too. If we
21  need to go through it, we can. So, you
22  don't know one way or the other how to
23  answer that question? All right. Well,

Page 284

1   let's go back to the policy, then.
2   A       Can you just rephrase the
3   question so we can get to an answer on
4   that?
5   Q       I asked you he never told you
6   that he turned it in, did he?  And you
7   haven't answered it yet.  Do you have an
8   answer?
9   A       Wow.  I had no reason to think
10  anything other than he turned it in.  No,
11  he did not tell me he turned it in.  But
12  nothing in the verbiage of any of his
13  statements back to me or requesting the
14  letter indicated that he had not turned it
15  in.  Is that fair?
16  Q       I think I understand you.
17  A       I'm sorry.  I can't be more
18  clear on that.
19  Q       If you look back at the policy
20  excerpt that we have labeled Exhibit 4, do
21  you see there that an employee requesting a
22  medical leave of absence is required to
23  submit a statement from his physician,

Page 285

1   correct?
2   A       Hold on.
3   Q       Do you see that at the bottom of
4   Page 10?
5   A       Yes, I see that.
6   Q       Do you understand that this is
7   something that's entirely independent of
8   FMLA, or do you not know one way or the
9   other?
10  A       I don't know.
11  Q       Do you expect Brian to have
12  followed the policies in this Miltope
13  handbook?
14  A       I have no -- I have no -- I
15  would --
16  Q       Do you think he would follow the
17  policy in the handbook?
18  A       Yes.
19  Q       Do you think Dee Coulter was
20  trained to follow the policy in the
21  handbook, as well?
22  A       I'm sure she was.
23  Q       And if her training included

Page 286

1   that FMLA leave included the requirement
2   that there should be a physician statement,
3   do you think that she would have conveyed
4   that to you?
5   A       Probably through Brian.
6   Q       You don't think she would have
7   told you that herself when she gave you the
8   paperwork?
9        MR. BLYTHE:  I think that
10  question has been asked and answered two or
11  three times.
12  A       I don't know.
13  Q       Well, last time you didn't
14  remember that conversation with her the
15  same way you remember it today, so I'm just
16  trying to make sure.  Do you remember
17  anything else she may have said to you?
18  A       Nothing stood out other than she
19  told -- I remember her telling me that I
20  would qualify because I was an only child.
21  I remember her saying something about
22  that.  I don't recall anything about a
23  physician's statement, a physician's

Page 287

1   letter, anything like that.  I don't recall
2   that.
3   Q       And this is the conversation
4   where Brian Goff was with you?
5   A       I believe so.  I think he was
6   working on my computer or something.  If
7   Brian had told me, "We need the physician's
8   statement part of the FMLA paperwork filled
9   out by your father's doctor," then I would
10  have probably said, "What is that?" and
11  then we would have proceeded on from
12  there.  But I was told I needed a letter,
13  and that's all I was told.  So, that's what
14  I did the very same day.  In fact, five
15  minutes after I got off with him, I called
16  the doctor's office and requested a letter
17  to go with my FMLA paperwork.
18  Q       So, are you saying today that
19  Dee Coulter, without having your completed
20  paperwork in hand, without having the
21  opportunity to discuss with Ed Crowell the
22  circumstances of your situation, that she
23  actually told you, "Yes, you will qualify"?

Page 288

1  A     I don't know if she worded it
2  you will qualify, you will probably
3  qualify, I think you qualify. I don't
4  know. But I got the impression that I
5  would qualify for FMLA after having the
6  conversation.
7  **Q     Do you admit that when you had**
8  **conversations with Brian and Gabe, they**
9  **both told you that you needed to get in**
10 **touch with human resources about any**
11 **requirements in particular to qualify for**
12 **this FMLA leave?**
13 A     Well, I mean, that's why I got
14 the paperwork from her.
15 **Q     And --**
16 A     I -- go ahead. I'm sorry.
17 **Q     If you will, look back on Page 9**
18 **of the policy.**
19 A     That would be 128?
20 **Q     That's right. Under Sick Time**
21 **it says, "The company reserves the right to**
22 **require medical substantiation following**
23 **three days of consecutive absence." Hadn't**

Page 289

1  **you been required before to submit medical**
2  **substation when your dad --**
3  A     Never.
4  **Q     You are saying you never had to**
5  **do that before?**
6  A     Never. I also never had to fill
7  out the first piece of paperwork when I was
8  off work for a week after my child was
9  born.
10 **Q     You were actually at the**
11 **hospital at that time, weren't you?**
12 A     I was at the hospital with my
13 child when she was born, yes.
14 **Q     And there wasn't time for you to**
15 **fill out paperwork when your wife was in**
16 **labor, was there?**
17 A     It was a planned C-section. So,
18 I knew exactly when she was going to be
19 born.
20 **Q     So, you didn't tell your**
21 **supervisor, hey, the c-section is on this**
22 **date and fill out any paperwork?**
23 A     I didn't fill out the first

Page 290

1  piece of paperwork. But I told them that
2  her birthday is going to be the 21st of
3  February. I want to be off on that Friday
4  and the following week. That way I would
5  have the whole weekend. She was born on
6  Friday, and I would have the week. I never
7  filled out any paperwork on that at all.
8  **Q     How much advance notice did you**
9  **give to your supervisor about that?**
10 A     Probably a week or so at least.
11 **Q     When was the c-section**
12 **scheduled? When was it decided that it**
13 **would be on February 21st?**
14 A     I'm doing good to remember all
15 the others. I can't remember the day we
16 decided.
17 **Q     Was it a couple of weeks in**
18 **advance at least?**
19 A     I'm not sure. I don't know. It
20 was -- probably that would be fair. I
21 don't recall exactly the amount of time
22 that passed between the day we decided and
23 the actual day.

Page 291

1  **Q     Going back to Exhibit 7, the**
2  **unemployment compensation claim decision,**
3  **do you agree that the last time you worked**
4  **was November 3rd?**
5  A     Define work. The last time I
6  was at work or the last time I was doing
7  something for Miltope?
8  **Q     I guess the real question is,**
9  **just to clarify, you didn't actually report**
10 **to work on November 3rd, correct?**
11 A     I called in.
12 **Q     And you attempted to do work by**
13 **telephone when you were not reporting to**
14 **work that week of November 3rd, correct?**
15 A     Right.
16 **Q     So, with those clarifications --**
17 well, strike that.
18     **You agree that you were out on**
19 **November 4th 2003 when your daughter was**
20 **sick, correct?**
21 A     Correct.
22 **Q     You agree that you notified the**
23 **employer at that time, correct?**

**Page 292**

1   A      Yes.
2   Q      You agree with the statement
3   that on November 5th you were out again due
4   to your father's illness?
5   A      Right. And that's the day I
6   asked Brian to turn the paperwork in,
7   November 5th.
8   Q      According to this statement,
9   "The claimant had requested a Family
10  Medical Leave of Absence related to his
11  father's illness in October 2003." That's
12  correct, right?
13  A      Yes, because I filled the
14  paperwork out in that week prior to -- the
15  week before. I filled the paperwork out
16  the week before.
17  Q      According to your testimony,
18  before you filled that out on October
19  27th. Is that still your testimony today?
20  A      I'm not sure. It was the week
21  of the 27th.
22  Q      According to your testimony
23  before, you filled out that paperwork the

**Page 293**

1   same day you had the meeting with Ed
2   Crowell on October 27th. Does that refresh
3   your memory?
4   A      It was that week. I'm not
5   exactly sure if it was that day, but it was
6   that week I can say.
7   Q      When you went in to tell Ed
8   Crowell that you wanted to take leave,
9   hadn't you already completed the paperwork?
10  A      I believe so.
11  Q      It says here you left the
12  paperwork on your desk and asked your
13  supervisor to turn in the paperwork.
14  That's correct, right?
15  A      True. That's correct.
16  Q      It says, "The claimant did not
17  provide the required medical documentation
18  with the paperwork to justify the request
19  for a Family Medical Leave of Absence."
20  Now do you disagree with that statement?
21  A      In hindsight, yes.
22  Q      At the time you thought you had
23  provided the November 5th letter to

**Page 294**

1   Miltope, correct?
2   A      Right.
3   Q      And is that the reason for your
4   disagreement with that statement?
5   A      Yes.
6   Q      There is a statement here that
7   the claimant was considered to have
8   abandoned his job because he had been
9   absent from November 6, 2003, through
10  November 11, 2003, without notice to or
11  permission from the employer. Do you
12  disagree with that statement?
13  A      Please do that again.
14  Q      It states here, "The claimant
15  was considered to have abandoned his job
16  because he had been absent from November 6,
17  2003, through November 11, 2003, without
18  notice to or permission from the employer."
19  Do you agree or disagree with that
20  statement?
21  A      I disagree with that because I
22  had turned that paperwork in and asked if
23  there was anything else they needed, please

**Page 295**

1   let me know.
2   Q      So, your disagreement is based
3   on the fact that you told Brian on the 5th,
4   "Turn in that paperwork for me" and you
5   didn't hear anything else from Miltope --
6   A      Right.
7   Q      -- about what else might be
8   needed?
9   A      You know, nobody came back and
10  said that the letter wasn't sufficient.
11  Nobody came back and said anything.
12  Q      So, the answer to my question is
13  yes?
14  A      Yes.
15         MR. BLYTHE: Wait a minute.
16  What was that question?
17         MS. LINDSAY: I asked him if he
18  disagreed with the statement because, one,
19  he had asked Brian to turn in the paperwork
20  and, two, he says he didn't hear back
21  anything.
22  A      So, that's yes. I'll go with
23  that.

Page 296

1  Q      Sometimes if I ask a yes-or-no
2  question and it really is yes or no, go
3  ahead and answer it that way.  We'll get
4  done faster.
5  A      All right.
6  Q      If you need to tell me more to
7  make me understand, that's fine.
8  A      Okay.
9  Q      When it says without notice to
10 or permission from the employer, you
11 disagree with that because you assumed that
12 you did have the leave approved, correct?
13 A      Yes.
14 Q      And did you raise these
15 objections at the hearing, your
16 disagreements with these statements?
17 A      Yes, I did.
18 Q      The next statement says, "The
19 claimant was never advised his request for
20 a Family Medical Leave of Absence had been
21 approved because the medical documentation
22 to justify the Family Medical Leave of
23 Absence was not submitted until after the

Page 297

1  claimant was separated."  Did you disagree
2  with that statement?
3  A      Let me read this myself one more
4  time.
5  Q      Go ahead.  It's the last
6  sentence of that Findings section.
7  A      No, I was never advised.  I
8  agree with that statement.  I was never
9  advised that my paperwork was not adequate.
10 Q      Well, this says -- it's a little
11 different statement -- that you were never
12 advised it was actually approved.
13 A      I was not notified if it had
14 been approved or disapproved.
15 Q      Thank you.  That answers my
16 question.  And did you appeal that
17 decision?
18 A      Yes, because I did not agree
19 with it.
20 Q      Was your unemployment
21 compensation claim ultimately denied?
22 A      Yes.
23

Page 298

1              (Defendant's Exhibit 13
2              was marked for.
2              identification)
3  Q      Looking at Exhibit 13, it
4  appears that y'all were e-mailing back and
5  forth about your return of the laptop to
6  Miltope; is that correct?
7  A      Correct.
8  Q      And do you see there on November
9  19th he said, "We need you to return the
10 company laptop and provide passwords to CAV
11 system ASAP"?
12 A      Right.
13 Q      So, at that point it was your
14 position you had already conveyed those
15 passwords to Lee?
16 A      Right.
17 Q      How long did it take you to
18 return that laptop?
19 A      It was a while.  I just -- you
20 know, I had all my personal items in my
21 cubical at work, and I had the laptop.  It
22 was a while.  There's a record of that
23 somewhere.  I think I Fed-Exed it back to

Page 299

1  them or Derrick's office Fed-Exed it back
2  to them.
3  Q      And that was after many requests
4  that you return the laptop, correct?
5  A      To give you a little groundwork
6  on this e-mail right quick, what started
7  this e-mail was the gentleman that kept his
8  boat at my house told me that Gabe had
9  instructed him to let me know I needed to
10 return that laptop.  And that upset me
11 quite a bit because I could have somebody
12 sent down there as a messenger to tell me
13 something, but I could not get anything
14 from anybody else.
15 Q      Don't you recall getting that in
16 a letter?  Don't you recall that was in
17 your letter from Ed Crowell to return the
18 company laptop?
19 A      I don't -- it probably was.  I
20 don't deny that.  You don't have to get
21 it.  I don't deny that.
22 Q      So, you knew as of the time you
23 were terminated that you were supposed to

Page 300

1    call him to arrange return of the laptop,
2    right, according to Exhibit 10?
3    A    Yeah.  That's fine.  But I
4    responded to Gabe with the first thing at
5    the bottom of the page, please direct all
6    communication directly to me.  I've sent a
7    number of e-mails to Brian, no response,
8    with cc's to you and Mr. Crowell.  You have
9    a way to contact me, please do so.
10   Q    So, when you wrote that, you
11   were responding to someone being sent as a
12   messenger to tell you something?
13   A    Exactly.
14   Q    Was that John Reeves?
15   A    Yes, it was.
16   Q    And he told you to return the
17   laptop, and that upset you that he was
18   being sent to do that?
19   A    Yes.  I thought they could have
20   -- no one was answering my e-mails that I
21   had sent, but then he could send somebody
22   down there as a messenger to tell me
23   something.

Page 301

1    Q    When Gabe e-mailed you on
2    November 11th, "You need to call me or
3    Brian ASAP," why didn't you call them?
4    A    I had been e-mailing them.
5    Remember I told you that I didn't want to
6    --
7    Q    Why didn't you just write him
8    back and say, "I'm not comfortable talking
9    to you on the phone.  E-mail me your
10   questions and I'll respond"?
11   A    I didn't think of that at that
12   time.
13   Q    On Tuesday, November 11th, when
14   he said that to you, that was prior to you
15   getting your termination letter, correct?
16   A    It was prior to me getting it.
17   Q    Right.  So, why would you be
18   afraid to talk to Gabe on the phone at that
19   point?
20   A    I did not -- what was the --
21   Q    Let's go back.  At that point
22   you thought your leave was approved, right?
23   A    Yes.

Page 302

1    Q    You hadn't received a letter,
2    but you thought your leave was approved.
3    You also knew that if they needed you, they
4    could call you, right?
5    A    Right.
6    Q    So, when they e-mailed you, "You
7    need to call me or Brian ASAP," did it
8    occur to you that maybe they had been
9    having trouble reaching you and they needed
10   you to take the initiative to call them?
11   A    But when did I get the e-mail?
12   When did I check my e-mail?  I'm not sure.
13   There must be some reason that I didn't
14   respond to that.  It may have been after
15   the fact.  I don't recall.
16   Q    According to -- just for the
17   record, it's what we produced as Bailey
18   versus Miltope Corp 00149.  According to
19   that piece of paper, you were e-mailed on
20   November 11th.  Do you have any reason to
21   think you didn't receive it?
22   A    No.  I'm asking what day did I
23   receive it.

Page 303

1    Q    Well, I wouldn't know that.
2    A    That's my question.  I mean, it
3    was sent on the 11th because it says that.
4    Q    Did you not check your e-mail
5    every day?
6    A    I might not have checked it.
7    That's on a Tuesday.
8    Q    According to your calendar, you
9    had returned from your Atlanta rehearsal
10   and you were tutoring Nicky and Josh that
11   day.
12   A    That's possible.
13   Q    So, wouldn't you have had time
14   to check your e-mail if that's all you were
15   doing that day?
16   A    If I was teaching that day, I
17   was at home.  So, I mean --
18   Q    And you had your laptop there,
19   right?
20   A    Well, I had a home computer.
21   Q    And you could access your work
22   e-mail from your home computer, right?
23   A    No.

Page 304

1  Q      Why didn't you just access it
2  off your laptop?
3  A      I did.
4  Q      In fact, that's what you had to
5  do to send all those e-mails you were
6  sending from home, right?
7  A      No. I could send an e-mail from
8  home, but I could not access my work e-mail
9  from my home computer.
10 Q      But you could access it from
11 your laptop?
12 A      Right.
13 Q      And you had your laptop
14 available to do that if you chose to?
15 A      I had just gotten it. I wasn't
16 real good with that laptop because -- I
17 mean, I had gone on there and -- I went on
18 there and checked some of my e-mails and
19 that kind of thing.
20 Q      Wasn't part of your job with
21 Miltope involving computer expertise to
22 manage the tracking and --
23 A      Inventory.

Page 305

1  Q      So, you didn't --
2  A      I'm not a technician. I was not
3  a technician.
4  Q      Prior to November you had had
5  some absences from Miltope because of
6  rehearsals with the band, correct?
7  A      There might have been one or
8  two.
9  Q      According to one of your
10 e-mails, you had a rehearsal on October
11 13th, which was a Monday. Do you remember
12 that?
13 A      I don't remember it, but yes,
14 that's possible.
15 Q      And according to company
16 records, you took a vacation day that
17 Monday, the 13th.
18 A      That's possible.
19 Q      So, you don't have any reason to
20 dispute that you actually attended a
21 rehearsal that day?
22 A      No, not at all.
23 Q      Do you recall in early October

Page 306

1  2003 doing Rick and Bubba's Fast Fest at
2  Oak Mountain Amphitheater?
3  A      What's that?
4  Q      It's your e-mail. It says Rick
5  and Bubba's Fast Fest at Oak Mountain
6  Amphitheater. You wrote Derrick Welsh
7  about that. Do you remember?
8  A      No, I didn't do that. There's
9  probably a lot more to it other than just
10 what you are reading. I have never done
11 anything with Rick and Bubba. It would be
12 cool, though.
13 Q      The president says those guys
14 are dog-gone funny. I heard that on the
15 radio this morning. So, you don't recall
16 that?
17 A      No. I have never done Rick and
18 Bubba. I don't have any idea. Read that
19 whole thing, and it will probably clear
20 that up.
21 Q      Do you remember a man named
22 Danny Johnson asking you to help him get a
23 job at Miltope?

Page 307

1  A      Yes, I do.
2  Q      Did you ever discuss with Mr.
3  Crowell Danny Johnson potentially being
4  employed there?
5  A      I don't recall if I did or not.
6  I think I had mentioned that I had -- or
7  either to Brian that I had someone that --
8  I think Danny had gotten A Plus
9  certification for computers or something.
10 He had gone to school, and I had asked if
11 there were any openings and that kind of
12 thing. But I don't think anything ever
13 came out of that.
14 Q      Do you remember attending a
15 rehearsal for the band the weekend of
16 September 5th?
17 A      I think so.
18 Q      According to your work schedule,
19 you took a sick day on that Friday, the
20 5th, and a vacation day that Monday, the
21 8th.
22 A      (Witness nods head.)
23 Q      So, that would have been so you

**Page 308**

1  could handle the rehearsal with the band?
2  A      Right.
3  Q      Earlier you testified that there
4  was an e-mail where you said to Brian and
5  Gabe, "If there's anything else you need,
6  please let me know," right?  Do you
7  remember that testimony?
8  A      Yes.  That was the e-mail around
9  the time I told them that I had requested
10 the doctor's letter.  If there was anything
11 else he needed, let me know.
12 Q      This is the e-mail I found
13 (indicating).  Is that the e-mail that you
14 sent?
15         MS. LINDSAY:  For the record,
16 that's Bates stamped 152.
17 A      Right, I sent that.  Yes, I
18 remember that.
19 Q      And that was the e-mail you were
20 referring to about following up with them
21 to find out if there was anything else they
22 needed?
23 A      Yes.

**Page 309**

1  Q      Was there any other
2  communication between the 5th and the 14th?
3  A      I don't remember.
4  Q      And if there isn't a document
5  that reflects that there was a
6  communication, do you have any reason to
7  believe that we are missing documents?
8  A      Between the 5th and the 14th
9  there was communication.  There was phone
10 communication.  You know, I told you on the
11 7th that I was working with Lee.  On the
12 6th I was working with Lee.  I was talking
13 to people in Pennsylvania.  But as far as
14 is there an e-mail, I don't know.
15 Q      Let me ask a better question.
16 What I was thinking about is in terms of
17 you e-mailing Brian or Gabe about whether
18 more documentation was needed.  The only
19 two e-mails I found are November 5th and
20 November 14th.
21 A      Okay.
22 Q      So, would there be any other
23 e-mails do you think that specifically

**Page 310**

1  address that to those people?
2  A      I don't know.  I don't think so.
3         MS. LINDSAY:  I think I'm
4  probably done, but I want to look at my
5  notes.  Do you want to take a brief lunch
6  break?
7         MR. BLYTHE:  That's fine.
8         (Lunch break was taken)
9  Q      Mr. Bailey, we are back on the
10 record after lunch.  Is there anything that
11 you need to say to clarify any prior
12 answers?
13 A      Not at this time.
14 Q      I was going to ask you why Tina
15 Howell was not listed as one of your
16 witnesses on your initial disclosures.  Do
17 you know?
18 A      I didn't think about it until in
19 the middle of all this.  She can be added,
20 if you like.
21 Q      Are you going to -- do you want
22 to call her to testify if there's a trial?
23 A      I guess, yes.

**Page 311**

1  Q      Do you know if she still works
2  at Miltope?
3  A      I don't think she does.
4  Q      Do you know how I can reach her?
5  A      I may have a phone number for
6  her.  If I don't, I can probably get one.
7  Q      Would you provide that to your
8  lawyer so that can be shared with me?
9  A      Sure.
10 Q      Going back to your conversation
11 with Dee -- which I understand there was
12 just one.  Am I right?
13 A      I believe so.
14 Q      If she says that she told you
15 that your leave would have to be approved
16 by Brian Burkhead and Ed Crowell, would you
17 dispute that?
18 A      No, I wouldn't dispute it.  I
19 think when the conversation was had and she
20 told me that I would qualify, it was
21 probably more, "Well, if everything is as
22 you say it is, you probably qualify," that
23 kind of thing.  It was not that she was

(Pages 312 to 315)                                                    27

Page 312

1   saying you can be off as of -- what date do
2   you want to be off?  It wasn't set in
3   stone.  She said if everything -- let me
4   rephrase this.  I think she was saying if
5   the conditions were as I had said, then I
6   would qualify.
7   Q      You understood that she did not
8   have the authority to authorize the leave
9   on her own, right?
10  A      I wouldn't think so.
11  Q      You didn't think she had that
12  authority?
13  A      Well, I didn't really even think
14  about that at the time.
15  Q      Would you look back at Exhibit
16  10?  I wanted to call your attention to
17  where it says, "You may be considered to
18  have resigned without notice and removed
19  from the payroll."  Do you see that part of
20  the letter?
21  A      Right.
22  Q      And then he states, "Your
23  actions meet this requirement of having

Page 313

1   voluntarily resigned."  Do you see that
2   part?
3   A      Right.
4   Q      As I understood your testimony,
5   you considered this letter to fire you; is
6   that right?
7   A      Correct.
8   Q      But you understand and agree
9   with me, don't you, that this letter states
10  that according to Miltope, you voluntarily
11  resigned?  Do you understand that?
12  A      I keep reading the first line.
13  Q      Okay.  So, the word "terminated"
14  is what raises a red flag for you?
15  A      Yes.  And there is no mention in
16  the second paragraph of please contact me
17  to make arrangements to clarify your need
18  for leave or the leave you requested
19  or anything.  It says to return the
20  company's laptop.  It makes no effort to --
21  it didn't read very much like a request for
22  a clarification or anything.  It reads as a
23  termination letter, because they want

Page 314

1   strictly the computer back and no other
2   communication.
3   Q      My question is --
4   A      I took this as a direct
5   termination letter.
6   Q      And do you understand that the
7   word "termination" could include an ending
8   of employment that is not because you are
9   fired?  Let me ask a better question.
10         Do you understand that you,
11  yourself, can terminate your own employment
12  from a company?
13  A      I'm sure a person could.
14  Q      You've probably seen that in
15  handbooks before, that employment at-will
16  in Alabama means you can terminate or I can
17  terminate your employment with or without
18  cause at any time, right?
19  A      I'm not really up on that.
20  Q      Let me show you in the Miltope
21  handbook.  It says in the last paragraph,
22  "Either the employee or Miltope may
23  terminate the employment relationship at

Page 315

1   any time."  Do you see that in the last
2   paragraph?
3   A      Yeah, I see that.
4   Q      So, do you understand that to
5   mean that you would have the right to
6   terminate the relationship yourself?
7   A      I'm certain that that would
8   be -- according to that paragraph that that
9   would be the case.
10         (Defendant's Exhibit 14
11         was marked for.
12         identification)
13  Q      Let me show you Defendant's
14  Exhibit 14.  If you would, look at the
15  middle e-mail from you to Brian on November
16  17th.  Do you see that?
17  A      Right.
18  Q      This appears to me to be your --
19  to be a follow-up e-mail after you received
20  your termination letter.
21  A      Right.
22  Q      And in response to that e-mail,
23  you were asked by John Reeves to return the
24  company laptop?  Is that kind of the way

Page 316

1  you felt the events transpired?
2  A      No. I think that would be --
3  according to this other e-mail that I sent
4  to Gabe on the 18th, if I responded to
5  Brian on the 17th, that means that John
6  would not have responded to me -- or John
7  would not have told me that yet. Because
8  it says --
9  Q      Let me ask you a better
10 question. After you sent this e-mail on
11 November 17th, was that when John Reeves
12 came to see you?
13 A      What was the day of the week of
14 November 17th?
15 Q      According to your e-mail, it was
16 a Monday.
17 A      Okay. I see that now. Sorry.
18 Q      That's okay.
19 A      Maybe John did tell me -- maybe
20 it was over the weekend that they came down
21 for the boat or something and he told me
22 that. That's possible.
23 Q      I assume that no one responded

Page 317

1  to your questions that you asked in your
2  November 17 e-mail. Is that correct?
3  A      No.
4  Q      I am correct?
5  A      No one responded to me. Yes,
6  you are correct.
7  Q      No one answered these questions?
8  A      I'm trying to follow that
9  around.
10 Q      Let me try to clean up the
11 question. No one at Miltope answered the
12 questions you raised in your November 17th
13 e-mail, correct?
14 A      Yes.
15 Q      According to the chaplain notes
16 about your dad the week before your
17 September 5th rehearsal for the McQueen
18 Street show, your dad was feeling hopeless
19 and it suggested in the note that it had to
20 do with you. Was your dad against you
21 working with the McQueen Street band?
22 A      No, ma'am.
23 Q      Do you know why he would have

Page 318

1  been upset concerning you the week before
2  you went to that rehearsal?
3  A      I am an only child. My father
4  has probably three things in his life that
5  he loves and cares about. One would be me,
6  one would be my daughter, and the other
7  would be a hundred-pound black lab. And
8  I'm sure that that's why he would be
9  concerned about me.
10 Q      So, you are saying he would be
11 preoccupied with you regardless of what was
12 going on with you?
13 A      Probably.
14 Q      Have you and your dad had any
15 conflicts concerning your participation in
16 the McQueen Street, Rat Race or Cold Hard
17 Truth bands?
18 A      No.
19      MS. LINDSAY: Unless there are
20 other documents that come into play -- I
21 know we talked about this before. I don't
22 think y'all have any other documents. But
23 if some come to light, I would reserve the

Page 319

1  opportunity to ask about those. Otherwise,
2  I think I'm done.
3  EXAMINATION BY MR. BLYTHE:
4  Q      I'll just start back when we
5  were here the first time. There were a
6  couple of things that needed clarifying.
7      On the November 29th 2003
8  McQueen Street, was that the 19th or the
9  29th that that was to be played, do you
10 recall?
11 A      As I said when she asked before,
12 I somehow thought it was the 19th, but I
13 might have made a mistake. It was the
14 29th.
15 Q      And y'all played where and when?
16 A      It was a place in Montgomery
17 called Carerra's, and we played that
18 Saturday. And it was from -- we had an
19 itinerary which I'm sure is in these
20 exhibits somewhere of every place we had to
21 be that whole day.
22 Q      Was that the fundraiser for the
23 --

(Pages 320 to 323)                                                          29

## Page 320

1  A      No.
2  Q      When you played at all with any
3  of these bands, were they primarily local
4  or regional affairs?  In other words, you
5  didn't have to go very far, such as Los
6  Angeles and --
7  A      No.  In that aspect, they would
8  be local.  Because the two McQueen Street
9  shows I've done, one was in Montgomery and
10 the other was in Prattville.
11 Q      Just let me be frank.  Could you
12 support yourself by playing in a band
13 solely?
14 A      Solely?
15 Q      Yes.  I mean you and your
16 family.
17 A      Not really.
18 Q      And back with the -- and I'm
19 just following up on a question that
20 Heather had asked you.  Imposter, was it
21 ever a break-even proposition?
22 A      Never.  It was a broke
23 proposition.

## Page 321

1  Q      And you haven't made enough
2  money in the music industry to really
3  amount to anything, maybe to pay for a set
4  of drums here and there or something like
5  that?
6  A      Yeah.  But that all falls back
7  into expenses and tools.
8      MS. LINDSAY:  I feel like I
9  should object to the form of that one.  To
10 really amount to anything is kind of harsh,
11 Derrick.
12 Q      Let me move on.
13 A      So now I know how you really
14 feel.
15 Q      Tell me just briefly what your
16 work history is with Miltope, just the
17 dates and times that you went to work, left
18 work and then came back to work.
19 A      The first time I was with
20 Miltope, I had -- sometimes I was on a
21 project and I would go in to work at 6:30
22 in the morning, and sometimes I wouldn't
23 leave until 7:00 o'clock at night.  Things

## Page 322

1  were different then.  The situation was
2  different then.
3  Q      Let me interrupt you.
4  A      Please do.
5  Q      When did you go to work for
6  Miltope the very first time?
7  A      The year?
8  Q      Yes.
9  A      '96, I think.
10 Q      And when did you leave working
11 for them the very first time?
12 A      Either early '98 or late '97.
13 Q      And how long were you gone from
14 Miltope?
15 A      Three and a half years.
16 Q      And then you came back?
17 A      Right.
18 Q      What year did you come back?
19 A      2001, I think.
20 Q      And then you finished with
21 Miltope I guess the date of the letter of
22 termination, correct?
23 A      Yes.

## Page 323

1  Q      That's what I was wanting to get
2  to.  There was some reference made earlier
3  in the deposition to a time sheet for the
4  week ending November 2nd 2003 and November
5  9th 2003, and I just wanted to clarify
6  this.  Those are not your signatures on
7  these time sheets?
8  A      Right.
9  Q      On either one; is that correct?
10 A      Right.
11 Q      I just wanted to clarify that.
12 Those are actually, I believe --
13 A      Brian Burkhead signing my name.
14 Q      And he initialed beside it?
15 A      Right.
16 Q      He wasn't trying to conceal it.
17 Who is Darrell Cook, just briefly?
18 A      Darrell Cook is in the Miltope
19 information systems, MIS.  I think he may
20 be the supervisor over MIS, but I'm not
21 exactly sure.
22 Q      Did you ever receive any
23 unemployment compensation after being

| Page 324 |
|---|
| 1  terminated from Miltope? |
| 2  A       No, sir. |
| 3  Q       Any medical benefits? |
| 4  A       No, sir. |
| 5  Q       Are you currently having some |
| 6  medical problems? |
| 7  A       Financial problems, not medical |
| 8  problems. |
| 9  Q       Well, have you just recently had |
| 10 some surgeries? |
| 11 A       Yes. |
| 12 Q       If you would, briefly tell me |
| 13 what that is. |
| 14 A       The amount or -- |
| 15 Q       Just what you had done, what you |
| 16 had performed. |
| 17 A       ACL reconstruction. |
| 18 Q       For us nonmedical people, that's |
| 19 your knee, correct? |
| 20 A       Anterior cruciate ligament. |
| 21 Q       But that's your knee, right? |
| 22 A       It's the one that goes between |
| 23 the two bones of the leg, yes, the |

| Page 325 |
|---|
| 1  football-ending injury. |
| 2  Q       How much did you make at |
| 3  Miltope? |
| 4  A       I made about $15 an hour. |
| 5  Q       And that was right before your |
| 6  termination, correct? |
| 7  A       Correct. |
| 8  Q       At that time what was your job? |
| 9  A       CAV administrator, government |
| 10 property administrator. |
| 11 Q       Was that your only obligation or |
| 12 duty with Miltope? |
| 13 A       As I had said before, they were |
| 14 wanting me to add the DPA upgrade |
| 15 responsibility which would require the |
| 16 traveling and that kind of stuff, and I was |
| 17 not in a position to be able to do that. |
| 18 Q       Was that permissible under the |
| 19 contract with the Navy concerning CAV? |
| 20 A       I don't know. CAV is supposed |
| 21 to be dedicated, and the Navy supplements |
| 22 the -- or pays Miltope quarterly for that |
| 23 position to be a dedicated position. |

| Page 326 |
|---|
| 1  Q       And to your knowledge, you were |
| 2  to be solely responsible to the Navy for |
| 3  those CAV requirements; is that correct? |
| 4  A       I believe so. |
| 5  Q       So, technically any other |
| 6  assignment or delegation of duty would have |
| 7  been in violation of that contract with the |
| 8  Department of Defense? |
| 9          MS. LINDSAY: Object to the |
| 10 form. |
| 11 A       I would think so. |
| 12 Q       Did you like working at Miltope? |
| 13 A       I did. |
| 14 Q       Did you like your job? |
| 15 A       I did. |
| 16 Q       In the end, do you feel like you |
| 17 were treated unfairly? |
| 18 A       Yes, I do. |
| 19 Q       Would you have stayed there had |
| 20 none of this occurred? Would you still be |
| 21 working at Miltope today? |
| 22         MS. LINDSAY: Object to the |
| 23 form. You can answer. |

| Page 327 |
|---|
| 1  A       I can still answer? |
| 2  Q       Yes. |
| 3  A       My intention with the whole |
| 4  thing was to go home, take care of my |
| 5  father and get everything going for a |
| 6  couple of weeks. And I had even told |
| 7  Brian, "If I get things to where I can come |
| 8  back, I'll come right back. But I just |
| 9  need to be home." And it was not -- they |
| 10 had given my daddy about three months, the |
| 11 doctor said, when we were in the hospital. |
| 12 We were about three months from there when |
| 13 all this was going on. I felt I needed to |
| 14 be there and at least make sure that I was |
| 15 doing everything I could for him. |
| 16         And I told Brian of my intention |
| 17 to try to come down there and catch things |
| 18 up when I could, even though I wasn't |
| 19 getting paid, just to be able to keep my |
| 20 job. But when I got the letter and |
| 21 everything else, I felt very mistreated, |
| 22 violated, lied to, everything else. |
| 23 Q       If you were still working for |

Page 328

1  **Miltope, would it have been -- and I guess**
2  **this question should be phrased this way.**
3  **Would it have been financially possible for**
4  **you to make other arrangements to care for**
5  **your father if you were still employed with**
6  **Miltope today?**
7  A        Probably.
8  **Q        You think you could hire**
9  **someone, a sitter or someone like that?**
10 A        Yes.
11 **Q        And your father today, is he --**
12 **is he well?**
13 A        No.
14          MS. LINDSAY: Object to the
15 form. You were too fast for me.
16 **Q        On Exhibit 3, what's marked as**
17 **SR619, in the middle of that page what does**
18 **it say as reason for admission?**
19 A        Mr. Bailey is an 84-year-old
20 white male with the above-mentioned medical
21 problems, including tobacco dependency, who
22 presently (sic) initially to clinic with a
23 two to three-day history of rigors and mild

Page 329

1  to moderate cough with some associated
2  fever and chills. No knowledge of
3  vomiting, diarrhea. On arrival he was
4  noted to be hypoxic with an 02 sat in the
5  81 to 91 percent range. And I don't know
6  what that word means right there, with a
7  temperature of 100.7. Physical exam
8  revealed decreased breathing sounds at
9  right base. Subsequent chest X-ray
10 revealed right lower lobe infiltrate with
11 diffusion. He was subsequently admitted.
12 IV fluid, hydration, nebulized treatments
13 and IV --
14 **Q        Let me stop you for a second.**
15 **When he was admitted, did you understand**
16 **him to have lung cancer?**
17 A        Yes, I did.
18 **Q        And on this document does it**
19 **give a long-term prognosis for him?**
20 A        I don't know.
21 **Q        Just take a second and look at**
22 **it.**
23 A        "The Patient's long-term

Page 330

1  prognosis, as mentioned above, is poor.
2  His son wishes for no aggressive measures,
3  and this has been discussed on several
4  occasions."
5  **Q        And the very first sentence in**
6  **the discharge summary addresses the same**
7  **thing, does it not?**
8  A        "Discussion was made with his
9  son at length in regards to his poor
10 overall long-term prognosis."
11 **Q        To you, when you were discussing**
12 **this with the doctor, as he documented in**
13 **his discharge summary, what did that mean**
14 **to you about your daddy?**
15 A        That he wasn't going to be
16 around much longer. Can I elaborate on
17 that?
18 **Q        Let me move on. What is**
19 **hospice? What's its purpose or mission, as**
20 **best you know?**
21 A        To help the family and a patient
22 that is terminally ill in their last days.
23 **Q        And was your father being -- was**

Page 331

1  **he admitted to hospice care?**
2  A        Yes, he was.
3  **Q        If I told you that it was around**
4  **July 22nd 2003, would you dispute that?**
5  A        No.
6          MS. LINDSAY: It's already been
7  answered, but I won't object.
8  **Q        During this time period when you**
9  **were working and trying to care for your**
10 **father and your daughter, this is the time**
11 **period when Brian made the comment**
12 **regarding you getting married; is that**
13 **correct?**
14          MS. LINDSAY: Object to the
15 form.
16 A        Yes.
17 **Q        In regards to that comment about**
18 **you needing to get married and your, I**
19 **guess, offense to that, did Brian ever**
20 **offer any meaningful defense to that**
21 **comment?**
22          MS. LINDSAY: Object to the
23 form.

Page 332

1   Q        Go ahead and answer.
2   A        Not really.
3   Q        Now, was it easy to get in to
4   see Mr. Crowell?
5         MS. LINDSAY: Object to the
6   form. We are getting into a lot of asked
7   and answered stuff. You can answer.
8         MR. BLYTHE: I have never asked
9   that question.
10        MS. LINDSAY: It's been covered
11  in prior deposition testimony, and he's
12  gone on at length about that. If y'all
13  want to keep on going so that I can ask
14  more clarifying questions, that's fine.
15  A        No.
16  Q        Let's look at Exhibit 5. When
17  was Exhibit 5 from?
18  A        '97.
19  Q        To your knowledge, is there any
20  similar document where you agreed to
21  conform to the company policies after being
22  rehired a second time with Miltope
23  Corporation?

Page 333

1         MS. LINDSAY: Object to the
2   form.
3   A        No, sir, there is not.
4   Q        Exhibit 6. Have you ever seen
5   this particular document before these
6   depositions?
7   A        No.
8         MS. LINDSAY: I'm sorry. I
9   didn't know what Exhibit 6 was when you
10  asked that. Object to form.
11  Q        Exhibit 8. Exhibit 8 I believe
12  concerns the fax from the doctor; is that
13  correct?
14  A        Yes.
15  Q        Just before -- before I even ask
16  you these other questions, what is at the
17  bottom of that e-mail?
18  A        My cell phone number and my home
19  phone number.
20  Q        Are those numbers still good?
21  A        Yes, they are.
22  Q        Even today?
23  A        Even today.

Page 334

1   Q        And I know that Heather asked
2   you a few questions about the possibilities
3   of the fax and what could or might have
4   been. Is it also possible that Miltope
5   actually received the fax from Dr. Law?
6   A        Yes, it is possible.
7   Q        Did the lady at the doctor's
8   office indicate to you that she had any
9   trouble faxing the document?
10        MS. LINDSAY: Object to the
11  form.
12  A        No.
13  Q        Did it appear from your
14  observations that she had any problem
15  faxing the letter from the doctor's office?
16  A        No, sir.
17  Q        And then you went to a meeting
18  with Mr. Crowell. That would have been
19  about October 27th?
20        MS. LINDSAY: Object to the
21  form.
22        MR. BLYTHE: I'm just really
23  trying to clarify it. I'm talking out

Page 335

1   loud.
2   Q        What was your purpose of going
3   to meet with Mr. Crowell?
4         MS. LINDSAY: Object to the
5   form.
6   A        Can I answer now?
7   Q        Sure.
8   A        To tell Mr. Crowell that I
9   wanted to take the Family Medical Leave
10  Act.
11  Q        Did you have the paperwork with
12  you when you went?
13  A        I don't think I had it with me.
14  I was on my desk filled out.
15  Q        So, you had already filled it
16  out?
17  A        Yes, sir.
18  Q        And I know you've told us here
19  today and the other day when we were taking
20  your testimony that when you left there,
21  you were confused; is that right?
22  A        Yes.
23  Q        Why?

Page 336

1   MS. LINDSAY: Object to the
2 form, asked and answered. You can answer
3 again.
4 A    Because I knew what I needed to
5 do when I went in there. And when I came
6 out, I wasn't sure.
7 Q    So, you went in there to ask for
8 family leave?
9   MS. LINDSAY: Object to the
10 form.
11 A    I pretty much went in to tell
12 him that I needed to take family medical
13 leave.
14 Q    Did Mr. Crowell discuss your
15 duty and obligations to the company?
16   MS. LINDSAY: Object to the
17 form.
18 A    Yes, he did.
19 Q    If you had not talked to him
20 about this, would you have just went ahead
21 and taken family leave?
22   MS. LINDSAY: Object to the
23 form.

Page 337

1 A    Yes.
2 Q    And you went in there with that
3 intention?
4   MS. LINDSAY: Object to the
5 form.
6 A    Yes.
7 Q    So, would it be safe to
8 characterize this as Mr. Crowell talked you
9 out of taking the leave?
10   MS. LINDSAY. Object to the
11 form. Are you going to lead him a lot
12 more?
13   MR. BLYTHE: I'm trying to just
14 get us through.
15   MS. LINDSAY: It's already been
16 covered. Object to form. You can answer.
17 A    Yes, I feel like he talked me
18 out of it.
19 Q    On that Monday that you were out
20 with your daughter, did you call Miltope?
21 A    The Monday I was out with myself
22 for being up all night with a flat tire.
23 She was at school. And yes, I did call

Page 338

1 Miltope.
2 Q    And did you keep calling until
3 you got a person?
4 A    I got Brian's voice mail. She sent me to
5 called Shelly's number. She sent me to
6 Darlene. I talked to Tongie, and Tongie
7 finally got me to Darlene and I explained
8 to Darlene what happened.
9 Q    Did you also send an e-mail to
10 Brian about being out that day?
11 A    I'm not sure if I did that day.
12   MS. LINDSAY: If there is one, I
13 would sure like to see it.
14   MR. BLYTHE: Hold on one
15 second. For some reason I thought you gave
16 it to me.
17 A    I know there's an e-mail in
18 there.
19   MS. LINDSAY: Are you referring
20 to notes to answer the question,
21 Mr. Bailey?
22   THE WITNESS: No. I was looking
23 for a copy of that e-mail.

Page 339

1 Q    Actually, I think that it was
2 covered on -- look on Defendant's Exhibit
3 8. Look on Exhibit 8 right there, if you
4 would.
5 A    Got you.
6 Q    The one we were just talking
7 about.
8 A    All right.
9 Q    What is the very first sentence
10 in that e-mail?
11 A    "I called in both Monday and
12 Tuesday, asked you to return the call both
13 times. Still no response from you. What
14 are you trying to say? Hopefully it is
15 different than what I am hearing."
16 Q    What's the date on that e-mail?
17 A    November 5th.
18 Q    So, the Monday I just asked you
19 about would have been addressed in this
20 e-mail on the 5th; is that correct?
21   MS. LINDSAY: Object to the
22 form.
23 A    Correct.

| Page 340 |
|---|

1  **Q        Did you ever get any type of**
2  **denial from Brian about the first sentence**
3  **in this e-mail of November 5th?**
4  A        No, sir, I did not.
5  **Q        Did he ever indicate to you that**
6  **there was any untruth in this e-mail —**
7  A        No, sir, he did not.
8  **Q        Let me finish.**
9  A        I'm sorry.
10 **Q        Depicted in Defendant's Exhibit**
11 **8?**
12 A        No.
13 **Q        Did it seem proper to you on**
14 **that Monday just to leave a voice mail on**
15 **somebody's message system and tell them you**
16 **are not coming?**
17         MS. LINDSAY:  Object to the
18 form.
19 **Q        Let me rephrase the question.**
20 **Why did you call around looking for a live**
21 **human?**
22 A        Because on September 5th of that
23 year, I had sent an e-mail to Mr. Burkhead

| Page 341 |
|---|

1  to tell him that I would not be in that
2  day, and I neglected to put a subject on
3  the e-mail.  That e-mail went directly into
4  his trash file because of the way he had
5  his settings on his e-mail.  And he had
6  told me that if I was ever going to be out
7  again, I needed to try to get in touch with
8  somebody and let somebody know.
9         Well, I had sent this e-mail,
10 and it says I will not be in today.  Sydney
11 is sick, throwing up.  I am at home with
12 her.  I will get with Lee and try to get
13 com order 34704, Navy Surface Warfare
14 Center Division, out.  Call me on my cell
15 or e-mail me if you need to contact me.
16 Have fun in the new boat.  See you
17 Tuesday.  That was on a Friday.
18         And it was a big to-do at work
19 because he said he never got an e-mail from
20 me.  And I told him that I had sent it.  I
21 had to print that off from my home computer
22 to let him have it and let him find it in
23 his computer, because he was in his garbage

| Page 342 |
|---|

1  on the computer desktop.
2         MS. LINDSAY:  Can I have a copy
3  of that?  I've never seen that before.
4  A        I just found it.
5         MR. BLYTHE:  Actually, I don't
6  have a copy of it.
7  A        Neither one of y'all have it.
8         MR. BLYTHE:  I would like to go
9  ahead and enter that as Plaintiff's Exhibit
10 1.
11         (Plaintiff's Exhibit 1
            was marked for
            identification)
12
13 A        So, I did not want to go through
14 that with him.  I wanted to speak to
15 somebody to avoid any problems with that,
16 because he could have had the same problem
17 with the voice mail.
18 **Q        Were you still in communication**
19 **with your supervisor and Miltope employees**
20 **up and until the time you received that**
21 **termination letter?**
22         MS. LINDSAY:  Object to the
23 form.

| Page 343 |
|---|

1  A        I was in touch with some
2  employees.  I had been sending e-mails to
3  employees that were my superiors that I
4  received no response from.  And I had also
5  cc'd Mr. Crowell on every one of those I
6  sent to Brian and Gabe.  No response from
7  him either.
8  **Q        So, this entire time that you**
9  **were sending e-mails to work from the**
10 **November 5th date on, those were also going**
11 **to Mr. Crowell, is that what you are**
12 **telling me?**
13 A        Some of them had courtesy cc's
14 to Mr. Crowell.  Some of them had them to
15 Gabe and Mr. Crowell.  Some of them -- I
16 don't think I sent anything just to Brian.
17 **Q        So, it would be safe to say that**
18 **you made sure there was more than one**
19 **person in any given situation that knew**
20 **what your situation was and you were**
21 **communicating with several people at one**
22 **time?**
23         MS. LINDSAY:  Object to the

Page 344

1   form.
2   A       Yes, sir.
3   Q       Now, when you actually got the
4   medical family leave paperwork -- let me
5   back up.
6           What did you do as far as
7   preparing to get family leave?
8           MS. LINDSAY: Object to the
9   form.
10  Q       What was the first step?
11  A       What was the first step?
12  Q       Yes.
13  A       I mentioned it to somebody, and
14  they told me I needed to -- I think Gabe
15  and Brian told me I probably needed to talk
16  to Ed. And I had said something to someone
17  who sent Dee over to see me. I don't
18  remember calling Dee and asking her to come
19  over. I remember her walking by and I
20  might have just asked her in passing.
21  Q       Dee who?
22  A       Coulter.
23  Q       And what was her job?

Page 345

1   A       She was the human resources
2   benefits coordinator. I think that's what
3   her title was.
4   Q       Is that who you got the
5   paperwork for the family leave from?
6   A       Yes.
7   Q       What did you do with the
8   paperwork?
9   A       I filled it out and put it on my
10  desk.
11  Q       Now, at this point after your
12  meeting with Mr. Crowell and it became
13  apparent that you needed to leave, what did
14  you do to facilitate that?
15  A       Called --
16          MS. LINDSAY: Object to the
17  form.
18  Q       Who did you call?
19  A       I called my supervisor and asked
20  him to turn the paperwork in. And if there
21  was anything else he needed, let me know.
22  Q       So, you actually spoke to him?
23          MS. LINDSAY: Object to the

Page 346

1   form. You are leading him.
2   Q       How did you communicate with
3   him?
4   A       I talked to him on the phone
5   that time.
6   Q       Did you follow this up with any
7   other form of communication?
8           MS. LINDSAY: Object to the
9   form. I feel like we are going through the
10  same old process again.
11  A       This is just a brief synopsis of
12  the --
13          MS. LINDSAY: I object to
14  redoing the testimony that's already in
15  place. Go ahead. You can answer. You are
16  just covering ground already covered.
17  A       I sent e-mails asking was there
18  anything else we needed, and I was in
19  contact with Lee Butler doing some work
20  with him, that kind of stuff.
21  Q       Did Brian, Ed or Gabe ever pick
22  up the phone and call you?
23  A       Not to my knowledge.

Page 347

1   Q       In fact, during this whole time
2   period you were still working even from the
3   doctor's office using your cell phone,
4   using e-mail from home and other things; is
5   that correct?
6           MS. LINDSAY: This is all
7   leading. Object to form. Go ahead. You
8   can answer the question.
9   A       Yes.
10          MS. LINDSAY: Are you going to
11  help me pay for the court reporter's time,
12  by the way?
13  Q       Did you perform work for Miltope
14  after November 3rd?
15  A       Yes.
16  Q       How about after November 5th?
17  A       Yes.
18  Q       The CAV codes. To your
19  knowledge, would there be any reason for
20  Brian or Gabe to know that you actually
21  gave the codes or passwords to Lee?
22          MS. LINDSAY: Object to the
23  form.

**Page 348**

1  Q      Go ahead.
2  A      Not unless Lee told them after
3  that point.
4  Q      I mean, there's no set up
5  operating procedure or anything --
6        MS. LINDSAY: Object to the
7  form.
8  Q      -- for conveying those
9  passwords?
10  A      No.
11        MS. LINDSAY: Object to the
12  form.
13  Q      Do you have any reason to
14  believe that Lee would conceal the fact
15  that you gave the passwords to him?
16  A      No.
17        MS. LINDSAY: Object to the
18  form.
19  Q      On the calendar, there were some
20  questions earlier about the November 3rd
21  entry.
22  A      Yes.
23  Q      Is it possible that you did, in

**Page 349**

1  fact, perform some work for Miltope that
2  day?
3  A      Yeah. I mean, I would have done
4  some stuff at home. I was trying to do
5  stuff at home. As far as did I make it to
6  work, no. That would just have been a
7  mistake.
8  Q      Now, as far as you are concerned
9  in this story, when did you effectuate
10  turning in your paperwork?
11        MS. LINDSAY: Object to the
12  form.
13  A      That Wednesday when I saw my
14  father sick. I knew I had to get him
15  taken care of and I had to get him to the
16  doctor. And I just -- there was no way
17  that I could do what I thought I could do.
18  I had to -- I had to get things under
19  control. And the only way to do that would
20  have been to take the leave.
21  Q      And when did you set the wheels
22  in motion for that?
23        MS. LINDSAY: Object to the

**Page 350**

1  form.
2  A      The Wednesday when I asked Brian
3  to turn the paperwork in.
4  Q      I notice in Defendant's Exhibit
5  13 there were several communications from
6  Gabe or at least a communication from Gabe
7  concerning the laptop.
8  A      Yes.
9  Q      Did his communication in any way
10  address the previous communication from
11  you?
12        MS. LINDSAY: Object to the
13  form.
14  A      That I had sent?
15  Q      Yes.
16        MS. LINDSAY: Same objection.
17  A      No.
18  Q      He just basically asked for the
19  laptop and the password; is that right?
20        MS. LINDSAY: Object to the
21  form.
22  A      Yes, much as the termination
23  letter.

**Page 351**

1        MS. LINDSAY: Object to the
2  form.
3  Q      Did it seem fair to you to have
4  some third party come to you for this
5  information rather than them addressing you
6  directly?
7        MS. LINDSAY: Object to the
8  form.
9  A      It didn't seem very
10  professional.
11  Q      Would it have been better if
12  Gabe had called you?
13        MS. LINDSAY: Object to the
14  form.
15  A      I would -- it would have been
16  better if they had answered my e-mail like
17  I asked. That would have been better,
18  because that's the way I requested the
19  information.
20        (Plaintiff's Exhibit 2
21        was marked for
21        identification)
22  Q      Tell me what Plaintiff's Exhibit
23  2 is, Pat.

(Pages 352 to 355)                                                             37

Page 352

1   A      "Mr. Crowell, I have a very
2   serious situation." It's my request to
3   have a meeting with him. It says further
4   down, "My father is very ill, and it has
5   reached the point that I need to be more
6   available to help him. Hospice does come
7   to the house now, but his needs are
8   increasing. His condition is terminal. I
9   would like to discuss my options with you."
10  Q      So, that's initially how you
11  initiated the conversation prior to the
12  October 27th meeting with Mr. Crowell; is
13  that correct?
14          MS. LINDSAY: Object to the
15  form.
16  A      Well, the one above that is the
17  second e-mail I sent requesting the
18  meeting. That was the one that actually we
19  worked from.
20          (Plaintiff's Exhibit 3
                was marked for
21              identification)
22  Q      Mr. Bailey, read Exhibit 3,
23  because we haven't beat this to death.

Page 353

1   A      This is from one of the -- oh, I
2   forgot about another responsibility. I was
3   excess inventory something or another,
4   too. I don't know what they called that.
5   I dealt with different clearinghouses
6   trying to sell scrap off. "Hi Pat. I
7   understand that you are having some medical
8   problems at home. I hope things get
9   better. Sorry to have bothered you with
10  all the messages this past week. We are
11  moving forward with the sale of the LCD
12  displays that you sent me. Again, I hope
13  things get better at home. Best regards,
14  Herb."
15  Q      Who is Herb?
16  A      Herb is the point of contact at
17  Harry Krantz, which is a clearinghouse for
18  excess inventory that we have, things that
19  are out of date that we used.
20  Q      So, there were other -- what was
21  the date of that e-mail?
22  A      November 11th.
23  Q      So, there were individuals that

Page 354

1   you worked with that were aware of your
2   situation?
3   A      Absolutely. Do you have this
4   one (indicating)?
5          MR. BLYTHE: No.
6   A      I just found some of these.
7          MS. LINDSAY: You are making my
8   job kind of hard.
9          MR. BLYTHE: I don't think it
10  shows anything except that he was doing
11  work from home.
12  A      That's come up in conversation.
13  I just found the e-mail.
14  Q      Let's mark that.
15          (Plaintiff's Exhibit 4
                was marked for
16              identification)
17  Q      What is Plaintiff's 4?
18  A      This is an e-mail that Melody
19  Orr from Mechanicsburg, Pennsylvania, NAV
20  ICP sent me discussing that order that I
21  was working on with Lee from the doctor's
22  office on the phone. It says I've
23  completed all 20 items for you -- 25 items

Page 355

1   for you. Good luck with the 1348's. I
2   know for a fact that you can get CAV from
3   any computer as long as you have the
4   correct address and user ID and password.
5   We have people in CAV that have worked from
6   home. She sent me the link, told me that I
7   could download the plug-ins. And I was on
8   dial-up is why it took so long to download
9   it. So, she gave me other people that I
10  could call if I had any problem because she
11  only works Monday through Thursday.
12  Q      Just a couple of follow-up
13  questions. How did -- and I'm asking this
14  because this has become a point of some
15  issue. How did Brian convey to you that
16  you needed to get a letter from the doctor?
17          MS. LINDSAY: Object to the
18  form, asked and answered.
19  A      He said, "You need a letter from
20  your father's doctor."
21  Q      How was that communicated to
22  you?
23  A      I think he told me that on --

Page 356

1 no. Yeah, he told me that on the phone or
2 either sent me an e-mail, one of the two.
3 I don't recall which.
4 Q      Or both?
5 A      Maybe both.
6        MR. BLYTHE: That's all I have.
7        (Short break was taken.)
8 EXAMINATION BY MS. LINDSAY:
9 Q      Mr. Bailey, we are back on the
10 record. I have some follow-up questions
11 for you. We've talked about what your
12 impression was when your father saw a
13 doctor in July 2003 regarding his
14 pneumonia. Do you remember that testimony?
15 A      Yes.
16 Q      As I understood that testimony,
17 you heard him say that there was a tumor.
18 Do you recall that?
19 A      A mass.
20 Q      A mass. And because of your
21 mother's untimely death from cancer, you
22 were thinking the worst, correct?
23 A      Well, he gave my mother --

Page 357

1 excuse me. Gave my father three months or
2 so to live. So, yes, I thought the worst.
3 Q      Your prior testimony was that he
4 told you he had three to six months if it
5 was malignant.
6 A      He said three to six months. He
7 didn't say anything about malignant.
8 Q      And you have reviewed with me,
9 I'm sure you'll recall, the documents that
10 establish that there was no malignancy
11 detected in July 2003, correct?
12 A      Some of that paperwork I only
13 saw and knew what any of it meant after the
14 fact.
15 Q      The doctor never said your dad
16 had lung cancer, correct?
17 A      He said he thought it was
18 cancer. And he wasn't even sure, since the
19 pneumonia was that bad, that he would even
20 make it home, much less worry about the
21 cancer getting him. He said the reason not
22 to do this invasive of a procedure would be
23 that we don't know if his cancer will get

Page 358

1 him before his general poor health will.
2 Q      Why would the doctor have put in
3 the notes that he was released in stable
4 condition, if that was the case?
5 A      He was doing better. I mean,
6 this was early in the scenario. He was in
7 there 12 days. So, in the very beginning
8 things did not look very good for him at
9 all.
10 Q      But he managed to recover from
11 the pneumonia and was released to get into
12 physical therapy at Chapman, right?
13 A      Correct.
14 Q      And ultimately he recovered
15 entirely based on the 11/06/03 visit in
16 that report, right?
17 A      Recovered from the pneumonia.
18 Q      And at that time you were
19 reassured that there actually wasn't any
20 cancer, correct?
21 A      No. I didn't know for a fact
22 there was no cancer at all until the CAT
23 scan that was done in November of '04,

Page 359

1 which would have been over a year later,
2 because he had come off of hospice.
3 Q      Were you surprised that your
4 father was still apparently doing fairly
5 well considering your belief that he had
6 lung cancer?
7 A      Yes, I was.
8 Q      He was still able to feed
9 himself, as you told me before, right?
10 A      Yes.
11 Q      He was still able to attend to
12 his basic needs if you were not there,
13 correct?
14 A      Some of them, yes.
15 Q      Before you told me that he was
16 able to tend to those needs so that you
17 were free to go to those band practices.
18 A      Yes.
19 Q      You didn't feel bad about that,
20 right?
21 A      I mean, could he pay bills?
22 No. Not that kind of thing. He couldn't
23 do stuff like that. As far as eat, take a

Page 360

1   bath at that point in time, yes, he could.
2   **Q       You took care of his finances,**
3   **right?**
4   A       Yes.
5   **Q       And you testified earlier about**
6   **your inability to support your family on**
7   **the income from your bands.**
8   A       Right.
9   **Q       And I suppose, then, that your**
10  **father receives some income based on his**
11  **status as a veteran and his --**
12  A       Right.
13  **Q       And he probably receives social**
14  **security?**
15  A       Right.
16  **Q       And he receives veteran's**
17  **benefits?**
18  A       Right.
19  **Q       So, you manage all that income**
20  **for him and pay the family bills, right?**
21  A       Correct.
22  **Q       So, your father's income**
23  **supports you, Sydney and him, correct?**

Page 361

1   A       Right.
2   **Q       And that's been true for several**
3   **years now, right?**
4   A       Several is a bad way to put it.
5   No, it's not been several years.
6   **Q       Has it been true since you**
7   **stopped working at Miltope?**
8   A       I had to be approved by the
9   Veterans Administration to care for him.
10  So, it was several months after I worked at
11  Miltope.
12  **Q       Didn't you have that approval**
13  **prior so that you could get that medication**
14  **that you were trying to --**
15  A       No.  He's had veteran's benefits
16  since he retired from the Marine Corp in
17  1968 and has always gotten his medicines
18  through the VA pharmacy.
19  **Q       What type of approval process**
20  **are you referring to?**
21  A       I had to meet with the veteran's
22  representative in Alexander City and submit
23  paperwork to be approved to help him take

Page 362

1   care of his basic needs.
2   **Q       When you say that, you are**
3   **saying you were being approved to receive**
4   **access to the veteran's benefits, the**
5   **financial benefits?**
6   A       No.  I have power of attorney
7   over my dad's affairs now and have had for
8   a couple of years.
9   **Q       When did that begin?  Was that**
10  **after you left Miltope that you got the**
11  **power of attorney?**
12  A       No.  I had it before that.
13  **Q       Then what special approval**
14  **process were you required to go through?**
15  A       Aide in attendance is what it's
16  called.
17  **Q       Pardon?**
18  A       Aide in attendance.  His -- go
19  ahead.
20  **Q       After that approval was given to**
21  **you, what did you have the power to do that**
22  **you didn't have the power to do before?**
23  A       I was able to take care of my

Page 363

1   father.
2   **Q       What does that mean, take care**
3   **of your dad, as far as the Veteran's**
4   **Administration is concerned?**
5   A       Well, you know, hospice is
6   licensed care, that kind of thing.  I
7   wanted to be able to take care of him.
8   **Q       Did you receive any special**
9   **training from the Veteran's Administration**
10  **on how to take his vital statistics?**
11  A       No.  But I've learned how to do
12  that.
13  **Q       You learned that from hospice?**
14  A       I have a machine that takes his
15  blood pressure and he has a nebulizer for
16  his breathing treatments.
17  **Q       And do you have CPR training?**
18  A       I have had it.  I probably am
19  not certified right now.  But if I had to
20  administer it, I could.
21  **Q       What special status do you have**
22  **with the Veterans Administration as a**
23  **result of this approval?  Are you able to**

40                                                              (Pages 364 to 367)

| Page 364 | Page 366 |
|---|---|

**Page 364**

1  use money on his behalf that the Veterans
2  Administration pays to him?
3  A       It's just to allow me to be able
4  to stay home with him.  It helps supplement
5  the income to allow me to stay home with
6  him rather than him be put in a government
7  facility.
8  Q       What paperwork did you have to
9  submit to get that approval?
10  A       I would have to go back and look
11  at the records from the files that we sent
12  in.
13  Q       What did you have to prove to
14  them about yourself to get that approval?
15  A       I don't know.  I mean, we would
16  have to talk to the veteran's
17  representative.
18  Q       Did they have the power to put
19  him in an assisted living facility without
20  your consent?
21  A       No, probably not.  But it was
22  just -- I don't know how to answer what you
23  are asking.  If I knew where you were

**Page 366**

1  A       I'm not sure when we applied for
2  it.
3  Q       Are there records that exist
4  that would show us that?
5  A       Probably so.
6  Q       Although there is not before us
7  a similar document from 2001 that shows you
8  signed off on receiving the handbook, you
9  did agree to conform to all Miltope
10  policies, correct?
11  A       It says in the last statement in
12  the handbook -- where is the handbook?
13  Q       It's here (indicating).
14  A       Read the last sentence in the
15  handbook.
16  Q       "I have read the handbook and
17  agree to conform to the rules of Miltope
18  Corporation."  That's what's on the
19  acknowledgment.  Is that what you are
20  talking about?
21  A       No.  On the last page of the
22  book itself.
23  Q       That is the last page of my

**Page 365**

1  going, I could probably have a better
2  chance to answer that question.
3  Q       I'm just confused about why you
4  needed some special approval from the
5  Veterans Administration if you already were
6  able to manage his financial affairs and
7  you already knew how to handle taking care
8  of his vital statistics and measurements.
9  I don't understand what else you would need
10  from the Veterans Administration.
11  A       I guess the okay, them saying
12  it's okay.  I don't know.
13  Q       And as a result of their okay,
14  did they give him a greater amount of
15  money?
16  A       There is an increased benefit
17  for that.
18  Q       How much does he receive every
19  month?
20  A       I would have to go look at the
21  records.
22  Q       And you applied for that
23  increased benefit in November of 2003?

**Page 367**

1  book.
2  A       Does it not say something in
3  there about Miltope reserves the right to
4  change any of these without notice?  So, I
5  don't know if it was the same book that I
6  would have gotten the second time or not.
7  Q       My question is you agreed to
8  conform to the policies to the extent you
9  understood them?
10  A       Okay.  That's fair.
11  Q       And you understood what the
12  policies were in 1996, '97, correct?
13  A       For the most part.  I had not
14  had to refer to them.
15  Q       But you had had access to them
16  and you still had access to them, right?
17  A       Yes.
18  Q       And there was never a time you
19  had a question about a policy that you
20  couldn't get answered, right?
21  A       Probably not.
22  Q       I thought on September 5th,
23  based on your rehearsal schedule, that you

Page 368

1  were rehearsing for the McQueen Street
2  reunion show. Am I wrong?
3  A     I don't know.
4  Q       There was a September 5th e-mail
5  that your lawyer designated as Plaintiff's
6  Exhibit 1 indicating that you sent an
7  e-mail to Brian saying that Sydney was
8  throwing up and you had to stay home.
9  A     Okay. And what did that
10 rehearsal schedule say?
11 Q       According to other e-mails, that
12 was a rehearsal weekend.
13 A     Okay. If I was gone to
14 rehearsal, how could I have sent an e-mail
15 from my house.
16 Q       That's my question to you, sir.
17 A     I'm asking.
18 Q       Sir, I'm the one who is trying
19 to ask the questions to know your
20 situation, because I didn't live these
21 events.
22        MR. BLYTHE: Let me go off the
23 record for a second.

Page 369

1     (Discussion held off the record)
2  A     I don't know.
3  Q       So, you don't know how to
4  explain that. All right.
5        You wouldn't have lied to Brian,
6  would you? You weren't trying to hide that
7  you were involved in this band, were you?
8  A     No, no, no.
9  Q       The sign-in sheets that you were
10 shown earlier for weeks ending 11/2 and
11 11/9, you testified that those were not
12 your signatures on those sheets. Do you
13 remember that testimony?
14 A     Yes, I do.
15 Q       And I believe we've looked at
16 those sheets together before, and I just
17 want to make sure I understood you
18 correctly. You don't dispute what's listed
19 on those sheets in terms of your time,
20 right?
21 A     No.
22 Q       I'm correct?
23 A     Yes.

Page 370

1  Q       In your testimony we've gone
2  over these documents a couple of times, and
3  I'm confused. This is Exhibit 6. You see
4  that it says Miltope on it, right?
5  A     Right.
6  Q       And you see that it appears to
7  be forms that one would fill out for family
8  medical leave, right?
9  A     It says physician's
10 certification for family medical leave.
11 Q       That's the first page of that
12 exhibit?
13 A     Yes.
14 Q       What's the next page?
15 A     Request for family medical
16 leave.
17 Q       And what's the third page?
18 A     Employee acknowledgment.
19 Q       Are you trying to say that you
20 never saw page one of that exhibit when Dee
21 Coulter gave you those materials?
22 A     I don't recall seeing page one.
23 Q       Did you see page two and page

Page 371

1  three?
2  A     I don't see page numbers on
3  them.
4  Q       I'm just talking about the
5  exhibit itself. Did you see the other
6  pages within that exhibit?
7  A     I saw this and filled that out
8  (indicating), and I saw this (indicating)
9  and filled that out. Wait a minute. I
10 signed that. And it said leave to start,
11 and I put immediately.
12 Q       Those are the --
13 A     This doesn't really look like
14 the same thing I saw. Have they had a form
15 change since I did this?
16 Q       Someone represented to me that
17 those were the forms that were given to
18 you. But you are telling me that you think
19 it might be different?
20 A     Well, it's possible. Do they
21 have the forms that I -- don't ask her
22 questions.
23 Q       They don't. And if you had a

Page 372

1  copy of them, I would love to see what you
2  filled out. But you don't have a copy,
3  correct?
4  A      No.
5  Q      Was there anything else that you
6  filled out other than the two pages that
7  you just talked about?
8  A      I don't think so.
9  Q      I've heard you testify to having
10  some e-mail communications. And as I
11  understand your testimony, you came to a
12  point where you only e-mailed Gabe and
13  Brian and you wanted them to e-mail you
14  back?
15  A      No.
16  Q      You did not want to discuss
17  things by telephone?
18  A      Right.
19  Q      Did this preferred approach on
20  your part in terms of e-mail communication
21  begin as of November 5th?
22  A      I'm not sure of the exact date
23  that it began. But when I could get no one

Page 373

1  to give me any straight answers, the
2  answers or any communications that I got at
3  that point I wanted in writing.
4  Q      As I understand it, you did have
5  a phone conversation with Brian on November
6  5th.
7  A      That was me asking or telling
8  him to turn the paperwork in.
9  Q      I'm just asking you did have a
10  phone conversation, yes or no.
11  A      Yes, on the 5th.
12  Q      Was that the last phone
13  conversation you had with Brian?
14  A      I think so. The next thing I
15  got from Brian was an e-mail telling me
16  that I need a letter or a --
17  Q      All I need is a yes or no.
18  A      I'm not sure. I don't remember
19  if it was an e-mail or a phone call.
20  Q      According to this Exhibit 8,
21  there is an e-mail from you to Brian saying
22  you have requested a letter from the
23  doctor. Now, is it a fair assumption that

Page 374

1  you sent this e-mail on November 5th at
2  8:29 a.m. after you had that conversation
3  with Brian?
4  A      Can I see that, please?
5  Q      Sure.
6  A      Okay. This is the same Exhibit
7  8.
8  Q      Exactly.
9  A      Yes, it is fair to think that
10  this was after that.
11  Q      After that conversation with
12  Brian by phone, right?
13  A      Yeah, it would have been after
14  because it says, "I have requested a letter
15  from the doctor detailing my father's
16  condition to satisfy the approval for
17  leave. I will forward it to your attention
18  when I receive it."
19  Q      Based on your testimony and your
20  e-mails, I believe that was the last
21  telephone conversation you had with any
22  management employee at Miltope. Am I
23  right?

Page 375

1  A      That's possible.
2  Q      If your testimony reflects that
3  that's accurate — I mean, your memory is
4  not the same as it was last time. It's
5  important that I understand what your
6  communications were, and this is my chance
7  to find out. Can you be more certain?
8  A      I think that is the last phone
9  conversation I had with management.
10  Q      As far as your e-mails, as I
11  understand it, Exhibits 8, 13 and 14
12  reflect all of your e-mail communications
13  that would have been directed to either Ed
14  Crowell as a cc or directly to Brian
15  Burkhead or directly to Gabe Riesco. Can
16  you look at these and tell me whether
17  there's anything else? Because if there's
18  anything else, I need to see it today.
19  A      I think so.
20  Q      You have e-mails with you that
21  you've referred to during this deposition.
22  Are there other e-mails in your stack?
23  A      I don't think so.

(Pages 376 to 379)

43

Page 376

1  Q    If there are and they come up
2  after today, I'm going to object to their
3  being used in this litigation because I
4  think I was entitled to see them before
5  today. So, this is your chance. Are you
6  sure?
7         THE WITNESS: Do you want me to
8  dig through and see if I can find anything,
9  or do you want to let that be it?
10        MR. BLYTHE: Flip through there
11 and see.
12 Q    Let me put it this way: You
13 don't have to flip through right now. But
14 if there's something else, I need it this
15 week.
16 A    Okay. That's fair.
17        MS. LINDSAY: And if there's
18 something else, then I reserve the right to
19 reopen.
20 Q    Based on my understanding that
21 these three exhibits represent your e-mail
22 communications to these management
23 employees, my understanding is that your

Page 377

1  final e-mail was the one sent November
2  18th, Tuesday, Gabe, could you direct any
3  communication to me.
4  A    That's not the final e-mail.
5  There were ones like that one that was
6  further down the line. There's another one
7  further out than that.
8  Q    To Gabe?
9  A    What was the date on this one
10 right here to Gabe (indicating)?
11 Q    I'm sorry. On November 19th he
12 e-mailed you. And then you e-mailed him
13 back, but there's no date on that. Do you
14 know why there's no date?
15 A    I do not.
16 Q    And this was apparently printed
17 off from your computer based on the line at
18 the top. Am I right?
19 A    Yes.
20 Q    So, in response to Gabe's
21 November 19th e-mail, according to that
22 piece of paper, you e-mailed him back. But
23 there's no date reflected as to when that

Page 378

1  e-mail occurred. Am I right?
2  A    I don't see anything on here.
3  Q    And it's your testimony that you
4  wrote that and e-mailed that to Gabe?
5  A    Yes.
6  Q    Why wouldn't there be a date on
7  there?
8  A    I don't know that.
9         MS. LINDSAY: I think that's
10 it. Thanks.
11    (Discussion was held off the record.)
12        THE WITNESS: Hang on one
13 second. Here is one thing I want to say.
14 You know the paper that you've got that
15 looks like this from the doctor's office
16 (indicating)?
17        MR. BLYTHE: It's Exhibit 3.
18        THE WITNESS: This ain't the
19 same paper. Let's see Exhibit 3 right
20 quick. What does yours say for result down
21 there?
22        MR. BLYTHE: Negative.
23        THE WITNESS: Well, mine says

Page 379

1  atypical. Why would that be?
2         MR. BLYTHE: That's 7/16, the
3  run date.
4         THE WITNESS: And this is 7/8.
5  Why does that say atypical?
6         MR. BLYTHE: You've got me.
7         THE WITNESS: Atypical means
8  what?
9         MS. LINDSAY: May I look at the
10 document you are referring to?
11        THE WITNESS: Not normal.
12        MR. BLYTHE: The comments are
13 different, too.
14        THE WITNESS: Eight days apart.
15 That's what I made my decision off of.
16 Q    (By Ms. Lindsay) When was this
17 produced to us?
18 A    I just have gone through a bunch
19 of stuff at the house. I thought that this
20 paper was the same as that paper
21 (indicating). But when we went through
22 this earlier and you read that negative for
23 malignancy, remember I told you I hadn't

Page 380

1  heard anything about malignancy?
2  Q        Right.
3  A        That's what I saw.  It says
4  atypical.
5  Q        So, people didn't use the word
6  "malignancy."  They used the word
7  "atypical" with you?
8  A        That's what that says.  Read
9  down there where it says squamous.
10 Q        Squamous epithelium are
11 identified.  Atypical group, and I can't
12 pronounce that word.
13 A        Squamous cell carcinoma is a
14 form of cancer that happens from the sun.
15 The word "squamous" when I sold insurance
16 was in the definition of cancer.  When I
17 saw squamous on there, that looks like
18 cancer to me.
19 Q        Did you ask Dr. Law if that
20 meant cancer?
21 A        I'm not sure if I did or not.
22 When I was told that my father had a mass
23 in his lung and then the doctor tells me

Page 381

1  that they went in there to try to get it
2  and couldn't get it and there was going to
3  be all this invasive surgery and everything
4  else, the --
5  Q        And you didn't want to put your
6  dad through that invasive --
7  A        He couldn't have lived through
8  it.  There was no way he could live through
9  it.  That's why we decided not to have all
10 that invasive procedure done.  Because he
11 had told me if you go in there and try to
12 get this out, it will reduce the quality of
13 life he has right now.  If we can just get
14 this pneumonia cleared out, we can get him
15 home.  He will probably have some time.
16 But he said that his long-term prognosis is
17 not good with his health the way it is, and
18 that is what was given to me.  That's what
19 hospice had and everything like that.
20 Q        So, you did receive a copy of
21 this piece of paper I'm holding while you
22 were visiting with the doctor?
23 A        No.  I got that from hospice.

Page 382

1  Q        When did you get that from
2  hospice?  What are you referring to?
3  A        I am looking at this other piece
4  of paper I was about to give you.
5        THE WITNESS:  Have you got that
6  (indicating)?
7        MR. BLYTHE:  I don't think so.
8  A        I've been doing some digging and
9  finding other stuff, too.
10 Q        Good for you.  Bad for me.
11 A        The reason I sit here and
12 torture myself over the answers is I'm just
13 trying to tell the truth.
14        MR. BLYTHE:  And that's --
15 Q        That's what we want you to do.
16 It's just that it's hard for us to manage
17 the deposition if we don't have the
18 documents in advance.
19        MR. BLYTHE:  There was something
20 else here that had me very confused.  I was
21 like what does that have to do with --
22        THE WITNE4SS:  Dogs do not bite.
23        MR. BLYTHE:  Now I understand.

Page 383

1  Q        Referring to your lab at home,
2  at Lake Martin?
3  A        Yeah, the Lake Martin lab.
4        MS. LINDSAY:  May I look at this
5  document?  This is Faith Hospice Patient
6  Information, and it's dated --
7  A        That's probably just something
8  that was in a file.
9  Q        I can't tell when it's dated.
10 Based on the appearance of the document,
11 you kept it in a three-ring binder?
12 A        I think they kept it in a
13 three-ring little paper folder with the
14 little things on it.
15 Q        And they gave you their
16 original?
17 A        That's probably the initial one
18 that they had.
19        MS. LINDSAY:  I guess what we
20 will do is make a copy of this.  Can we
21 just make this an exhibit to the record and
22 get copies of it that way?
23        MR. BLYTHE:  You can do it with



Page 384

1   that one, too, if you want to (indicating).
2        MR. LINDSAY:  We don't have to.
3   I think we've got it in the records we
4   subpoenaed.
5        (Plaintiff's Exhibit 5
         was marked for
6        identification)
7 **Q**     **The doctor did not discuss with**
8 **you this comment on Exhibit 5 that you've**
9 **shown me, the atypical squamous cells?**
10 A     There were two doctors.  There
11 was an attending physician and there was a
12 specialist.
13 **Q**     **Did either one of them explain**
14 **to you that comment?**
15 A     The one doctor told me that
16 there is a mass in his lungs.
17 **Q**     **And you've told me about that**
18 **conversation, right?**
19 A     Yeah.  That's the same old
20 conversation over and over.
21 **Q**     **And that's Dr. Law?**
22 A     Exactly.
23        MS. LINDSAY:  I'm done.

Page 385

1       MR. BLYTHE:  I don't have
2 anything else.
3
4      (END OF DEPOSITION)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 386

1      C E R T I F I C A T E
2
3 STATE OF ALABAMA )
4 JEFFERSON COUNTY )
5
6     I hereby certify that the above
7 and foregoing deposition was taken down
8 by me in stenotype, and the questions and
9 answers thereto were reduced to computer
10 print under my supervision, and that the
11 foregoing represents a true and correct
12 transcript of the deposition given by
13 said witness upon said hearing.
14
15     I further certify that I am
16 neither of counsel nor of kin to the
17 parties to the action, nor am I in
18 anywise interested in the result of said
19 cause.
20
21
       _____
       LeAnn Maroney, Commissioner
22
23